Natasha Prinzing Jones
Thomas J. Leonard
BOONE KARLBERG P.C.
201 West Main St., Suite 300
P.O. Box 9199
Missoula, MT 59807
Telephone: (406) 543-6646
Facsimile:  (406) 549-6804
npjones@boonekarlberg.com
tleonard@boonekarlberg.com

Jeffrey Keith Sandman *(PHV pending)*
WEBB DANIEL FREIDLANDER LLP
5208 Magazine St., Ste 364
New Orleans, LA  70115
Telephone: (978) 886-0639
jeff.sandman@webbdaniel.law

D. Gill Sperlein *(PHV pending)*
THE LAW OFFICE OF D. GILL SPERLEIN
345 Grove Street
San Francisco, CA  94102
Telephone: (415) 404-6615
gill@sperleinlaw.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; JFF PUBLICATIONS, LLC; ANNA LOUISE PETERSON; LYNSEY GRISWOLD; PHE, INC.; and CONVERGENCE HOLDINGS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AUSTIN KNUDSEN, in his official capacity as the Attorney General of the Stat of Montana, <br><br> Defendant. | Case No. <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs, for their Complaint, state and allege as follows:

## INTRODUCTION

1.     Despite numerous federal court decisions invalidating as unconstitutional state and federal laws seeking to regulate or ban the publication of material harmful to minors on the internet, the Montana legislature has tried yet again. S.B. 544 (the "Age Verification Act" or "Act") places substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to age-verify every internet user before providing access to non-obscene material that meets the State's murky definition of "material harmful to minors." Specifically, and in relevant part, the Act subjects to liability any "commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the internet from a website that contains a substantial portion of such material" where "the entity fails to perform reasonable age verification methods to verify the age of individuals attempting to access the material." That liability is owed to "an individual for damages resulting from a minor accessing the material, including court costs and reasonable attorney fees as ordered by the court"—making the Act enforceable, in the first instance, by private actors rather than government officials.

2.     Pursuant to 18 U.S.C. § 2201 and 2202, and 42 U.S.C. § 1983 and 1988, this action seeks declaratory and injunctive relief to vindicate rights,

privileges, and immunities secured by the Constitution and laws of the United States. The Act violates the First and Fourteenth Amendments to, and the Commerce and Supremacy Clauses of, the United States Constitution, because it impermissibly burdens Plaintiffs' exercise of their rights thereunder in myriad ways.

3.      The Act violates the First Amendment in several respects. First, it imposes a content-based burden on protected speech that requires narrow tailoring and use of the least restrictive means to serve a compelling state interest, yet it captures a substantial quantity of protected speech without accomplishing its stated purpose of protecting minors from materials they may easily obtain from other sources and via other means. Second, compelling providers of online content to place an age-verification content wall over their entire websites unconstitutionally labels them as "adult businesses," with all the negative implications and ramifications that follow. And third, by requiring the use of some particularized approval method as a condition to providing protected expression, the Act operates as a presumptively-unconstitutional prior restraint on speech.

4.      The Act violates the Fourteenth Amendment in myriad ways, too. First, because it fails to provide a person of ordinary intelligence with fair notice of to whom the Act applies, what is required, and what is prohibited, the Act is impermissibly vague, violating the procedural component of the Due Process

Clause. Second, the Act intrudes upon fundamental liberty and privacy rights without being properly tailored to serve the government's interest, thus violating the substantive component of the Due Process Clause. Third, the Act's exemption of certain news organizations draws impermissible content-based distinctions among persons engaged in free speech, violating the Equal Protection Clause.

5.      The Act also significantly burdens interstate commerce by restricting the ability of providers of online content to communicate with Montana residents. This burden is clearly excessive in comparison to the limited local benefit provided by the Act and the availability of less restrictive alternative means of protecting children from erotic content.

6.      Finally, by treating website operators as the publishers of material hosted on their websites but produced by other content providers, the Act stands in direct conflict with 47 U.S.C. § 230 ("Section 230") and is therefore preempted by that supreme federal law.

7.      This attempt to restrict access to online content is not novel. A quarter-century ago, the United States Supreme Court invalidated a federal law restricting internet communications deemed harmful to minors on First Amendment grounds in *Reno v. ACLU*, 521 U.S. 844 (1997). It did so just a few years later in *Ashcroft v. ACLU*, 542 U.S. 656 (2004). And in state after state, laws

containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional.[1]

8.   Despite this long legacy of constitutional invalidity, the Montana legislature enacted, and the governor signed into law, the Act in May 2023, rendering it effective on January 1, 2024. Now, providers (including Plaintiffs) are in the untenable position of abiding by its terms and enduring the constitutional infringement, or violating them and risking ruinous liability.

9.   As such, Plaintiffs seek to have the Act declared unconstitutional and void, and to have the Attorney General enjoined from participating in its enforcement.

### JURISDICTION AND VENUE

10.   This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C.

---

[1] *See, e.g., American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia); *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont); *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico); *ACLU v. Goddard*, Civ. 00- 0505 (D. Ariz. Aug. 11, 2004) (Arizona); *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina); *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (New York).

§ 1343(3). It seeks remedies under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65.

11.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

### I.    Plaintiffs

12.    Plaintiff Free Speech Coalition, Inc. (FSC) is a not-for-profit trade association incorporated under the laws of California with its principal place of business in Canoga Park, CA. FSC assists film makers, producers, distributors, wholesalers, retailers, internet providers, performers, and other creative artists located throughout North America in the exercise of their First Amendment rights and in the vigorous defense of those rights against censorship. Founded in 1991, the Free Speech Coalition currently represents hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected and non-obscene materials that are disseminated to consenting adults via the internet. Most of that material would fit within Montana's statutory definition of "material harmful to minors."

