Natasha Prinzing Jones
Thomas J. Leonard
BOONE KARLBERG P.C.
201 West Main St., Suite 300
P.O. Box 9199
Missoula, MT  59807
Telephone: (406) 543-6646
Facsimile: (406) 549-6804
npjones@boonekarlberg.com
tleonard@boonekarlberg.com

Jeffrey Keith Sandman*
WEBB DANIEL FREIDLANDER
LLP
5208 Magazine St., Ste 364
New Orleans, LA  70115
Telephone: (978) 886-0639
jeff.sandman@webbdaniel.law

D. Gill Sperlein*
THE LAW OFFICE OF D. GILL
SPERLEIN
345 Grove Street
San Francisco, CA  94102
Telephone: (415) 404-6615
gill@sperleinlaw.com

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; JFF PUBLICATIONS, LLC; ANNA LOUISE PETERSON; LYNSEY GRISWOLD ; PHE, INC.; AND CONVERGENCE HOLDINGS, INC.,<br><br>                                  *Plaintiffs,*<br><br>                    v.<br><br>AUSTIN KNUDSEN, in his official capacity as Attorney General of the State of Montana<br><br>                                  *Defendant.* | Case No. 9:24-cv-00067-DWM<br><br><br>**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

LEGAL STANDARD ..............................................................................................2

ARGUMENT..........................................................................................................3

   I.   Plaintiffs have alleged a plausible First Amendment claim. .........................3

     A. The First Amendment rights of adults are protected from incursion by state laws burdening speech that is obscene for minors only. ..............................3

     B. Because the Act both compels private speech and works as a prior restraint on speech, it must receive a fulsome First Amendment analysis. ...............5

     C. The Act's incursion on First Amendment rights demands strict scrutiny review. ........................................................................................................8

     D. The Act succumbs under strict scrutiny. .....................................................11

   II.   Plaintiffs have alleged a plausible substantive due process claim. .............14

     A. Each Plaintiff has standing. .........................................................................14

     B. Each Plaintiff has alleged a cognizable liberty interest.............................20

   III.   Plaintiffs have alleged a plausible procedural due process claim. ..............21

   IV.   Plaintiffs have alleged standing to raise an equal protection challenge......28

   V.   Plaintiffs have alleged a plausible Commerce Clause claim......................29

     A. The Act impermissibly regulates the activities of out-of-state websites....29

     B. The Act creates inconsistent regulation of the internet. .............................30

   VI.   Plaintiffs have plausibly alleged that Section 230 preempts the Act. .........31

CONCLUSION ....................................................................................................33

CERTIFICATE OF COMPLIANCE.......................................................................35

CERTIFICATE OF SERVICE ..............................................................................35

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis*, 143 S. Ct. 2298 (2023)......................................6

*ACLU v. Gonzales*, 478 F. Supp. 2d 775 (E.D. Pa. 2007) ..........................14

*ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999)....................................30

*ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008) .........................................14

*Alexander v. Bozeman Motors, Inc.*, 367 Mont. 401 (2012)......................19

*American Libraries Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) .30

*Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024).....15

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ............................................21

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ...................................................passim

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................2

*Book People, Inc. v. Wong*, 692 F. Supp. 3d 660 (W.D. Tex. 2023)..........27

*Boos v. Barry*, 485 U.S. 312 (1988)................................................................10

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011)................................12

*California v. Texas*, 593 U.S. 659 (2021) ......................................................19

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) ...............................16

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).................2

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) ...............................22

*Craig v. Boren*, 429 U.S. 190 (1976)........................................................15, 16

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ...............................3

*Exxon Corp. v. Governor of Maryland*, 437 U. S. 117 (1978) ...................30

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)..............................19

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992)...............10

*Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024), ...............8

*Friends of Georges, Inc. v. Mulroy*, 675 F.Supp.3d 831 (W.D. Tenn. 2023) ...................................................................................................................27

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990)................................15

*Ginsberg v. New York,* 390 U.S. 629 (1968) ............................................8, 24

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..............................18

*Healy v. Beer Inst.*, 491 U.S. 324 (1989)........................................................30

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977)..........17

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) ...........................................................................................6

*Kaahumanu v. Hawaii*, 682 F.3d 789 (9th Cir. 2012) ...............................17

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)...........................................2

*Kolender v. Lawson*, 461 U.S. 352 (1983) .....................................................21

*Krug v. Lutz*, 329 F.3d 692 (9th Cir. 2003)...................................................21

*Lawrence v. Texas*, 539 U.S. 558 (2003)........................................................20

*Lazy Y Ranch, Ltd. v. Behrens*, 546 F.3d 580 (9th Cir. 2008)..................10

*NAACP v. Button*, 371 U.S. 415 (1963) ........................................................22

*Nat'l Pork Prods. Council v. Ross,* 598 U. S. ____ (2023) ..........................30

*Niemotko v. Maryland*, 340 U.S. 268 (1951) ..................................................7

*Payan v. Los Angeles Cmty. Coll. Dist.*, 2021 WL 3743307 (9th Cir. Aug. 24, 2021).........................................................................................................17