13.    The Free Speech Coalition sues on its own behalf and on behalf of its members to vindicate its own constitutional rights, its members' constitutional rights, and those of the members' respective owners, officers, employees, and

current and prospective readers, viewers, and customers. Both FSC and its members are harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

14.     Plaintiff Deep Connection Technologies Inc. (DCT) is a business corporation organized under the laws of Delaware with its principal place of business in San Francisco, CA. DCT operates O.school, a judgment-free online educational platform focused on sexual wellness. Andrea Barrica, O.school's founder and CEO, is a queer woman of color who has grown O.school to reach more than 25 million people globally and 4.2 million across the United States. O-school's mission is to help people worldwide improve their sexual health, power, and confidence. Previously, Barrica co-founded inDinero.com, the leading financial solution for growing startups, and served as a partner at 500 Startups, a global venture capital fund where she worked with hundreds of startup companies. Barrica was raised in a religious, conservative Filipino family that preached abstinence, and she received only fear-based sex education in public schools. Seeking support and information about sex and sexuality, Barrica was unable to find reliable resources online, leading her to launch O.school in 2017 in order to change the way people learn about sexuality. She is the author of *Sextech Revolution: The Future of Sexual Wellness*, and she is a professional speaker, having presented for TED Unplugged, SXSW, the Women in Tech Festival, UN

Women, Planned Parenthood, and others. Barrica fears that O.school contains a "substantial portion" of content that meets the statutory definition of "material harmful to minors."

15. As O.school provides critical sex education that it deems appropriate (and necessary) for older minors, DCT opposes any age-verification measure that would preclude those teens from accessing O.school's content. DCT is confused as to what constitutes "reasonable age verification methods" under the Acts and concerned about the prohibitive cost of providing complying age verification protocols.

16. DCT is harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

17. Plaintiff Charyn Pfeuffer (Pfeuffer) is a 50-year-old woman living in Seattle, WA. She has written professionally about sex and relationships for 25 years and has been creating online sexual content for three. Pfeuffer's writings have been published by sites that do not contain a "substantial portion" of "material harmful to minors" (like Refinery29, Thrillist, Fodor's The Daily Dot, Men's Health), as well as some sites that very well might (like Kinkly). She archives her written work in an online portfolio and shares it via her social media platforms. More recently, through her online video sex work, she has discovered an

endless array of fans seeking someone to speak with, including committed partners interested in exploring a particular fantasy before bringing it into their real world relationships; seniors looking for light flirtation; recently single men and women looking for consolation; psychologically isolated people (especially active-duty and former military personnel) who have been failed by traditional support systems; and those pursuing basic sexual education, including what lubricants to buy (and when to use them), how to perform oral sex, and how to talk about consent and establish boundaries. On webcam sites OnlyFans and SextPanther, much of Pfeuffer's content meets the statutory definition of "material harmful to minors."

18.     With respect to her online catalogue of writing, Pfeuffer is confused as to whether her portfolio would be considered a "website," whether she would qualify as a "commercial entity" responsible for performing her own age-verification checks, and how she is to determine whether a "substantial portion" of her writing constitutes "material harmful minors." With respect to her online sex work on webcam sites, she is confused as to whether her channel is considered a "website," whether she qualifies as a "commercial entity," and whether she is responsible for performing her own age-verification checks in a manner qualifying as a "reasonable age verification method" on a platform operated by another entity.

19.     Pfeuffer is harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

20.     Plaintiff JFF Publications, LLC (JFF) is a limited liability company organized under the laws of Delaware with its principal place of business in Broward County, FL. It has one Member, a natural person who is a citizen of Florida. JFF operates an internet-based platform at the domain <JustFor.Fans> that allows independent producers/performers of erotic audiovisual works to publish their content and provide access to fans on a subscription basis. Each producer/performer operates and maintains an individual JustFor.Fans channel, which may contain photographs or videos and permits the exchange of messages between producers/performers and fans. JFF developed and continues to enhance the software and features that drive the JustFor.Fans platform, it arranges third-party billing capabilities, and it otherwise maintains the platform. Although it develops and implements advertising and marketing plans for the platform, many of the independent producers/performers selling subscriptions on the platform implement their own marketing plans to drive customers to their specific JustFor.Fans channel. Most often, producers/performers maintain a social media presence through which they encourage their fans to purchase a subscription to

their JustFor.Fans channel, sometimes providing a direct link to the JustFor.Fans platform.

21.     JFF is confused about what constitutes a "website" (whether each performer channel, the JustFor.Fans platform, or even *other* platforms operated by JFF), confused as to what constitutes "reasonable age verification methods" under the Act and how a "substantial portion" of a "website's" content is to be measured, and concerned about the prohibitive cost of providing complying age verification protocols.

22.     JFF, as well as the performers it hosts and the 'fans' viewing those performers, are harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

23.     Plaintiff Anna Louise Peterson, Ed.D., LCPC (Dr. Peterson) is a psychotherapist who lives and operates a private practice in Missoula, Montana. She earned her Ed.D in counseling from the University of Montana and has served as an adjunct professor in the Department of Counselor Education at the University of Missoula and in the Department of Social Work at Walla Walla College. She is a member of the American Counseling Association, the Association of Lesbian, Gay, Bisexual, and Transgender Issues in Counseling, and the World Professional Association for Transgender Health.

24.     In connection with her professional work, Dr. Peterson relies on internet research on transgender issues and sexuality. She fears that, as websites block access to internet users in Montana to avoid running afoul of the Act, she will see a substantial reduction in the availability of online materials that she depends on. She is also concerned about her own privacy and objects to providing her identity to access websites that have instituted age verification protocols to comply with the Act.

25.     Dr. Peterson is harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

26.     Plaintiff Lynsey Griswold (Griswold), known professionally as "Lynsey G," is a writer, editor, and publisher who concentrates on the intersection of pornography, feminism, and sexuality. She is a co-founder of Oneshi Press—an independent publishing company based in Missoula, Montana that produces richly illustrated fantasy and sci-fi graphic novels, comics, and art books—including her own graphic novel, *Tracy Queen*, about an adult film star. Her work has appeared in Rolling Stone, Glamour, Playboy, Bitch Magazine, Refinery29, Bust, MEL Magazine, McSweeney's Internet Tendency, WHACK! Magazine, and elsewhere. She is the author of "Watching Porn," a memoir about her time as a journalist for the adult entertainment industry.

27.     As a consumer of adult content, Griswold cannot now access

numerous adult websites that no longer grant access to Montana consumers to

avoid running afoul of the Act. She is also fearful for her own privacy and objects

to providing her identity to access websites that have instituted age verification

protocols to comply with the Act. And as a writer and publisher, she is concerned

that the Act may impact her ability to sell her graphic novel online.

28.     Griswold is harmed by the Act as detailed in this Complaint. The

requested declaratory and injunctive relief will, in whole or in part, alleviate those

harms.