*Postscript Enterprises, Inc. v. Whaley*, 658 F.2d 1249 (8th Cir. 1981)....17

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ....................................11

*Reliable Consultants, Inc. v. Earle*, 517 F.3d 738 (5th Cir. 2008)............17

*Reno v. ACLU*, 521 U.S. 844 (1997) ..........................................................passim

*Renton v. Playtime Theatres,* 475 U.S. 41 (1986)........................................10

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1986) .........................3

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011)............................................5

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022)....................................29

*United States v. Coil*, 442 F.3d 912 (5th Cir. 2006)....................................17

*United States v. Extreme Associates, Inc.*, 431 F.3d 150 (3d Cir. 2005)..17

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) ..................................................................................................................5, 12

*United States v. Williams*, 553 U.S. 285 (2008) ..........................................22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ...................................................................................................................29

## STATUTES

47 U.S.C. § 230 ................................................................................................32

## TREATISES

Wright & Miller, Fed. Prac. & Proc. Juris. (3d ed.)....................................15

## CONSTITUTIONAL PROVISIONS

United States Constitution - Article III.........................................1, 14, 15, 28

## INTRODUCTION

In moving to dismiss Plaintiffs' Complaint, the AG misapprehends critical aspects of both the Federal Rules of Civil Procedure and the Constitution. In brief: He invites the Court to resolve disputed questions of fact in a motion aimed at the sufficiency of the pleadings. He confuses the distinction between facial and as-applied challenges as one concerned with pleading minimums rather than remedies. He fails to appreciate the difference between *constitutional* (*i.e.,* Article III) and *prudential* (*i.e.,* "jus tertii") standing requirements and would send this Court on a detour that is wholly unnecessary to resolve the motion. And, perhaps most curiously, he denies the constitutional implications of *any* state law so long as it (1) merely regulates, but does not prohibit, the publication of constitutionally-protected and non-obscene adult content and materials, or (2) includes among its stated mission the aim to protect the sensibilities of children.

This Court should deny the AG's effort to resolve on the pleadings the critical constitutional questions that, as numerous courts have

already found, provide Plaintiffs a substantial likelihood of success fol-

lowing a trial on the merits.

## LEGAL STANDARD

"To survive a motion to dismiss,[1] a complaint must contain suffi-

cient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal

quotation marks omitted). "A claim has facial plausibility when the plain-

tiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* A

court is to "accept all factual allegations in the complaint as true and

construe the pleadings in the light most favorable to the nonmoving

party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

With respect to constitutional claims, "the distinction between fa-

cial and as-applied challenges is not so well defined that it has some au-

tomatic effect or that it must always control the pleadings and disposition

in every case involving a constitutional challenge. *Citizens United v. Fed.*

*Election Comm'n*, 558 U.S. 310, 331 (2010). Rather, "it goes to the

---

[1] Should the Court grant the AG's motion in any respect, Plaintiffs
request an opportunity to replead those dismissed claims.

breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id.*

ARGUMENT

**I.   Plaintiffs have alleged a plausible First Amendment claim.**

**A. The First Amendment rights of adults are protected from incursion by state laws burdening speech that is obscene for minors only.[2]**

Invoking the innocence of children is not, and cannot be, a magic incantation sufficient for legislatures to run roughshod over the First Amendment rights of adults. States may, of course, "pass laws that protect minors from material that is 'obscene as to youths.'" Def. Br. at 7 (citing *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975); *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1986)). But efforts to do so must not disregard the rights of *adults* who are ensnared in the net not intended for them. Even the AG's supporting cases recognize as much: *Erznoznik* facially invalidated a city ordinance prohibiting drive-in movie theaters from exhibiting films containing nudity when the screen could be seen from a public place. *See* 422 U.S. at 205, 217–18. Because "precision of drafting and clarity of purpose are essential" where

---

[2] *See* Def. Br. at 7-11.

3

"First Amendment freedoms are at stake," even attempts to protect children from adult content were doomed to fail where those "prerequisites are absent." *Id.* at 217-18. And in *Sable Commc'ns*, the Court struck down the federal ban on indecent interstate commercial telephone messages. *See* 492 U.S. 115 at 117. Although it recognized the government's compelling interest "in protecting the physical and psychological well-being of minors," withstanding constitutional scrutiny required it to "do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms" of adults. *See id.* at 126.

The AG takes a big swing when he argues that nothing short of an outright ban may constitute an impermissible "interference" with adult liberties. Because the Act "merely limits the distribution *to minors* of content that's *obscene to minors*," the argument goes, it "doesn't suppress anything" and poses no constitutional concern whatsoever. And with SB544 imposing "no limitation *at all* on the creation of obscene content," *Ashcroft* doesn't govern here. *See* Def. Br. at 8-9.

But of course the First Amendment is concerned with far more subtle (and insidious) incursions than outright bans on protected speech.