29.     Plaintiff PHE, Inc. (PHE) is a North Carolina Corporation doing

business as Adam and Eve, an award-winning sexual wellness retailer that owns

and operates various online stores and franchises brick and mortar stores bearing

its well-respected trademark. Through its online store at adameve.com, PHE

markets, processes payments for, and fulfills orders for adult toys, lingerie, soaps,

lubricants, candles, bath items, novelty items, and adult games. PHE also publishes

educational articles relating to sexual health and wellness on adameve.com, sells

adult videos from a second web domain devoted exclusively to DVD sales

(adultmoviemart.com), streams erotic movies on a third (adameveplus.com), and

promotes its brick-and-mortar franchise stores via a fourth site

(adamevestores.com) that provides a separate subdomain for each of its franchised

stores to offer its own store-specific information. (These subdomains are created by adding alphanumeric characters in front of the second level domain so that, for example, https://threeforks.adamevestores.com would send a user to the site for Adam and Eve's Three Forks, Montana store.)

30.     Each of the websites described above contains some material that might qualify as "material harmful to minors" under the Act, but PHE cannot determine which (if any) are out of compliance because it does not know, for example, what constitutes "the material as a whole" or how it should measure the 33 1/3% threshold under which its "harmful to minors" offerings must remain vis-à-vis its other offerings.

31.     PHE is harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

32.     Plaintiff Convergence Holdings, Inc. (Convergence) is a Montana Corporation doing business as Adam and Eve Montana. Convergence owns and operates Adam and Eve franchise stores located in Three Forks, Helena, Great Falls, Missoula, and Billings. Each of the five stores benefits from its own adamevestores.com subdomain, where PHE publishes store-specific information (like addresses and hours of operation), as well as general information applying equally across all franchise stores (like current promotions, return policies, rewards

programs, etc.). The subdomains also contain links to PHE's adult merchandise website (adameve.com), and Convergence earns royalties from those sales attributable to shoppers who arrived to adameve.com via an affiliate link posted on the franchise-specific subdomain.

33.     As Convergence does not own or operate the subdomains for its franchise stores and cannot therefore be subject to an enforcement action under the Act, it is not able to challenge the Act by violating it in order to obtain a forum in which to assert its constitutional claims as defenses. This affirmative challenge is the *only* means by which it can act to vindicate its constitutional rights in any forum, at any time. *Compare Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537 (2021) (asserting that "any individual sued under [the Texas Heartbeat Act] may pursue state and federal constitutional arguments in his or her defense").

34.     Convergence is harmed by the Act as detailed in this Complaint. The requested declaratory and injunctive relief will, in whole or in part, alleviate those harms.

## II.    Defendant

35.     Defendant Austin Knudsen is a person within the meaning of Section 1983 of Title 42 of the United States Code, and he currently serves as the Attorney General for the State of Montana. As such, he is "the legal officer of the state and shall have the duties and powers provided by law." Mont. Const. Art. VI, § 4(4).

Those responsibilities under state law are peculiarly vast and include, per Mont. Code Ann. § 2-15-501, the duties "to prosecute or defend appropriate cases in which the state or any officer of the state in the officer's official capacity is a party or in which the state has an interest" whenever "required by the public service"[2]; and "to give an opinion in writing, without fee, to the legislature or either house of the legislature, to any state officer, board, or commission . . . when required upon any question of law relating to their respective offices" (which opinion shall be "controlling unless overruled by a state district court or the supreme court").

36.     Moreover, Montana law establishes a department of justice and places the attorney general as its head. *See* Mont. Code Ann. § 2-15-2001. It is the department of justice that is responsible for the various enforcement measures authorized by the Consumer Protection Act, *see* Mont. Code Ann. § 30–14–101, *et seq.*, of which the instant Age Verification Act is but one part, *see* Mont. Code

---

[2] As was recently noted by Chief Judge Morris:

> The Montana Code fails to define the statutory phrases "required by the public service" and "in which the state has an interest." These phrases encompass "broad and abstract terms that necessarily result in deference to the superseding state official." Tyler Quinn Yeargain, *Discretion Versus Supersession: Calibrating the Power Balance Between Local Prosecutors and State Officials*, 68 Emory L.J. 95, 116 (2018). The Montana Supreme Court has interpreted the phrase "in which the state has an interest" in the context of the Attorney General's broad power to determine when to institute legal action: "as an executive officer of the State of Montana, the Attorney General determines when to prosecute or to defend cases in which the State has an interest." *W. Tradition P'ship, Inc. v. Att'y Gen. of State*, 367 Mont. 112, 291 P.3d 545, 550 (2012).

*Imperial Sovereign Ct. v. Knudsen*, 2023 WL 6794043, at *5 (D. Mont. Oct. 13, 2023).

Ann. § 30-14-159. Thus, "[t]o accomplish the objectives and to carry out the duties prescribed by this part, the department, in addition to other powers conferred upon it by this part, may issue subpoenas to any person, administer an oath or affirmation to any person, conduct hearings in aid of any investigation or inquiry, prescribe forms, and adopt rules as may be necessary that have the force of law." Mont. Code Ann. § 30-14-114.

37.     The department of justice is charged, in the first instance, with enforcing the Consumer Protection Act: "Whenever the department has reason to believe that a person is using, has used, or is about to knowingly use any method, act, or practice declared by 30-14-103[3] to be unlawful and that proceeding would be in the public interest, the department may bring an action in the name of the state against the person to restrain by temporary or permanent injunction or temporary restraining order the use of the unlawful method, act, or practice upon giving appropriate notice to that person." Mont. Code Ann. § 30-14-111. With the legislature's decision to codify the Age Verification Act within Montana's Consumer Protection Act, it is entirely foreseeable that providers of "material

---

[3] Section 30-14-103 "does not limit itself to deception-based conduct"—prohibiting "unfair or deceptive practices in commercial conduct." *Haskett v. Am. Home Centers, LLC*, 636 F. Supp. 3d 1187, 1193 (D. Mont. 2022). "An 'unfair' act or practice under the law reaches "more broadly than mere deception" to include "practices contrary to established public policy." *Id.* (cleaned up, with internal quotation marks omitted).

harmful to minors" will face direct civil enforcement actions brought by the department of justice.

38.    The Age Verification Act itself also requires that the department of justice "shall provide an annual report of enforcement actions taken under this section" and shall "provide an internet version of the report free of charge to the public" or at "a fee for paper copies that is commensurate with the cost of printing the report." Mont. Code Ann. § 30-14-159(6).

39.    Attorney General Knudson is sued for prospective relief concerning his future exercise of the foregoing powers and duties in order to prevent his subjecting the Plaintiffs and others to a deprivation of rights, privileges, or immunities secured to them by the Constitution and laws of the United States. Plaintiffs seek a declaration of the constitutional invalidity of the Act and an injunction precluding the Attorney General from participating in the enforcement of the Act in any manner.