4

"The Court has recognized that the 'distinction between laws burdening and laws banning speech is but a matter of degree' and that the 'Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565–66 (2011) (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 812 (2000)). "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Id.* And if there were any doubt about the Constitution's tolerance for incidental burdens on the rights of adults, *Ashcroft* extinguished it. *See* 542 U.S. at 670 (applying strict scrutiny to statute that burdened but did not prohibit access to web content deemed "harmful to minors").[3]

## B. Because the Act both compels private speech and works as a prior restraint on speech, it must receive a fulsome First Amendment analysis.[4]

---

[3] The AG insists that because "[a]ge-verification is the statutory obligation, not an affirmative defense as in COPA, [] there's less risk that 'speakers may self-sensor rather than risk the perils of trial.'" Def. Br. at 9 (quoting *Ashcroft*, 542 U.S. at 670-71). This is a distinction without a meaningful difference. In either case, would-be speakers may be haled into court to face criminal sanction (under COPA) or ruinous liability (in SB544).

[4] *See* Def. Br. at 10-11.

The AG likewise denies that SB544 either compels speech or functions as a prior restraint on speech—each theory providing an independent basis for invalidation pursuant to the First Amendment. As to the former, it is well-settled that government compulsion of private speech is presumptively unconstitutional and draws strict scrutiny. *See, e.g.*, *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2314 (2023). And the only way to comply with a constitutionally overbroad and vague statute is for businesses like O.school that lie on the margins of its application to brand themselves inappropriate for minors and verify user ages as a prerequisite to digital entry—even though certain precocious minors are *precisely* those who stand to gain the most from access to this content. Just as *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, Inc.* involved requirements that parade organizers "alter the expressive content of their parade," *see* 515 U.S. 557, 572-73 (1995), so too does SB544 require certain *nonpornographic* website operators to do the same by

insinuating, through age-verification checks, that their contents are inappropriate for all minors.[5]

The AG likewise ignores the ways in which the Act's prescription of limited and specific "reasonable age verification methods" works as a prior restraint on speech. In all but name, the Act creates a permitting regime where approved age-checks are left exclusively[6] to a private marketplace that has not even been shown to exist—much less at prices that make the exercise of First Amendment rights financially possible. The scenario contemplated by the Act is scarcely any different than a municipal permitting ordinance referring petitioning parties *not* to any state officer but to a private party that provides and processes permit applications at its own whim and for whatever fees it decides to charge. *Cf. Niemotko v. Maryland*, 340 U.S. 268, 271–72 (1951). The First Amendment demands more.

_____

[5] Here and elsewhere, different theories of First Amendment infringement—including the overbreadth in the definition of "minor" (discussed *infra*) and the compelled speech doctrine—work together to expose the trouble with the Act.

[6] Although a "digitized identification card" is one of the few qualifying "age verification methods," Montana does not actually offer any such card. *See* Compl. ¶ 71.

7

**C. The Act's incursion on First Amendment rights demands strict scrutiny review.[7]**

The AG suggests that the Act need only survive some lesser measure of scrutiny—rational basis or what he calls "heightened" (intermediate) review—rather than the strict scrutiny that has always applied to laws burdening protected speech based on its content. Those arguments must fail.

First, he lobbies for rational basis review—relying on *Ginsberg v. New York* and the Fifth Circuit's recent application of that precedent to Texas's age-verification law regulating adult content on the internet. *See* Def. Br. at 11 (citing 390 U.S. 629 (1968) and *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 267 (5th Cir. 2024), *cert granted,* 603 U.S. ____ (July 2, 2024)). But *Ginsberg* says nothing about internet regulation, and both *Reno v. ACLU*, 521 U.S. 844 (1997) and *Ashcroft v. ACLU*, 542 U.S. 656 (2004) recognize that age verification over the internet poses unique risks compared to the in-person age verification at issue in *Ginsberg*. Those distinctions should be obvious: In-person verification poses no real risk of hacks or leaks, of being tracked or monitored, or of being forever

---

[7] *See* Def. Br. at 11-14.

linked to sensitive, controversial content. Many adults are never even asked for their identification in person; their appearance alone suffices to obtain entry. But age verification over the internet is a different beast: *All* must identify themselves to enter certain taboo spaces, and *none* are safe, actually or ostensibly, from the risks attending the creation of a digital ledger of that entrance and perusal. The *only* case to apply *Ginsberg* to internet regulation has resulted in a grant of certiorari to the Supreme Court for resolution in its October 2024 Term. *See Paxton*, 95 F.4th 263, *cert granted,* 603 U.S. ____ (July 2, 2024).