## FACTS

### I.    Communication Over the Internet

40.    The internet is a decentralized, global medium of communication that links people, institutions, corporations, and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. The internet connects an estimated

5.39 billion people (or 68% of the world's population), and in Montana, it is estimated that 79.8% of residents are internet users.[4]

41.    Because the internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the internet or limits the ability of others to access such materials. Rather, the range of digital information available to internet users is individually created, maintained, controlled, and located on millions of separate individual computers around the world.

42.    The internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it. Unlike television, cable, radio, newspapers, magazines or books, the internet provides the average citizen and business, whether large or small, with an affordable means for communicating with, accessing, and posting content to a worldwide audience "with a voice that resonates farther than it could from any soapbox." *Reno*, 521 U.S. at 870. Although the majority of the information on the internet does not depict or describe nudity or sexual activity, such material is indeed widely available on the internet.

---

[4] *See* http://www.internetworldstats.com/stats.htm;
https://www.statista.com/statistics/184691/internet-usage-in-the-us-by-state/.

43.     An Internet Protocol (IP) address is a unique address that identifies a

connection to a device on the internet or a local network, much like a telephone

number is used to connect a telephone to other telephones. In essence, an IP

address is the identifier that allows information to be sent between devices on a

network. Internet Service Providers (ISPs) and telecommunications companies

control blocks of IP addresses, and the location of an internet connection can be

roughly determined according to the geo-location those companies assigned the IP

address associated with a connection.

44.     A Virtual Private Network (VPN) functions as an intermediary

between an individual computer and the targeted server. It hides the user's actual

public IP address and instead "tunnels" traffic between the user's device and a

remote server. Setting up a VPN is free and simple, and doing so permits users to

hide their location while browsing the web.

## II.     The Act

45.     In May 2023, the Montana legislature enacted, and Governor Greg

Gianforte signed into law, S.B. 544, codified at Montana Code Section 30-14-159

and effective as of January 1, 2024. The operative provisions of the Act are as

follows:

(1) A commercial entity that knowingly and intentionally publishes or
distributes material harmful to minors on the internet from a website that
contains a substantial portion of the material must be held liable if the entity

fails to perform reasonable age verification methods to verify the age of individuals attempting to access the material.

(2) A commercial entity or third party that performs the required age verification may not retain any identifying information of the individual after access has been granted to the material.

(3)(a) A commercial entity that is found to have violated this section must be liable to an individual for damages resulting from a minor accessing the material, including court costs and reasonable attorney fees as ordered by the court.

(b) A commercial entity that is found to have knowingly retained identifying information of the individual after access has been granted to the individual must be liable to the individual for damages resulting from retaining the identifying information, including court costs and reasonable attorney fees as ordered by the court.

(4) This section may not apply to any bona fide news or public interest broadcast, website video, report, or event and may not be construed to affect the rights of any news-gathering organizations.

(5) An internet service provider or its affiliates or subsidiaries, a search engine, or a cloud service provider may not be held to have violated the provisions of this section solely for providing access or connection to or from a website or other information or content on the internet or a facility, system, or network not under that provider's control, including transmission, downloading, intermediate storage, access software, or other forms of access or storage to the extent the provider is not responsible for the creation of the content of the communication that constitutes material harmful to minors.

(6) The department[5] shall provide an annual report of enforcement actions taken under this section. The department shall provide an internet version of the report free of charge to the public and shall charge a fee for paper copies that is commensurate with the cost of printing the report.

---

[5] "Department" means the department of justice. *See* Mont. Code Ann. § 30-14-102(2).

(7) For the purposes of this section:

(a) "Commercial entity" includes corporations, limited liability companies, partnerships, limited partnerships, sole proprietorships, or other legally recognized entities.

(b) "Distribute" means to issue, sell, give, provide, deliver, transfer, transmute, circulate, or disseminate by any means.

(c) "Internet" means the international computer network of both federal and nonfederal interoperable packet switched data networks.

(d) "Material harmful to minors" is defined as all of the following:

(i) any material that the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

(ii) any of the following material that exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated display or depiction of any of the following, in a manner patently offensive with respect to minors:

(A) pubic hair, anus, vulva, genitals, or nipple of the female breast;

(B) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or

(C) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(iii) the material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

(e) "Minor" means any person under 18 years of age.

(f) "News-gathering organization" means any of the following:

(i) an employee of a newspaper, news publication, or news source, printed or on an online or mobile platform, of current news and public interest, while operating as an employee as provided in this subsection (7)(f)(i), who can provide documentation of employment with the newspaper, news publication, or news source; and

(ii) an employee of a radio broadcast station, television broadcast station, cable television operator, or wire service, while operating as an employee as provided in this subsection (7)(f)(ii), who can provide documentation of employment.

(g) "Publish" means to communicate or make information available to another person or entity on a publicly available internet website.

(h) "Reasonable age verification methods" include verifying that the person seeking to access the material is 18 years of age or older by using any of the following methods:

(i) providing a digitized identification card; or

(ii) requiring the person attempting to access the material to comply with a commercial age verification system that verifies in one or more of the following ways:

(A) government-issued identification; or

(B) any commercially reasonable method that relies on public or private transactional data to verify the age of the person attempting to access the information is at least 18 years of age or older.

(i) "Substantial portion" means more than 33 1/3% of total material on a website, which meets the definition of "material harmful to minors" as defined by this section.

(j) "Transactional data" means a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event. Transactional data may include but is not limited to records from mortgage, education, and employment entities.

### III.   The Impact of the Act

46.   To comply with the Act, commercial websites providing content that they are concerned might meet the vague statutory definition of "material harmful to minors" may respond in one of three ways: by (1) attempting to divert all web traffic from Montana IP addresses, thus precluding *all* online visitors from this State; (2) contracting (at great expense) the services of age-verification operations to age-verify visitors to their site; or (3) declining to abide by the terms of the Act, thus risking private lawsuits. It is a Hobson's Choice they should not have to make.