As a back-up to its call for rational basis review, the AG suggests that some intermediate "heightened" scrutiny might be appropriate under the secondary effects doctrine. He argues that "[e]ven if it makes content based distinctions, SB544 doesn't regulate the content that Entities put on their website" but rather "the secondary effects of that content on minors by requiring Entities to employ reasonable methods to ensure that those accessing age-restricted content are of age." Def. Br. at 14. To put it generously, the argument misses the mark. The *Reno* Court flatly rejected the same argument that the challenged statute worked merely as a "cyberzoning" of the internet that should be subject to intermediate

9

scrutiny. *See* 521 U.S. at 867–68 (holding that because "the purpose of the CDA is to protect children from the primary effects of indecent and patently offensive speech, rather than any secondary effect of such speech," it was a "content-based blanket restriction on speech" that "cannot be properly analyzed as a form of time, place, and manner regulation") (internal quotation marks omitted). But *Reno* wasn't laying new ground here; it has long been axiomatic that the impact of speech *on its listener* is not a "secondary" effect at all. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) ("Regulations that focus on the direct impact of speech on its audience" are not properly analyzed under *Renton v. Playtime Theatres,* 475 U.S. 41 (1986).); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation.").

Even under more deferential review, lingering questions of fact render dismissal at the pleadings stage inappropriate. *See, e.g., Lazy Y Ranch, Ltd. v. Behrens*, 546 F.3d 580 (9th Cir. 2008) (affirming denial of motion to dismiss complaint subject only to rational basis scrutiny). This case includes plenty of unresolved factual questions, including the sincerity of Montana's stated interest in protecting minors when the burden

on *adults* is so great. Regardless, deferential review is not appropriate here: Like other content-based regulations on speech, the Act is subject to—and fails to survive—strict scrutiny.

### D. The Act succumbs under strict scrutiny.[8]

Under strict scrutiny, the Act stands little chance of survival even at the *merits* stage, and certainly must survive at the *pleading* stage. Strict scrutiny demands that statutes be "narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see also Ashcroft*, 542 U.S. at 670. To pass muster, the Act must not only employ the least-restrictive means of protecting minors, *see Reno*, 521 U.S. at 874, but must actually serve that interest, *see Ashcroft*, 542 U.S. at 670, and the AG bears the burden of showing both. *Id.* at 663. Protecting children from adult content may well constitute a "compelling" state interest, but the Act is neither narrowly tailored to serve that interest nor the least restrictive means of doing so.

Start with the tailoring. Because the Act regulates only those websites whose content offerings are comprised of 1/3 (or more) "material harmful to minors," it effectively exempts search engines and social

---

[8] *See* Def. Br. at 14-15.

media—the two places children are *most* likely to encounter pornography in the first place. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011) (noting that California's law was "wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it"). In any case, a motion to dismiss is simply the wrong place to invite decisions that turn on such assessments.

Nor is the Act the least restrictive means of serving the state's purported interest. When it comes to content-based restrictions on speech, it is well established that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813; *see also Reno*, 521 U.S. at 874. And for decades now, courts have recognized the availability, affordability, and effectiveness of device-level blocking and filtering technologies that, as a parental option rather than a government mandate, pose no constitutional concerns. As the Supreme Court explained 20 years ago, "[b]locking and filtering software is an alternative that is [likely] less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them." *Ashcroft*, 542 U.S. at 666-67 (noting that "adults without children may gain access to speech they have a right to

see without having to identify themselves," and "even adults with children may obtain access to the same speech on the same terms simply by turning off the filter on their home computers").

Montana's legislatively-imposed, site-level restriction casts the same net that was found both too wide and too porous to withstand constitutional scrutiny in *Ashcroft*. In the intervening decades, that net hasn't shrunk, and the holes have grown only wider. The recent proliferation of cheap VPN programs has given children with a modicum of tech-savvy and access to Google the ability to scramble their IP address to evade a state's site-level restrictions. *See* Compl. ¶¶ 44, 49. So, too, has accessing the "dark web" become simpler than ever before, and site-level content restrictions risk diverting children to corners of the hidden internet that are *not* so restricted and which contain material far more harmful (and illegal) than what is available at an http. *See id.* Montana's failure to pursue lesser restrictions proves dispositive.

Meanwhile, in the years since COPA's constitutional challenge in *Ashcroft*, device-level restrictions have improved dramatically. Unlike site-level age screening, filters are "difficult for children to circumvent" and capable of calibration to a particular child's age and sensitivity by

13

parents. *See ACLU v. Gonzales*, 478 F. Supp. 2d 775, 789 (E.D. Pa. 2007), *aff'd sub nom.*, *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008). Today, many of these programs come preinstalled and ready to use from the moment a new computer or phone is purchased; others are free or inexpensive to download and highly customizable, offering benefits well beyond screening for sexual content. *See* Compl. ¶ 50. If Montana were truly committed to its stated mission of protecting minors, it's hard to see why it wouldn't vigorously pursue a campaign to bring device-level filters into every household.

## II.  Plaintiffs have alleged a plausible substantive due process claim.

### A. Each Plaintiff has standing.[9]

The AG does not contend that *any* Plaintiff lacks standing to assert *all* of the claims raised in this action. His challenge instead concerns the right of discrete Plaintiffs *who are properly before the Court* to vindicate discrete constitutional guarantees that, in his estimation, are too attenuated from the harm befalling those plaintiffs. But these standing concerns are *not* of the Article III variety and call instead for an optional

---

[9] *See* Def. Br. at 15-20.