#### A.   The Ineffectiveness of the Act and the Effectiveness of Alternative Means

47.   While placing overwhelming burdens on certain providers of content online, the Act will fail to accomplish its goal of protecting Montana's minors. Because the Act requires age-verification in order to access only those websites that offer "material harmful to minors" as a "substantial portion" of their total content (defined as one-third or more), minors will face no impediment to obtaining such material from websites watered down—either incidentally or purposefully in order to avoid the consequences of the Acts—with *other* content unoffensive to the sensibilities of the Montana legislature. Whether "content" percentages are measured in bytes of material, discrete web pages, seconds of video, words of a sexual nature, or some other metric, and whether they include linked material, is entirely unclear. What *is* clear is that—given enough non-

"harmful" material on a single site—even the providers of material that *is* "harmful to minors" under any definition earn a pass under the Act.

48.     Through the 33 1/3% "substantial portion" threshold, Montana appears to be the latest state to seek to exempt social media companies and search engines from the reach of its age-verification law. Ironically, however, it is these same sites that are most likely to provide a minor's first exposures to sexually explicit content. As a pair of researchers recently reported, "a higher proportion of 16- and 17-year-olds in the United Kingdom have been exposed to sexually explicit videos or pictures on social media (63%) and search engines (51%) than on dedicated pornographic websites (47%)."[6]

49.     Minors also have other routes to obtaining "material harmful to minors" over the internet, including by: (1) pursuing such material published by persons and entities in other countries beyond the jurisdiction of Montana's state or federal courts; (2) resorting to the dark web via a Tor browser to obtain material far more harmful than what is available from popular adult websites; and (3) using a VPN to create an encrypted connection between the device and a remote server operated by the VPN service in another state or country. Studies show that nearly

---

6 *See* Thurman, Neil J. and Obster, Fabian, "The Regulation of Internet Pornography: What a Survey of Under-18s Tells Us About the Necessity for and Potential Efficacy of Emerging Legislative Approaches," POLICY & INTERNET (May 15, 2021), *available at* SSRN: https://ssrn.com/abstract=3846713.

*half* of 16- and 17-year-olds have used a VPN or Tor browser and another 23% know what they are.[7]

50.     At the same time, there are alternative means available for Montana parents to address the Act's goal. The two major personal computer operating systems, Microsoft and Apple, include parental control features straight out of the box. Almost all browsers, including Google Chrome, Mozilla Firefox, Microsoft Edge, and Apple's Safari, also have parental control options. If parents want to add additional parental control features, they may easily purchase supplementary software like Bark or NetNanny or even download additional software for free, including Questodio, Kaspersky Safe Kids, FamilyKeeper, and others. These features enable parents to block access to sexually explicit materials on the Web, prevent minors from giving personal information to strangers by e-mail or in chat rooms, limit a child's screentime, and maintain a log of all online activity on a home computer. Parents can also use screening software that blocks messages containing certain words, as well as tracking and monitoring software. A parent also may restrict and observe a child's use of the internet merely by placing a computer in a public space within the home. All of these methods constitute "less restrictive means" for accomplishing the same ends.

---

[7] *See id.*

51.     Over twenty years ago, the United States Supreme Court recognized that even the parental filtering programs available at the time were less restrictive and certainly more effective than government-imposed age-verification methods. *See Ashcroft v. ACLU*, 542 U.S. 656, 666 (2002). In that case, although a credit card was required for age-verification, the Court noted that it was *still* a less effective option due to the high rate of false certification.

### B.     The Impact on Older Minors

52.     The impact of the Act and its constitutionality depends, to a significant extent, on the meaning of "material harmful to minors" under Montana law. In *Ginsberg v. New York*, 390 U.S. 629 (1968), the United States Supreme Court established an obscenity test for minors, variable as to each of its three components—whether the material appeals to the prurient, shameful, or morbid interest of minors in sex; whether the material is offensive to the average adult applying contemporary community standards with respect to what is suitable for minors; and whether material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

53.     With respect to at least the second and third components of this test— what is suitable for minors under contemporary community standards, and whether the material has serious value for minors—the variability relates to the age and maturity of the minor. There is a broad range of material that has serious literary,

artistic, political, or scientific value for at least some 16- and 17-year-olds which might legitimately be considered "harmful" to a 10-year-old. For example, materials about sexual relations, the risk of sexually-transmitted diseases, sexual health, and the enjoyment of sex certainly have serious value to many 16- and 17-year-olds in Montana (where 16-year-old minors may marry with parental consent).

54.     Because the Act apparently includes material appropriate for older minors within the scope of "material harmful to minors" that requires age verification, it is unconstitutional for the reasons set forth throughout this Complaint. Whether material is designed to appeal to the prurient interest is determined by an average person applying contemporary community standards *with respect to minors*. Whether material is presented in a "patently offensive" manner is, again, considered *with respect to minors*. And whether the material lacks serious literary, artistic, political, or scientific value is, again, considered *with respect to minors*.

55.     The Act fails to explicitly exclude material appropriate for older minors from the "material harmful to minors" for which access is conditioned upon proof of majority. Requiring persons who publish such material on the internet to place it behind an age-verification wall violates the First and Fourteenth Amendments by infringing the constitutional rights of both older minors (who are

denied access to constitutionally-protected material), and the commercial entities
that publish or distribute such material.

### C.   The Impact on All Minors

56.   Requiring age verification to access a website whose content offerings
include a "substantial portion" of "material harmful to minors" means denying
those minors access to websites whose content offerings are overwhelmingly *not*
classified as "material harmful to minors." *See* Subsection 7(i) (defining
"substantial portion" to mean "more than 33 1/3% of total material on a website").
The Act aims to preclude *all* minors from accessing even those websites offering
content, almost two-thirds of which is plainly *not* violative of the already vague
and overbroad standard defining "material harmful to minors." Conceivably,
websites like Twitter could soon find themselves falling with the ambit of these
statutes.[8]

### D.   The Impact on Adults

57.   The Act demands that, as a condition of access to constitutionally
protected content, an adult must provide a digital proof of identity to adult content
websites that are doubtlessly capable of tracking specific searches and views of
some of the most sensitive, personal, and private contents a human being might

---

[8] *See* https://www.reuters.com/technology/exclusive-where-did-tweeters-go-twitter-is-losing-its-
most-active-users-internal-2022-10-25/ (noting the growth of adult content on Twitter).

search for. Although the Act provides a cause of action to any website visitor whose identifying information is retained by the website, such provision offers cold comfort to adults who value the privacy of their search history for non-obscene pornographic material more than a speculative damages award in an era of rampant data leaks—including from websites purporting to place a premium on privacy and discretion.[9] The inevitable result is that at least some portion of Montana adults will feel the Act's chill and forego accessing this constitutionally-protected material.