"prudential" evaluation under principles of "jus tertii" standing. *See Craig v. Boren*, 429 U.S. 190, 193–94 (1976) ("[L]imitations on a litigant's assertion of jus tertii are not constitutionally mandated, but rather stem from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative."); Wright & Miller, Fed. Prac. & Proc. Juris. § 3531.9.2 (3d ed.) ("Once it is established that a party can properly ask a court to consider the validity of a governmental act, the threshold standing doctrines ascribed to Article III ordinarily should be satisfied.").

Rather than resolve the question of prudential standing, courts regularly skip right past it upon concluding that Article III dictates were satisfied. *See, e.g., FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 237 (1990); *Apache Stronghold v. United States*, 101 F.4th 1036, 1064 n.9 (9th Cir. 2024). When they do engage the prudential inquiry, courts generally look to three factors: "the relationship of the litigant to the person whose rights are being asserted; the ability of the person to advance his own rights; and the impact of the litigation on third-party interests." *Caplin*

*& Drysdale*, 491 U.S. at 624 n.3. As will become clear, those factors over-whelming counsel in favor of adjudicating all claims.

Start with the so-called "Entity" Plaintiffs. *See* Def. Br. 4-5 (assign-ing Plaintiffs to one of three groups). For at least a half-century, "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market or function." *See Craig*, 429 U.S. at 195 (holding that beer seller had standing to assert the equal pro-tection rights of its would-be male customers who, per state law, could not buy beer until turning 21 while their female peers could buy beer at 18); C*arey v. Population Servs. Int'l*, 431 U.S. 678 (1977) (holding that a mail-order seller of contraceptives could raise the privacy rights of poten-tial customers in challenging a state statute that prohibited anyone but a physician (and in some cases, pharmacists) from distributing contra-ceptives). Today, vendors are routinely afforded standing to assert the constitutional rights of customers and prospective customers, and the cases are too numerous to catalogue in which third-party standing is af-forded to vendors asserting their customers' rights in challenging laws restricting the sale of erotic materials. *See, e.g., Reliable Consultants, Inc.*

16

*v. Earle*, 517 F.3d 738, 742-743 (5th Cir. 2008); *United States v. Extreme Associates, Inc.*, 431 F.3d 150, 155 (3d Cir. 2005); *United States v. Coil*, 442 F.3d 912, 915 n. 2 (5th Cir. 2006); *Postscript Enterprises, Inc. v. Whaley*, 658 F.2d 1249, 1251–1252 (8th Cir. 1981).

FSC, meanwhile, clearly has standing to assert the rights of its members. *See* Compl. ¶ 13 ("The Free Speech Coalition sues on its own behalf and on behalf of its members . . . ."). "An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Payan v. Los Angeles Cmty. Coll. Dist.*, 2021 WL 3743307, at *2 (9th Cir. Aug. 24, 2021) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Kaahumanu v. Hawaii*, 682 F.3d 789, 797 (9th Cir. 2012) (conferring standing upon association of wedding services professionals to assert the litigating rights of its members). In focusing solely on FSC's *organizational* standing, the AG ignores its open-and-shut claim to *associational* standing. *See*

17

*Payan*, 2021 WL 3743307, at *1–2 (addressing differences between organizational and associational standing).

Of course, FSC has standing to vindicate its own interests, too. As a "not-for-profit trade association" assisting members "in the exercise of their First Amendment rights," *see* Compl. ¶ 12, it finds those core business activities directly impeded by SB544—as FSC cannot assist, counsel, and advocate for the free expression of its members across the broader internet with SB544 exposing those members to substantial risk). *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (conferring standing where organization's ability to provide counseling and referral services for low-and moderate-income homeseekers was impaired by apartment owner's "racial steering" practices).

Finally, the Individuals have standing. Because SB544 imposes liability only on "commercial entities" and not individuals, the AG suggests that these Individual Plaintiffs cannot establish standing to assert their substantive due process claim where they have not specifically alleged that they operate as "sole proprietorships," included within the Act's definition of "commercial entities." Def. Br. at 18-19. But no such allegation is necessary when sole proprietorships, by definition, have "no separate

18

legal existence distinct from the operator of the business," Black's Law Dictionary (9th ed. 2009), and therefore "can be held directly liable for intentional actions because these entities are actual, physical people" under Montana law. *Alexander v. Bozeman Motors, Inc.*, 367 Mont. 401, 407 (2012).

The Complaint makes plain that each Individual is harmed by the Act *either* by virtue of the restrictions placed upon her own business as a regulated entity *or* those placed upon other regulated entities that will result in a loss of privacy for the Individual whose professional obligations require access to those materials. *See* Compl. ¶¶ 17-19, 23-28. And the AG entirely ignores that even *unregulated* parties may have standing to challenge government action where they can show that "'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)). Thus, "[w]hen the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Id.* at 384. Here, it scarcely need be said how

19

SB544 would affect *consumers* of websites publishing adult content. The Complaint makes those effects plain. *See* Compl. ¶¶ 18, 24, 27.