### E.    The Impact on Non-Pornographic Websites

58.    Because of the Act's vagueness, cautious operators of even *non*-pornographic websites must place an age-verification content wall over their entire websites if they wish to continue communicating with Montana audiences without risking ruinous tort liability. Doing so labels them an "adult business"—resulting not only in declining internet traffic, but social stigma, lost ad revenue, and exclusion from public or private programs or curricula. If they are a website that processes payments, they may lose the ability to accept VISA, Mastercard, Amex, and other major credit cards and be forced to use third-party billing companies that

---

[9] *See, e.g.,* https://www.independent.co.uk/news/uk/crime/porn-hacker-blackmail-zain-qaiser-trial-prison-sentence-a8861236.html (discussing hacker who blackmailed porn users after they clicked on his pop-up advertisements); https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data/ (discussing Ashley Madison data breach).

charge fees up to 15% of the purchase price, rather than the 3-5% typically charged by credit card companies. They also may face difficulty purchasing business liability insurance and hiring employees. Some of the Supreme Court's leading First Amendment precedents have established the principle that the government may not compel persons to speak a particular message. *See Wooley* v. *Maynard,* 430 U.S. 705 (1977) (requiring motorists to display state's "live free or die" motto on license plate found to violate First Amendment); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc*., 515 U.S. 557 (1995) (finding First Amendment violation where parade organizers were forced to accept groups espousing contrary messages). That principle is simply incompatible with the requirement of commercial entities that find themselves on the margins of the Act's reach.

## F.   Vagueness and Overbreadth

59.    Because many of the statutory terms are vague and overbroad, the Act further restricts and chills the speech of online content providers and restricts the availability of certain material to those entitled and wishing to receive it. The Act is riddled with vague words, phrases, and requirements, including the following.

60.    The phrase "taken as a whole" in the definition of "material harmful to minors" is vague because what constitutes the "whole" is unclear in the context of the internet generally, or a particular website more specifically. Should one

consider only a specific article, certain text, or an individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked material?

61.     The phrase "substantial portion," defined as "more than 33 1/3% of total material on a website," is vague insofar as it fails to explain how "total material" is calculated. Is it by the volume of data? The number of posts? What is the proper metric to measure? Gigabytes? Character count? Number of images? Video runtime? And what about linked material? May a website avoid the problem altogether by providing a link to all the anodyne content in the local public library?

62.     The term "minor," defined as "any person under 18 years of age," is vague insofar as it fails to designate the whole from which a content provider must ascertain the average. Pursuant to the Act, whether material is designed to appeal to the prurient interest, is presented in a "patently offensive manner," or lacks serious literary, artistic, political, or scientific value is determined with respect to minors generally. Does this "minor" refer to an average 17-year-old days from an 18th birthday? Or to some hypothetical pre-teen reflecting the median sensibility across *all* minors, from infants to high school seniors? Or to some other person or position?

63.     The terms "commercial entity" and "website" lack the requisite precision demanded by the First Amendment. Because a "commercial entity"

includes every "legally recognized entit[y]" from the largest corporation down to the smallest "sole proprietorship," the Act (intentionally or otherwise) requires individual performers to implement their own age-verification protocols even when relying on another company's platform to host their content. At best, this is an inefficient and cost-prohibitive way of effecting the State's interest. At worst, it is impossible where performers do not control the code upon which the platforms are built. Compounding the problem is the lack of definitude as to what constitutes a "website" in the first place. In its simplest form, a website *can* mean a series of connected pages under a single domain name. Often, however, webpages have more complicated structures, sometimes involving multiple domain names or subdomains, links to separate but related businesses, or links to third-party content living on different servers. In failing to define "website," the Act likely captures far more speech than intended, and certainly more than is constitutional.

64.    The statutory catch-all permitting "any commercially reasonable method that relies on public or private transactional data" as a means of verifying a user's age provides no guideposts whatsoever, as "commercially reasonable" is a vague term not defined by the Act.

65.    Reference to "contemporary community standards" is vague and overbroad, due to the borderless nature of the internet. Montana is a diverse state, and the "contemporary community standards" vary widely from Missoula to

Helena to other parts of the state. But when a content provider publishes material on a website, the same material is made available in *every* Montana county. To avoid running afoul of the Act, website operators must abide by a "most prudish county" standard—restricting (in the case of minors) or chilling (in the case of adults) substantial quantities of constitutionally protected content.

66.     It is unclear what, exactly, a commercial entity must "know" or "intend" to be liable under the Acts. Must the entity merely intend to publish or distribute material that, incidentally, happens to fit the statutory definition of "material harmful to minors?" Must the entity *know* that the published material meets that definition? Must it know that the publishing website's offerings, as a whole, contain at least one-third such material? The question is of particular salience to commercial entities that publish or distribute materials on websites owned and operated by *other* commercial entities—potentially tasking the former with a duty to inventory the full array of materials offered by the latter.

### G.     The Prior Restraint (and Statutory Severability)

67.     The Act effectively requires that, before a covered commercial website may disseminate any constitutionally protected expression to a consenting adult requesting it, the website must affirmatively employ a "reasonable age verification method" on pain of express statutory liability. The requirement thus imposes a classic prior restraint on speech.

68.     Prior restraints are not unconstitutional per se, but they come to the courts bearing "a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Prior restraints arising from a government pre-approval requirement are presumptively unconstitutional because they pose the danger that any discretion exercised in connection with the approval process may become an instrument of content-based censorship that will impose a serious chill upon the willingness of affected speakers to speak. Government may not require this sort of pre-approval process unless the discretion involved in administering it—both substantive and procedural—is tightly constrained to avoid the inherent censorship dangers.

69.     With respect to those procedural safeguards, the pre-approval process must be administered so that the presumption favors allowing the expression in question; the burden must always fall on the side of disallowing the expression. Secondly, the pre-approval process must operate rapidly and without unnecessary delay. Finally, the costs of the pre-approval process, if assessed to the putative speaker at all, must also be tightly and objectively constrained so as to avoid unnecessarily burdening the expression in question.

70.     The Act imposes an unconstitutional prior restraint on the communication between covered websites and adults seeking to access them. Covered websites must employ "reasonable age verification methods" when

individuals attempt to access their expression. But even assuming that these statutory specifications suffice, nothing requires that any such methods be made available to all website operators, operate reliably with common computer software, operate for a reasonable fee, or even exist in the first place. The State of Montana may not statutorily impose a prior restraint only to leave its operation to private actors who may or may not take up the mantle—*particularly* when leaving key terms like "commercially reasonable" undefined.