### B. Each Plaintiff has alleged a cognizable liberty interest.[10]

As discussed above, putative adult viewers of "material harmful to minors" have a fundamental liberty interest in obtaining these materials without compromising their own privacy, and the vendors that provide these materials are able to vicariously assert those interests on behalf of their customers. The AG's argument to the contrary is that, notwithstanding the Supreme Court's "broad language on personal autonomy" in *Lawrence v. Texas*, its observation that the case did not "involve minors" is somehow dispositive of the inquiry here as to the rights of *adults*—as SB544 is "mainly concerned with minors." Def. Br. at 21 (citing 539 U.S. 558, 578 (2003)). Again, this argument betrays the deeply mistaken belief that any regulation "concerned with minors" is somehow immune from judicial scrutiny for the burden it places on adults. Were that the case, states could restrict non-obscene adult content, sexual devices, and prophylactics without constitutional concern merely with the legislative

---

[10] *See* Def. Br. at 20-21.

incantation that their motivations were driven by the desire to "protect minors." It barely need be said that the Constitution demands more.

Plaintiffs also "have a liberty interest grounded in their First Amendment right to receive information." *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015); *see also Krug v. Lutz*, 329 F.3d 692, 696–97 (9th Cir. 2003) (reasoning that prison inmate had "a liberty interest in the receipt of his subscription mailings sufficient to trigger procedural due process guarantees," and that this liberty interest was rooted in the inmate's First Amendment rights). Summary dismissal of their substantive due process claim is therefore unwarranted.

### III. Plaintiffs have alleged a plausible procedural due process claim.[11]

Plaintiffs' claims about the vagueness of SB544's key terms sound in both the First and Fourteenth Amendments, with substantial overlap between vagueness and overbreadth theories. *See Kolender v. Lawson*, 461 U.S. 352, 358 n. 8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines."). Although a statute is void for vagueness if it "forbids . . . the doing of an act in terms

---

[11] *See* Def. Br. at 22-25.

so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application," *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926), the "standards of permissible statutory vagueness are strict in the area of free expression," and the Supreme Court "has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar." *NAACP v. Button*, 371 U.S. 415, 432 (1963); *see also Reno*, 521 U.S. at 871–72 (where the vagueness arises amidst a "content-based regulation of speech[,] the vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech"). Even the AG's favored cases reflect this cross-disciplinary approach to vagueness in the context of regulations on speech. *See United States v. Williams*, 553 U.S. 285, 304 (2008) ("Although ordinarily a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others, we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech.") (internal quotation marks omitted).

In this case, most of the Act's definition of "material harmful to minors" was pulled verbatim from challenged sections of COPA that the Supreme Court declared unconstitutional in *Ashcroft*. The Montana legislature did not so much as attempt to revise these definitions to save them from constitutional challenge, and there has been no intervening legal development to shield them today from the same arguments that carried the day two decades ago. Specifically, those cut-and-pasted provisions include the following terms:

*"As a whole"*:    Although COPA defined material "harmful to minors" to track the modified-for-minors obscenity standard laid down decades earlier, Justice Kennedy noted in *Ashcroft v. Free Speech Coalition* that it was "essential to answer the vexing question of what it means to evaluate Internet material 'as a whole,' when everything on the Web is connected to everything else." 535 U.S. at 599. And on remand to the Third Circuit, that court likewise recognized that the burden on speech "becomes even more troublesome when those evaluating questionable material consider it 'as a whole' in judging its appeal to minors' prurient interests." *ACLU v. Ashcroft*, 322 F.3d at 252-53 (concluding that COPA "mandates evaluation of an exhibit on the Internet in isolation, rather

than in context"—which "surely fails to meet the strictures of the First Amendment").

The Act is virtually identical to COPA in relevant respects—including its failure to define "as a whole" while including, as "material harmful to minors," "*any* material" that meets the modified-for-minors *Miller* Test. Just as COPA failed to satisfy the First Amendment by "mandat[ing] evaluation of an exhibit on the Internet in isolation, rather than in context," so does SB544. The Montana legislature had two decades to study the history and refine its definition to pass constitutional muster. But it failed to do so, leaving Plaintiffs and others scratching their heads.

*"Minor"*:   The Supreme Court has strongly suggested that modified-for-minors obscenity regulations are unlikely to survive First Amendment scrutiny if they do not exempt older minors. *See Reno*, 521 U.S. at 865–66 (1997) (distinguishing the "junior obscenity" statute upheld in *Ginsberg* from the unconstitutional regulation before the Court on the basis that, among other things, the former exempted 17-year-olds, whereas the latter did not). COPA defined "minor" as "any person under 17 years of age"—prompting the Third Circuit to quip that it "need not suggest how the statute's targeted population could be more narrowly

24

defined, because even the Government does not argue, as it could not, that materials that have 'serious literary, artistic, political or scientific value' for a sixteen-year-old would have the same value for a minor who is three years old." *ACLU v. Ashcroft*, 322 F.3d at 253-54. The court concluded that "[e]ven if the statutory meaning of 'minor' were limited to minors between the ages of thirteen and seventeen, Web publishers would still face too much uncertitude as to the nature of material that COPA proscribes." *Id.* at 255. For that reason alone, the statute was determined to be unconstitutional.