71.     Included within the definition of "reasonable age verification methods" is a "digitized identification card"—ostensibly the *one* state-provided channel for the exercise of protected speech online.[10] *See* Mont. Code Ann. § 30-14-159(7)(h)(i). But the Act does not then define "digitized identification card"— much less actually provide one for citizens of the state to use—even though the Act would seem to be predicated upon the operation of *some* state-assured means of compliance. The age-verification scheme lies at the very core of the Act and depends on the State's provision of the "digitized identification card" without which the Act fails to pay the slightest lip service to First Amendment rights by outsourcing to private third parties the duty of constraining the prior restraint on protected speech.

---

[10] All other means of compliance require the participation of a "commercial age verification system." *Id.* at (7)(h)(ii).

72.     The severability of a statute is matter of state law. *See Sam Francis Found'n v. Christies, Inc.,* 784 F.3d 1320, 1325 (9th Cir. 2015) (en banc). And under Montana law, a statute may be severed even if it, like here, does not contain a severability clause. *See State v. Theeler*, 385 Mont. 471, 474 (2016). But in doing so, a court "must determine whether the unconstitutional provisions are necessary for the integrity of the law or were an inducement for its enactment." *Id.* Severance of an unconstitutional provision requires that "the remainder of the statute must be complete in itself and capable of being executed in accordance with the apparent legislative intent." *Id.* Although "the presumption is against the mutilation of a statute, if removing the offending provisions will not frustrate the purpose or disrupt the integrity of the law, [a court] will strike only those provisions of the statute that are unconstitutional." *Williams v. Bd. of Cnty. Comm'rs of Missoula Cnty*., 371 Mont. 356, 376 (2013) (internal quotation marks and citations omitted). *See also Montana Citizens for Right to Work v. Mangan*, 580 F. Supp. 3d 911, 922 (D. Mont. 2022) (performing severance analysis and concluding that Montana's Fair Notice provision "cannot be made constitutional through severance" as such severance would "frustrate the very purpose of the law").

73.     The Act cannot survive a judicial determination that the "reasonable age verification methods," ostensibly providing safe harbor, in fact fail to provide

the constitutionally sufficient channels for Plaintiffs to exercise their First

Amendment rights.

### H.    The Exception for "News-Gathering" Organizations

74.    The Act purports to exempt any "bona fide news or public interest

broadcast, website video, report, or event and shall not be construed to affect the

rights of a news-gathering organizations," defined to include employees of a

newspaper, news publication, news source of current news and public interest,

radio broadcast station, television broadcast station, cable television operator, or

wire service. Through this definition, the Act makes impermissible distinctions

among media providers—exempting any employee of chosen media while offering

no such protection to independent (non-employee) "news gatherers," or to

bloggers, vloggers (video bloggers), or podcasters whose platforms do not fit

within the definition of "news-gathering organizations."

75.    This vague exemption seeks to preserve the free speech rights of some

while trampling on the free speech rights of others who publish the same content.

While independent news gatherers receive no exemption, news websites like

Str8upgayporn.com, xbiz.com, and avn.com—which focus on the adult

entertainment industry and contain a significant amount of material otherwise

regulated by the Act—likely are not subject to the age-verification procedures. By

making this distinction among media, the Act violates the Free Speech and Free

Press Clauses of the First Amendment, and the Equal Protection Clause of the

Fourteenth Amendment.

## I.    The Invasion of Privacy Interests

76.    The Act violates the right to substantive due process as guaranteed by

the Fourteenth Amendment to the United States Constitution, as it impinges upon

liberty and privacy interests in one's own private sexual conduct. *See Lawrence v.*

*Texas*, 539 U.S. 558 (2003).

77.    Offline age-verification does not produce a ledger of age-verified

adults; one may enter an adult bookstore or sex shop merely by presenting a

license proving his or her age of majority, and the clerk need not do anything

beyond checking the date of birth and returning the ID. But age-verification over

the internet, in the manner contemplated by the Act, invites the risk, real or

reasonably perceived, that the viewer's digital "fingerprint" will be left on the

site—and not just on the website's "front door," but on every bit of digital content

examined. It's a striking invasion of privacy at a time and place when a person

legitimately expects it most. No governmental interest exists sufficient to justify

this intrusion.

**J.     The Burden on Interstate and Foreign Commerce**

78.     The Act burdens interstate commerce by impinging on communication, protected by the First Amendment, between out-of-state content-providers and Montanans in several ways.

79.     The Act effectively requires a website operator to choose between (on one hand) diverting web traffic from Montana or (on the other) making the laborious determination of whether more than one-third of its content fits the vague and overbroad definition of "material harmful to minors" and then instituting the State's required age-verification protocols. And because satellites and cellular towers do not appreciate state boundaries, residents of border towns in neighboring states might find themselves restricted from accessing certain websites or required to provide a Montana digital driver's license that they do not have.

80.     Moreover, Montana is just one of many states to impose these age-verification requirements, with more sure to follow. *See, e.g.,* Louisiana H.B. 142 (effective January 1, 2023); Utah S.B. 287 (effective May 3, 2023); Mississippi S.B. 2346 (effective July 1, 2023); Virginia S.B. 1515 (effective July 1, 2023); Arkansas S.B. 66 (effective July 31, 2023); Texas H.B. 1181 (effective September 1, 2023). With each state or locality defining "material harmful to minors" differently, requiring consideration of different community standards, and demanding different age-verification technologies and protocols, website operator

compliance becomes exorbitantly laborious, confusing, and expensive. The result

might be a total shutdown of adult websites or stringent, across-the-board age-

verification protocols affecting users from states that have *not* imposed similar

restrictions on web content. The unimpeded interstate exchange of constitutionally-

protected material clearly outweighs any one state's—including Montana's—

interests in requiring age verification to protect minors from viewing certain adult

content online.

### K.    The Express Conflict with Federal Statutory Law

81.    Under Section 230, "[n]o provider or user of an interactive computer

service shall be treated as the publisher or speaker of any information provided by

another information content provider." 47 U.S.C § 230(c)(1).

82.    Plaintiff JFF is a "provider or user of an interactive computer service"

within the intendment of the statute. *See* 47 U.S.C § 230(f)(2) (defining

"interactive computer service" to mean "any information service, system, or access

software provider that provides or enables computer access by multiple users to a

computer server, including specifically a service or system that provides access to

the Internet and such systems operated or services offered by libraries or

educational institutions."). JFF does not produce content that could plausibly be

deemed "material harmful to minors." Rather, it merely provides the platform for

other "information content providers." *See* 47 U.S.C § 230(f)(3) (defining term to

mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").