And yet, rather than whittling down COPA's definition of "minor," the Montana legislature *broadened* it to include seventeen-year-olds—an age group more developed in its sensibilities and more burdened by a blanket definition that judges the "literary, artistic, political, or scientific value" *not* by reference to other seventeen-year-olds, but to the broader (and younger) group of all "minors." The result is the restriction of material appropriate (and in some cases, critical) to an older teen's self-discovery in matters as elemental as sexual expression, sexual orientation, gender identity. Again, the Montana legislature had 20 years to adjust its definition to pass constitutional muster. Again, it failed to do so.

25

Other terms appearing within SB544 are no clearer and present the same interpretive problems for those potentially regulated by the law. *See* Compl. ¶¶ 61 ("substantial portion"[12]), 63 ("commercial entity" and "website"), 64 ("commercially reasonable"), 65 ("contemporary community standards"), 66 ("know" and "intend"). But the AG doesn't even attempt to resolve these ambiguities. We're told that difficulty determining whether objectionable material on a website clears the one-third threshold "isn't a vagueness problem," but we aren't told *why*. *See* Def. Br. at 24. We're told "contemporary community standards" is sufficiently clear because, as part of the *Miller* standard for obscenity, it has been "evaluated in federal cases for more than a half-century." *See id.* Never mind that in plenty of those cases, courts have invalidated the challenged laws *because of the vagueness of that very term. See, e.g., Friends of Georges,*

---

[12] Illogical results flowing from poorly conceived statutes usually occasion little constitutional concern, but the First Amendment demands greater precision. No content-based restriction on speech can survive strict scrutiny when it would afford minors access to search engines, Twitter, and other commonly-used websites where hardcore pornography is but a click away (despite not being a "substantial portion" of the material on offer), while simultaneously denying access to websites like O.school offering a fulsome and honest sexual education. Even less so when the Act offers no guidance as to whether total content is determined according to bytes of material, number of web pages, seconds of video, words of a sexual nature, or some other metric entirely.

26

*Inc. v. Mulroy*, 675 F.Supp.3d 831, 873 (W.D. Tenn. 2023); *Book People, Inc. v. Wong*, 692 F. Supp. 3d 660, 672 (W.D. Tex. 2023) ("community standards"), *aff'd in part, vacated in part on other grounds*, 91 F.4th 318 (5th Cir. 2024).

As for the rest of the terms identified for their vagueness, the AG faults Plaintiffs for failing to "address whether these terms are impermissibly vague in the 'vast majority of [SB544]'s intended applications.'" Def. Br. at 25 (quoting *Hill*, 530 U.S. at 733). But this is to flip the standard on its head, as the full quote from *Hill* makes clear: "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when *it is surely valid* in the vast majority of its intended applications[.]" *Hill*, 530 U.S. at 733 (emphasis added, internal quotation marks omitted). For reasons already articulated, SB544 is *not* "surely valid in the vast majority of its intended

applications," and federal pleading standards do not require what the AG seems to demand of Plaintiffs here.[13]

## IV. Plaintiffs have alleged standing to raise an equal protection challenge.[14]

Once again, the AG fundamentally misunderstands the standing requirements that apply to particular *claims* once Article III has been satisfied with respect to the *action*. *See* Part II.A, *supra*; Def. Br. at 27 (arguing that Plaintiffs lack standing "for the same reasons they lack standing for the substantive due process claim"). This argument presents another case of "jus tertii" standing, *not* Article III standing, and it meets the same fate as the last. *Cf. Vill. of Arlington Heights v. Metro. Hous.*

_____

[13] The AG may not hide behind some lesser standard attending facial—as opposed to as-applied—challenges. Plaintiffs have challenged SB544 *both* on its face *and* as-applied to these Plaintiffs. *See* Compl. ¶¶ 87-89. Regardless, the Supreme Court has made clear that such distinction bears on available remedies but not required pleading strictures. *See supra* at 2-3.

[14] *See* Def. Br. at 25-28.

*Dev. Corp.*, 429 U.S. 252, 263–64 (1977) (finding no need for "prudential"

standing inquiry in case asserting third-party's equal protection rights).[15]

## V.   Plaintiffs have alleged a plausible Commerce Clause claim.[16]

The Act violates the Commerce Clause because it regulates strictly

out-of-state conduct, places burdens on interstate commerce that clearly

outweigh its illusory local benefits, and legislates a critical instrumental-

ity of commerce that demands unform regulation.