83.     In seeking to render JFF and other providers and users of "interactive computer services" liable on account of the actions of "content providers," the Act stands in direct conflict with Section 230, which expressly preempts inconsistent state laws. *See* 47 U.S.C § 230(e)(3). Article VI, Paragraph 2 of the U.S. Constitution requires that federal law take precedence in such case.

### L.     The Need for, and Nature of, the Injunctive Relief Sought

84.     The Act has placed Plaintiffs in justified fear that, if they continue to exercise their constitutional rights, they will be haled into court by any number of private individuals alleging harm cognizable under the Act that, despite the moniker, the Attorney General nevertheless participates in enforcing. Plaintiffs have no adequate remedy at law.

85.     All Plaintiffs seek an injunction precluding Attorney General Knudsen from participating in the enforcement of the Act through any action, including but not limited to the following: (i) the real or threatened representation (or supervision of such representation) in any litigation brought pursuant to that Act; (ii) the real or threatened initiation of an action (or supervision of such action) brought pursuant to Montana's Consumer Protection Act, *see* Mont. Code Ann. § 30–14–101, *et*

*seq.*, based on perceived violations of the Age Verification Act; (iii) the real or threatened issuance of subpoenas, holding of hearings, or adoption of rules regarding the Age Verification Act or perceived violations thereof; (iv) the provision of a controlling legal opinion to the Montana legislature or any state officer, board, or commission regarding a question of law concerning the Age Verification Act; or (v) the provision of the statutorily-required annual report of enforcement actions taken under the Age Verification Act.

## CAUSES OF ACTION

### COUNT 1: Violation of Free Speech Rights Secured Under the First and Fourteenth Amendments of the United States Constitution

86.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

87.    The Act violates the First Amendment (made applicable to the states through the Fourteenth Amendment) both on its face and as applied to Plaintiffs because unconstitutionally interferes with the ability to communicate constitutionally protected speech, compels speech to the detriment of Plaintiff businesses, chills speech, and imposes an unconstrained prior restraint on speech.

88.    The Act violates Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution because it is not narrowly tailored and the least restrictive means of accomplishing any compelling governmental purpose.

89.     The Act violates Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution because it is substantially overbroad.

90.     All Plaintiffs seek an injunction against the Attorney General precluding his participation in the enforcement of the Act, as articulated *infra.*

**COUNT 2: Violation of the Due Process and Equal Protection Rights Secured Under the Fourteenth Amendment of the United States Constitution**

91.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

92.     The Act violates Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment (procedural component) because it is impermissibly vague and fails to provide a person of ordinary intelligence fair notice of what is prohibited.

93.     The Act violates Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment (substantive component) because it intrudes into the private sexual conduct and proclivities of adults, thus impairing a fundamental right in a manner that is not the least restrictive means of accomplishing any compelling governmental purpose.

94.     The Act violates the equal protection provisions of the Fourteenth Amendment because, with no rational basis for doing so, it exempts certain news-gathering organizations while subjecting others to its every restriction.

95.     All Plaintiffs seek an injunction against the Attorney General precluding his participation in the enforcement of the Act, as articulated *infra*.

## COUNT 3: Violation of the Commerce Clause of the United States Constitution

96.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

97.     The Act violates Plaintiffs' rights under the Commerce Clause because it constitutes an unreasonable and undue burden on the instrumentalities of interstate and foreign commerce.

98.     All Plaintiffs seek an injunction against the Attorney General precluding his participation in the enforcement of the Act, as articulated *infra*.

## COUNT 4: Violation of the Supremacy Clause of the United States Constitution and Section 230 of Title 47, United States Code

99.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

100.    The Act violates the rights of Plaintiff JFF, a provider and user of an "interactive computer service" within the meaning of 47 U.S.C. § 230, because it effectively treats Plaintiff as the publisher or speaker of material provided by other information content providers. As 47 U.S.C. § 230(e)(3) states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent" with Section 230, the Act violates Section 230.

101.   Article VI, Paragraph 2 of the United States Constitution (Supremacy Clause) exalts the laws of the United States as "the supreme law of the land" notwithstanding "anything in the constitution or laws of any State to the contrary." Given the direct conflict between the (Montana) Act and the (federal) Section 230, the federal law must preempt the State's.

102.   Plaintiff JFF seeks an injunction against the Attorney General precluding his participation in the enforcement of the Act, as articulated *infra.*

## COUNT 5: Declaratory Judgment Act

103.   Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

104.   There is a genuine present and justiciable dispute as to whether participation in the enforcement of the Act by the Attorney General violates the Plaintiffs' rights under the U.S. Constitution and federal law, as stated in Counts 1-4.

105.   The interests of Plaintiffs, on the one hand, and the Attorney General, on the other, are real and adverse.

106.   Absent court intervention, which would resolve the dispute over the Act's lawfulness, the Attorney General will proceed with participating in the enforcement of the Acts, even though they are unconstitutional and void.

107.   All Plaintiffs seek a judicial declaration stating that the Act is unconstitutional and unenforceable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court:

A.      Permanently enjoin the Attorney General, his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction, from participating in the enforcement of the Act;

B.      Declare that the Act violates the First and Fourteenth Amendments to, and the Commerce and Supremacy Clauses of, the United States Constitution and is therefore unenforceable and void;

C.      Award Plaintiffs their reasonable costs and attorneys' and other fees pursuant to 42 U.S.C. § 1988; and

D.      Grant Plaintiffs such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all fact issues in the above-entitled case.

 DATED: May 14, 2024                    BOONE KARLBERG P.C.

                                        */s/ Natasha Prinzing Jones*
                                        Natasha Prinzing Jones
                                        Thomas J. Leonard
                                        *Attorneys for Plaintiffs*

DATED: May 14, 2024                    WEBB DANIEL FRIEDLANDER, LLP

                                       */s/ Jeffrey Sandman*
                                       Jeffrey Sandman (PHV pending)
                                       *Attorney for Plaintiffs*

DATED: May 14, 2024                    THE LAW OFFICE OF D. GILL SPERLEIN

                                       */s/ D. Gill Sperlein*
                                       D. Gill Sperlein (PHV pending)
                                       *Attorney for Plaintiffs*