### A. The Act impermissibly regulates the activities of out-of-state websites.

SB544 burdens interstate commerce by impinging on communica-

tion occurring *outside* Montana's borders. Unlike, say, pork produced ac-

cording to animal husbandry practices that violate the standards of

---

[15] The AG's reliance on *Tingley v. Ferguson* is baffling. *See* Def. Br. at 26, 28 (citing 47 F.4th 1055 (9th Cir. 2022)). *Tingley* held that the "unique standing considerations in the First Amendment context tilt dramatically toward a finding of standing when a plaintiff brings a pre-enforcement challenge"; that the "Supreme Court has dispensed with rigid standing requirements for First Amendment protected speech claims and has instead endorsed a hold your tongue and challenge now approach"; that "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury"; and that  standing to bring First Amendment claims "in no way depends on the merits of those claims." *Id.* at 1067-68 (internal quotation marks and citations omitted).

[16] *See* Def. Br. at 28-32.

29

another state where it is sold, *see Nat'l Pork Prods. Council v. Ross,* 598 U. S. ____ (2023), content published over the internet *automatically* reaches internet-enabled computers in all 50 states and requires affirmative, costly, and inevitably imperfect steps by the website operator to limit its geographic reach. The Act thus "has the practical effect of . . . control[ling] conduct beyond the boundaries of the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).

## B. The Act creates inconsistent regulation of the internet.

The Act also violates the long-established rule barring states from enacting differing standards for instrumentalities of national commerce where uniformity is required—including the internet. The dormant aspect of the Commerce Clause shows its teeth when "a lack of national uniformity would impede the flow of interstate goods." *Nat'l Pork Prods. Council v. Ross,* 598 U. S. ____ (2023), Slip Copy at 17-18 n.2 (quoting *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 128 (1978)). The internet is precisely the type of instrumentality of commerce that demands uniform regulation of materials published thereon. *See ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999) ("[C]ertain types of commerce have been recognized as requiring national regulation. The

Internet is surely such a medium."); *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168–69 (S.D.N.Y. 1997)).

The threat of inconsistent regulation is clear and present. Montana is now one of 18 states with age-verification laws either already in place or awaiting their effective dates.[17] If its Act is permitted to stand, then publishers of internet content will have to navigate a morass of differing legal standards, "community standards," and approved technologies and protocols for age verification. *Cf. Stevens*, 559 U.S. at 476 ("Those seeking to comply with the law . . . face a bewildering maze of regulations from at least 56 separate jurisdictions."). Disparate regulation of erotic material is just the canary in the coal mine; a patchwork of state-by-state regulation of this sort threatens the internet as we know it.

## VI. Plaintiffs have plausibly alleged that Section 230 preempts the Act.[18]

The final basis for the AG's motion to dismiss is both confused and confusing. Although he acknowledges that Section 230 "instructs courts not to treat companies like JFF as publishers of third-party content that

---

[17] *See* "FSC Action Center," *available at:* https://action.freespeech-coalition.com/age-verification-resources/state-avs-laws/.

[18] *See* Def. Br. at 32-34.

it hosts," he contends that the Act "only imposes liability on JFF based on whether it complies with SB544's age-verification procedures." Def. Br. at 33-34. But those age-verification procedures are merely a safe harbor within a statute that *plainly does* impose liability on a publisher-host of third-party content. *See* SB544(1) (instructing that an entity "*must be held liable* if [it] fails to perform reasonable age verification methods to verify the age of individuals attempting to access the material") (emphasis added).

Section 230 is unequivocal that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). SB544 avails a litigant of precisely that prohibited cause of action unless the web host imposes additional costly measures that are not demanded by Section 230 itself. Put differently, it purports to deny the web host the benefits of Section 230 immunity absent additional action. The "inconsistency" between state and federal law is clear, and the Supremacy Clause requires that the former therefore must give way to the latter.

32

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court deny the AG's motion to dismiss in all respects.

DATED this 15th day of July, 2024.

> */s/* Natasha Prinzing Jones
> Natasha Prinzing Jones
> Thomas J. Leonard
> BOONE KARLBERG P.C.
> 201 West Main St., Suite 300
> P.O. Box 9199
> Missoula, MT 59807
> Telephone: (406) 543-6646
> Facsimile: (406) 549-6804
> npjones@boonekarlberg.com
> tleonard@boonekarlberg.com

> */s/ Jeffrey Keith Sandman*
> Jeffrey Keith Sandman*
> WEBB DANIEL FREIDLANDER LLP
> 5208 Magazine St., Ste 364
> New Orleans, LA 70115
> Telephone: (978) 886-0639
> jeff.sandman@webbdaniel.law
> *Admitted Pro Hac Vice*

> */s/ D. Gill Sperlein*
> D. Gill Sperlein*
> THE LAW OFFICE OF D. GILL
> SPERLEIN

33

345 Grove Street
San Francisco, CA 94102
Telephone: (415) 404-6615
gill@sperleinlaw.com
*Admitted Pro Hac Vice*

*Counsel for Plaintiffs*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and in-dented material; and the word count calculated by Microsoft Word for Mac Version 16.86 is 6386 words, excluding tables of content and au-thority, certificate of service, certificate of compliance, and exhibit in-dex.

*/s/ D. Gill Sperlein*
D. Gill Sperlein

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF sys-tem on registered counsel.

Dated: July 15th, 2024

*/s/ D. Gill Sperlein*
D. Gill Sperlein

35