Austin Knudsen
  *Montana Attorney General*
Christian B. Corrigan
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Attorneys for Defendant*

In the United States District Court
For the District of Montana
Missoula Division

| | |
|---|---|
| Free Speech Coalition, Inc.; Deep Connection Technologies, Inc.; Charyn Pfeuffer; JFF Publications, LLC; Anna Louise Peterson; Lynsey Griswold; PHE, Inc.; and Convergence Holdings, Inc., | Case No. 9:24-cv-00067-DWM |
| *Plaintiffs,* | **NOTICE OF SUPPLEMENTAL AUTHORITY** |
| v. | |
| AUSTIN KNUDSEN, in his official capacity as Attorney General of the State of Montana | |
| *Defendant.* | |

Defendant Austin Knudsen submits this Notice of Supplemental Authority under Local Rule 7.4.

After briefing on Defendant's Motion to Dismiss Plaintiffs' Complaint was complete, *see* ECF Nos. 17-20, the U.S. Court of Appeals for the Ninth Circuit issued a precedential opinion in *Ariz. All. for Retired Ams. v. Mayes*, 2024 U.S. App. LEXIS 23963 (9th Cir. Sept. 20, 2024) ("Ex. A"), holding that, after the Supreme Court's decision in *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024), an organization can no longer establish Article III standing "if it diverts resources in response to a governmental policy that frustrates its mission." *Id.* at *5.  Instead, it must "show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action." *Id.* at *5-*6.

In briefing on the motion to dismiss, Defendant argued that Free Speech Coalition, Inc. ("FSC") failed to plausibly allege standing for its substantive due process and equal protection claims under *Hippocratic Medicine* because it "allege[d] no facts *at all* about the effect of SB544 on its 'core business activities,'" *see* ECF No. 18, at 27 (quoting *Hippocratic Med.*, 602 U.S. at 395), and FSC only alleged that "SB544 impaired its

ability to serve its members and achieve its organizational mission to se-
cure its members' First Amendment rights, *see* ECF No. 18, at 27 (citing
Compl. ¶¶12-13); ECF No. 20, at 11-12.

The Ninth Circuit's decision in *Arizona Alliance* directly supports
Defendant's standing arguments.  To start, *Arizona Alliance* confirms
that the traditional three-part standing analysis applies to determine an
organization's standing. 2024 U.S. App. LEXIS, at *25.  And to find that
an organization has suffered "an actual and concrete harm," courts must
now determine that the alleged harm "'directly affects and interferes'
with the organization's 'core business activities,'" not just its "abstract
social interests."  *Id.* at *22-*23 (quoting *Hippocratic Med.*, 602 U.S. at
395); *see id.* at * 23 (rejecting argument that injuries to an organization's
"general legal, moral, ideological, and policy concerns" suffice to confer
Article III standing (quoting *Hippocratic Med.*, 602 U.S. at 386)).  To the
extent that existing Ninth Circuit precedent permitted direct organiza-
tional standing on a "frustration-of-mission and diversion-of-resources"
theory "rejected in *Hippocratic Medicine*," *Arizona Alliance* squarely
overruled those precedents.  *Id.* at *25.

DATED this 26th day of September, 2024.

AUSTIN KNUDSEN
  *Montana Attorney General*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

*/s/ Peter M. Torstensen, Jr.*

PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
christian.corrigan@mt.gov
peter.torstensen@mt.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: <u>September 26, 2024</u>    <u>/s/ *Peter M. Torstensen, Jr.*    </u>
PETER M. TORSTENSEN, JR.

# Exhibit A

🛈 Cited
As of: September 25, 2024 7:45 PM Z

## *Ariz. All. for Retired Ams. v. Mayes*

United States Court of Appeals for the Ninth Circuit

May 16, 2023, Argued and Submitted, Phoenix, Arizona; September 20, 2024, Filed

No. 22-16490

**Reporter**
2024 U.S. App. LEXIS 23963 *; __ F.4th __; 2024 WL 4246721

ARIZONA ALLIANCE FOR RETIRED AMERICANS; VOTO LATINO; PRIORITIES USA, Plaintiffs-Appellees, v. KRISTIN K. MAYES, in his official capacity as Attorney General for the State of Arizona, Defendant-Appellant, YUMA COUNTY REPUBLICAN COMMITTEE, Intervenor-Defendant-Appellant, and KATIE HOBBS, in her official capacity as Secretary of State for the State of Arizona; LARRY NOBLE, Nominal Defendant, in his official capacity as Apache County Recorder; DAVID STEVENS, Nominal Defendant, in his official capacity as Cochise County Recorder, previously named as David Stephens; PATTY HANSEN, Nominal Defendant, in her official capacity as Coconino County Recorder; SADIE JO BINGHAM, Nominal Defendant, in her official capacity as Gila County Recorder; WENDY JOHN, Nominal Defendant, in her official capacity as Graham County Recorder; SHARIE MILHEIRO, Nominal Defendant, in her official capacity as Greenlee County Recorder; RICHARD GARCIA, Nominal Defendant, in his official capacity as La Paz County Recorder; STEPHEN RICHER, Nominal Defendant, in his official capacity as Maricopa County Recorder; KRISTI BLAIR, Nominal Defendant, in her official capacity as Mohave County Recorder; MICHAEL SAMPLE, Nominal Defendant, in his official capacity as Navajo County Recorder; GABRIELLA CAZARES-KELLY, Nominal Defendant, in her official capacity as Pima County Recorder; DANA LEWIS, Nominal Defendant, in her official capacity as Pinal County Recorder; SUZANNE SAINZ, Nominal Defendant, in her official capacity as Santa Cruz County Recorder; MICHELLE BURCHILL, Nominal Defendant, in her official capacity as Yavapai County Recorder; RICHARD COLWELL, Nominal Defendant, in his official capacity as Yuma County Recorder, Defendants.

**Prior History: [*1]** Appeal from the United States District Court for the District of Arizona. D.C. No. 2:22-cv-01374-GMS. G. Murray Snow, Chief District Judge, Presiding.

**Summary:**

**SUMMARY**[*]

**Elections / Standing**

The panel vacated the district court's preliminary injunction enjoining two Arizona election law amendments aimed at curtailing the risk of unlawful voting: (1) a provision that allows the cancellation of a voter's registration if a county receives confirmation from another county that the voter has moved and is registered in that new county ("Cancellation Provision"); and (2) a provision that makes it a felony to knowingly provide a mechanism for voting to another person registered in another state ("Felony Provision").

The panel held that the plaintiffs, three nonprofit groups who asserted that these two laws would jeopardize Arizonans' right to vote if they went into effect, lack Article III standing to challenge the Cancellation Provision because they alleged only a frustrated mission and diverted resources, and failed to show that Arizona's actions directly harmed pre-existing core activities. Under *FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 144 S. Ct. 1540, 219 L. Ed. 2d 121 (2024),* the plaintiffs must allege more than that their mission or goal has been frustrated—they must plead facts showing that **[*2]** their core activities are directly affected by the defendant's conduct. This Court's organizational standing precedents are irreconcilable with *Hippocratic Medicine* and are therefore overruled.

The panel rejected the plaintiffs' constitutional challenge to the Felony Provision. The plaintiffs have standing to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

challenge the Felony Provision because they have shown that they face a realistic possibility of prosecution. However, they are unlikely to succeed on the merits because the phrase "mechanism for voting" in the Felony Provision is not unconstitutionally vague. Although the statute does not define the phrase "mechanism for voting," the definition of the word "mechanism," along with the structure of the statute, strongly suggests that "mechanism for voting" includes only unlawful acts of voting, not voter outreach or registration.

Concurring, Judge Lee wrote separately to explain why, even if the plaintiffs had Article III standing to challenge the Cancellation Provision, they would not prevail on the merits of their claim that the *National Voter Registration Act* preempts the Cancellation Provision. He expressed his disagreement with two Seventh Circuit decisions, which the district court relied on in holding that **[*3]** the Cancellation Provision conflicts with the National Voter Registration Act.

Dissenting in part, Judge Nguyen dissented from the majority's holding that plaintiffs lack organizational standing to challenge the Cancellation Provision. In her view, the majority erroneously overruled several cases as irreconcilable with *Hippocratic Medicine*, which broke no new ground on the standing doctrine. She would affirm the district court's preliminary injunction as to the Cancellation Provision because the district court correctly determined, in line with the Seventh Circuit's analysis of a similar law, that the Cancellation Provision likely violates the National Voter Registration Act. As for the Felony Provision, Judge Nguyen concurs in the result.

**Counsel:** Aria C. Branch (argued), Spencer W. Klein, Joel J. Ramirez, Daniel J. Cohen, and Tina M. Morrison, Elias Law Group LLP, Washington, D.C.; Jonathan P. Hawley, Elias Law Group LLP, Seattle, Washington; Roy Herrera and Daniel A. Arellano, Herrera Arellano LLP, Phoenix, Arizona; for Plaintiffs-Appellees Arizona Alliance for Retired Americans.

Tracy A. Olson (argued), Brett W. Johnson, Eric H. Spencer, and Colin P. Ahler, Snell & Wilmer LLP, Phoenix, Arizona, for Intervenor-Defendant-Appellant Yuma County Republican **[*4]** Committee.

Joshua M. Whitaker (argued) and Jennifer J. Wright, Assistant Attorneys General; Drew C. Ensign, Deputy Solicitor General; Joseph A. Kanefield, Chief Deputy, Chief of Staff; Mark Brnovich, Former Attorney General of Arizona; Kristin K. Mayes, Attorney General of

Arizona; Office of the Arizona Attorney General, Phoenix, Arizona; for Defendant-Appellant Kristin K. Mayes.

**Judges:** Before: Jacqueline H. Nguyen, Daniel P. Collins, and Kenneth K. Lee, Circuit Judges. Opinion by Judge Lee; Concurrence by Judge Lee; Partial Dissent by Judge Nguyen.

**Opinion by:** Kenneth K. Lee

# Opinion

LEE, Circuit Judge:

Arizona enacted two election law amendments aimed at curtailing the risk of unlawful voting: (1) a provision that allows the cancellation of a voter's registration if a county receives "confirmation from another county" that the voter has moved and is registered in that new county ("Cancellation Provision"); and (2) a provision that makes it a felony to knowingly provide a "mechanism for voting" to another person registered in another state ("Felony Provision").

Three nonprofit groups sued, asserting that these two laws would jeopardize Arizonans' right to vote if they went into effect. The district court agreed and **[*5]** preliminarily enjoined them. We vacate the preliminary injunction and remand.

We first hold that the plaintiff organizations lack standing to challenge the Cancellation Provision. The plaintiffs rely on our circuit's confusing line of organizational standing cases that have broadly construed *Havens Realty v. Coleman, 455 U.S. 363, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)*, as allowing an organization to assert standing if it diverts resources in response to a governmental policy that frustrates its mission. But the Supreme Court in *FDA v. Alliance for Hippocratic Medicine* has now put a halt to those line of cases. *602 U.S. 367, 144 S. Ct. 1540, 219 L. Ed. 2d 121 (2024)*. The Court held that neither the frustration of a mission nor the diversion of resources confers standing under Article III, making our precedents clearly irreconcilable with *Hippocratic Medicine*. Organizations can no longer spend their way to standing based on vague claims that a policy hampers their mission.

Now, organizations must fully satisfy the traditional requirements of Article III standing. *Hippocratic Medicine* clarified that the distinctive theory of

organizational standing reflected in *Havens Realty* extends *only* to cases in which an organization can show that a challenged governmental action directly injures the organization's pre-existing core activities and does **[*6]** so *apart* from the plaintiffs' response to that governmental action. *602 U.S. at 395-96*. Emphasizing that *Havens Realty* "was an unusual case" that the Court "has been careful not to extend . . . beyond its context," the Supreme Court in *Hippocratic Medicine* squarely rejected the sort of "expansive theory" of *Havens Realty* standing that has long been a hallmark of our jurisprudence. *Id.* Applying the Supreme Court's now-clarified understanding of *Havens Realty*—which has overruled our prior contrary caselaw—we conclude that the plaintiffs have failed to plead Article III standing to challenge the Cancellation Provision.

We also reject the plaintiffs' constitutional challenge to the Felony Provision. We disagree with the district court's conclusion that the phrase "mechanism for voting" in the Felony Provision is so vague that it would likely sweep in constitutionally protected activity such as voter outreach and registration. Although the statute does not define the phrase "mechanism for voting," the definition of the word "mechanism," along with structure of the statute, strongly suggests that "mechanism for voting" includes only (unlawful) acts of voting, not voter outreach or registration. And under the constitutional **[*7]** avoidance doctrine, we read the Felony Provision narrowly to steer clear of potential constitutional problems.

**BACKGROUND**

**I. Arizona enacts Senate Bill 1260 to combat unlawful voting**.

In June 2022, Arizona enacted Senate Bill (SB) 1260 to tackle (what the state perceived as) the problem of unlawful voting. SB 1260 "[m]odifies the criteria for voter registration cancellations, active early voting list regulations and violations associated with illegal voting." Ariz. H.B. Summary, 2022 Reg. Sess. S.B. 1260. In particular, it adds three provisions to Arizona's Elections and Electors Code: (1) the "Felony Provision," *A.R.S. § 16-1016(12)*, (2) the "Cancellation Provision," *A.R.S. § 16-165(A)(10)*, *(B)*, and (3) the "Removal Provision," *A.R.S. § 16-544(Q)-(R)*. This appeal concerns only the Felony Provision and the Cancellation Provision.

The Cancellation Provision allows county recorders to cancel a voter's registration if the county recorder either (1) "receives confirmation from another county recorder that the person registered has registered to vote in that other county," *A.R.S. § 16-165(A)(10)*, or (2) receives "information that a person has registered to vote in a different county," at which point she "shall confirm the person's voter registration with that other county and, on confirmation, shall cancel the person's registration," **[*8]** *A.R.S. § 16-165(B)*.

The Felony Provision makes it a "class 5 felony" for anyone to "[k]nowingly provide[] a mechanism for voting to another person who is registered in another state." *A.R.S. § 16-1016(12)*. The statute, however, does not define "mechanism for voting."

**II. Arizona laws must conform with the National Voter Registration Act**.

Arizona's election laws must comply with federal voting laws, including the NVRA. The NVRA, among other things, imposes certain procedural requirements before a state (or, by extension, a county) can remove a registered voter from its voting rolls. *See, e.g.*, *52 U.S.C. § 20507(a)(3)(A)*, *(d)(1)*. For example, the NVRA permits a state to remove a voter from the voting rolls if she makes that request. *52 U.S.C. § 20507(a)(3)(A)*. Relevant here, the NVRA also allows a state to remove a voter if she has moved to a different jurisdiction. *Id. § 20507(d)(1)*. And there are two ways to confirm that the voter has moved. First, the voter can "confirm[] in writing that [she] has changed residence to a place outside the registrar's jurisdiction." *Id. § 20507(d)(1)(A)*. Second, the state may remove a voter who has not recently voted and does not respond after receiving notice from the state. *Id. § 20507(d)(1)(B)*.

**III. The district court preliminarily enjoins enforcement of the Felony Provision and Cancellation Provision**.

After Arizona enacted **[*9]** SB 1260, three political nonprofit organizations—the Arizona Alliance for Retired Americans, Voto Latino, and Priorities USA—sued the Arizona Attorney General, the Secretary of State, and fifteen county recorders, challenging SB 1260 on constitutional grounds. The Yuma County Republican Committee (YCRC) intervened to defend the law.

The plaintiffs sought to preliminarily enjoin the Felony

Provision and the Cancellation Provision. [1] The plaintiffs claimed that the Cancellation Provision violates the NVRA because it does not comply with the NVRA's requirements for canceling a voter's registration. They also claimed that the Felony Provision violates the *First* and *Fourteenth Amendments* because it is vague and overbroad. According to the plaintiffs, by failing to define "mechanism for voting," the law might criminalize various voter-outreach activities protected by the *First Amendment*, including voter registration.

On the first business day after SB 1260 went into effect, the district court preliminarily enjoined the enforcement of the Felony and Cancellation Provisions. On appeal, the Attorney General and YCRC challenge the plaintiffs' standing and the district court's preliminary injunction.

**STANDARD OF REVIEW**

"Standing is a legal **[*10]** issue subject to *de novo* review." *Arakaki v. Lingle, 477 F.3d 1048, 1056 (9th Cir. 2007)*. To establish Article III standing to sue, a plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins, 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016)*. At the preliminary injunction stage, a plaintiff must make a "clear showing" for each of these three requirements. *See Lopez v. Candaele, 630 F.3d 775, 785 (9th Cir. 2010)*.

This court "review[s] the grant or denial of a preliminary injunction for abuse of discretion." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009)*. To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*.

"A district court necessarily abuses its discretion when it

---

[1] The plaintiffs also sought to enjoin SB 1260's Removal Provision, arguing that it violates the *Due Process Clause* by placing an unjustifiable burden on citizens' exercise of their fundamental right to vote. The district court, however, declined to enjoin the Removal Provision and the plaintiffs do not appeal that decision.

bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Johnson v. Couturier, 572 F.3d 1067, 1078-79 (9th Cir. 2009)* (cleaned up). This court's review typically "does not extend to the underlying merits of the case," meaning that "[a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different **[*11]** result if it had applied the law to the facts of the case." *Id.* (citation omitted). But where, as here, the district court's analysis of the likelihood of success on the merits "rests solely on conclusions of law and the facts are either established or undisputed, de novo review is appropriate" for that factor. *Warsoldier v. Woodford, 418 F.3d 989, 993 (9th Cir. 2005); see also Credit Suisse First Boston Corp. v. Grunwald, 400 F.3d 1119, 1126 n.7 (9th Cir. 2005)* ("[W]e review *de novo* any underlying issues of law, including the district court's interpretation of [Arizona] state law." (citation omitted)).

**ANALYSIS**

**I. The plaintiffs lack standing to challenge the Cancellation Provision**.

An organization asserting that it has standing based on its own alleged injuries must meet the traditional Article III standing requirements—meaning, it must show (1) that it has been injured or will imminently be injured, (2) that the injury was caused or will be caused by the defendant's conduct, and (3) that the injury is redressable. *See Hippocratic Medicine, 602 U.S. at 395-96; Havens Realty, 455 U.S. at 378-79*. But our circuit's organizational standing case law has been conflicting and confusing, and some of our cases construing *Havens Realty* have lost sight of these requirements. Rather than require organizations to show actual injury, we have sometimes allowed organizations to sue when they have alleged little **[*12]** more than that they have diverted resources in response to the defendant's actions to avoid frustrating the organization's loosely defined mission.

These organizational standing precedents are irreconcilable with the Supreme Court's recent decision in *Hippocratic Medicine*. Under *Hippocratic Medicine*, the plaintiffs must allege more than that their mission or goal has been frustrated—they must plead facts showing that their core activities are directly affected by the defendant's conduct. *602 U.S. at 370, 395*. That is, the plaintiffs here must do more than merely claim that

Arizona's law caused them to spend money in response to it—they must show that Arizona's actions directly harmed already-existing activities. The plaintiffs have not pleaded facts to establish these requirements.

To understand why the plaintiffs lack standing under *Hippocratic Medicine*'s proper reading of Article III, we must walk through how our circuit mistakenly took a detour in construing *Havens Realty*.

### A. Article III standing bars parties from using the courts merely to vindicate abstract political and societal goals.

Article III of the Constitution only allows federal courts to decide cases and controversies. So a federal court may not decide an issue unless the plaintiff has, as Justice **[\*13]** Scalia memorably put it, answered a threshold question: "What's it to you?" A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983). But not just any answer to that question will do. Courts may not allow plaintiffs with only ideological interests in the outcome of a case to pursue that case in court. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 563, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. Nor may courts allow plaintiffs to seek out and challenge laws that they disagree with based on disagreement alone. *Allen v. Wright, 468 U.S. 737, 760, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)*.

These limitations are critical to the separation of powers and our adversarial system of justice. Courts do not resolve disputes in some abstract, generalized sense—we resolve justiciable disputes between the parties before us. By confirming that the plaintiff who brings a lawsuit has a genuine interest in the outcome, we reach better-reasoned decisions than we would if we issued opinions every time a plaintiff who "roam[ed] the country in search of governmental wrongdoing" found what it was looking for. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 487, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982)*. And this ensures that the scope of the judicial role remains—as the Founders intended it to be—limited. *Hippocratic Medicine, 602 U.S. at 379-80*; *see also* Federalist No. 47 (James Madison) (explaining that the judicial branch "can exercise no executive prerogative" or perform **[\*14]** "any legislative function").

To satisfy Article III's standing requirement, plaintiffs must make three showings. First, they must show injury.

The injury must be "concrete," meaning "not abstract." *Id. at 381*. It must be particularized, meaning that it affects the plaintiff individually, not in a generalized manner. *Id.* And it must be either real or imminent, meaning that it has occurred or will likely occur soon. *Id.*

Second, plaintiffs must show that their injury "likely was caused or likely will be caused by the defendant's conduct." *Id. at 382*. When a plaintiff challenges a government regulation that directly applies to or regulates them, this is easy to do. *Id.* But when a plaintiff challenges a government action that does not directly apply to it, or that does not necessarily affect its behavior, this requirement may be harder to meet. *Id.* Plaintiffs may not "rely on speculation about the unfettered choices made by independent actors not before the courts," *Clapper v. Amnesty Int'l, 568 U.S. 398, 414 n.5, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013)* (quotation omitted), or assume that third parties will act in unpredictable or irrational ways, *California v. Texas, 593 U.S. 659, 669, 675, 141 S. Ct. 2104, 210 L. Ed. 2d 230 (2021)*. Nor may plaintiffs rely on "distant (even if predictable) ripple effects." *Hippocratic Medicine, 602 U.S. 383*. Instead, plaintiffs must show a sufficiently close and predictable link between the **[\*15]** challenged action and their injury-in-fact. *Id.* [2]

_____

[2] The dissent claims that we are conflating third-party standing principles (*Hunt* representational standing) with first-party standing (*Havens Realty* organizational standing). Dissent at 48-49. Not so. The causation requirement under traditional Article III standing must always be satisfied, either as to the organization itself (in a first-party standing case) or as to one or more members of the organization (in a third-party standing case). And it is incorrect to say that *Hippocratic Medicine*'s emphasis on causation was referring to third-party standing only. The Court held that when a "plaintiff challenges the government's 'unlawful regulation (or lack of regulation) of someone else,'" then standing may be "substantially more difficult to establish" because causation "ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps the response of others as well." *602 U.S. at 382* (citing *Lujan, 504 U.S. at 562*). That is exactly the situation here: the plaintiff organizations are asserting their own injuries—*i.e.*, diversion of resources and frustration of mission—based on the government's regulation of third parties (their clients whom they register to vote). This is still first-party standing—and *Hippocratic Medicine*'s emphasis on causation applies here. Finally, the dissent points out that the first-party standing analysis is the same for organizations as it is for individuals. Dissent at 49. That is true. The problem has been that we have not rigorously applied the traditional Article III standing analysis to organizations as we typically have for individuals.

Finally, plaintiffs must show that their injury is redressable. *Id. at 380*. To do so, they must show that a favorable ruling will cure their injury. *California, 593 U.S. at 671*. When evaluating redressability, courts must "consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *Id.* (quoting *Allen, 468 U.S. at 753 n.19*). If there is no injury or if the requested remedy would not cure the plaintiff's injury, then the injury is not redressable. *Id. at 672*.

**B. *Havens Realty*—and the Ninth Circuit's expansion of it.**

In *Havens Realty*, the defendant company managed two apartment complexes, one of which was occupied predominantly by whites, and the other of which was integrated. *455 U.S. at 368 & n.1*. In leasing its apartments, the defendant allegedly engaged in "racial steering" by steering non-whites only to the integrated complex and away from the largely white complex. *Id. at 366-68* & nn. 1 & 4. These steering activities included falsely informing Black prospective renters, including a HOME employee, that there were no apartments available in the largely white complex. *Id. at 368*. The Supreme Court held that HOME had standing to challenge the landlord's racial **[*16]** steering practices because the practices "frustrated" HOME's "efforts to assist equal access to housing through counseling and other referral services" and required HOME to "devote significant resources to identify and counteract" the practices. *Id. at 379*.

From *Havens Realty*, we have derived a two-part test that conferred standing on organizations if they merely alleged that a challenged policy (1) frustrated the organization's mission or goal, and (2) required the organization to spend money or divert resources in response. *See, e.g., Fellowship of the Christian Athletes v. San Jose Unified School Dist., 82 F.4th 664, 682 (9th Cir. 2023)* (en banc); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC, 666 F.3d 1216, 1219 (9th Cir. 2012)*.

We have often said that *Havens Realty* does not allow organizations to vindicate abstract interests or spend their way into Article III standing, but our cases have been less clear, and often conflicting, on what there a plaintiff must do to show injury. *See Nielsen v. Thornell, 101 F.4th 1164, 1181-82 (9th Cir. 2024)* (Collins, J., dissenting) (arguing for a narrow reading of our confusing precedents, many of which "applied *Havens Realty* in summary fashion" and with "no detailed

analysis"). So in practice, we often paid lip service to a more stringent standing requirement, but many of our cases seemed effectively to allow plaintiffs to assert standing merely by expending resources in furtherance of "strong moral, ideological, **[*17]** or policy objection[s] to a government action." *Hippocratic Medicine, 602 U.S. at 381*.

But as the Supreme Court has now clarified, *Havens Realty* never discussed frustrating an abstract organizational mission—it discussed the direct impact of racial steering on HOME's "core business activities." *See Hippocratic Medicine, 602 U.S. at 395*. In loosely characterizing *Havens Realty* as a case about missions and goals, our cases lost sight of that crucial limitation. Organizations can—and do—define their missions "with hydra-like or extremely broad aspirational goals." *See Nielsen, 101 F.4th at 1170*. Looking at indirect impacts on those missions and goals—instead of direct interference with the organization's core *activities*— could allow an organization to challenge virtually anything, including policies that only affect the organization's intangible social interests. For example, an organization can define its mission as, say, ensuring equal protection or safeguarding property rights—and easily assert that a governmental policy in the abstract frustrates that mission, even if the challenged policy has no direct impact on the organization's carrying out of its existing core activities. In doing so, our cases have effectively allowed organizations to assert standing based on the sort of "general **[*18]** legal, moral, ideological, and policy concerns" that the Supreme Court has confirmed "do not suffice on their own to confer Article III standing to sue in federal court." *Hippocratic Medicine, 602 U.S. at 386*.

We equally erred to the extent that our cases have suggested that the mere diversion of resources in response to a policy can provide standing. In *Havens Realty*, HOME spent resources offsetting policies that harmed its then-existing activities—specifically, its ongoing activities in counseling its constituents on available housing. *455 U.S. at 376*; *see also Hippocratic Medicine, 602 U.S. at 395*. Some of our cases appear to have loosened this requirement, finding standing wherever an organization alleged that it spent (or would spend) resources on new activities *in response* to a challenged policy—even if those new activities consist only of educational and advocacy efforts in ideological opposition to the challenged policy. And, most troublingly, we have sometimes accepted that such new activities confer standing even if they are no more than a new opportunity for the organization to advance its

loosely defined "mission." *Roommate.com, 666 F.3d at 1226* (Ikuta, J., concurring in part) (noting that an organization's mission has not been frustrated if it spends money to further that goal). Thus, we have at times **[*19]** gone so far as to endorse a self-help theory of standing under which an organization's mission is supposedly hampered if, in response to a defendant's conduct, the organization decides to further its mission in a *different* way, by shifting resources from one "activity that advances [its] goals" to new activities that *also* further its goals by opposing the new policy. *See Nat'l Council of La Raza v. Cegavske, 800 F.3d 1032, 1040-41 (9th Cir. 2015)* (concluding that voter advocacy organization suffered injury by engaging in additional voter advocacy). In other words, our case law has suggested that an organization suffers cognizable harm because it voluntarily spends money to further its goals.

Many judges on this circuit have highlighted how this circuit's expansion of *Havens Realty* went astray. *See, e.g., Roommate.com, 666 F.3d at 1224* (Ikuta, J., concurring in part) ("This case brings the strain between our case law and Supreme Court precedent close to a rupture."); *Rodriguez v. City of San Jose, 930 F. 3d 1123, 1135 n. 10 (9th Cir. 2019)* (Friedland, J.) ("We share many of these concerns" about the circuit's organizational standing precedents "but are bound to apply" them); *East Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 693 (9th Cir. 2021)* (Bumatay, J., dissenting from the denial of rehearing en banc) ("We have moved well beyond requiring particularized and concrete injury and have embraced a 'general grievance' theory of **[*20]** jurisdiction by construing organizational standing so broadly."); *Sabra v. Maricopa Cnty. Comm. Coll., 44 F.4th 867, 896 (9th Cir. 2022)* (VanDyke, J., concurring) ("[A]s in other areas of our court's jurisprudence, we have paid lip service to [Article III's] rules while faltering in their application."); *Nielsen, 101 F.4th at 1180* (Collins, J., dissenting) (If "mere advocacy" is enough, then "any person who is opposed to any government policy would have standing to challenge that policy."). After the Supreme Court's decision in *Hippocratic Medicine*, we can no longer follow our overbroad reading of *Havens Realty*.

The dissent maintains that *Hippocratic Medicine* did not alter our (mis)reading of *Havens Realty*. Dissent at 47-48. But it did. The telltale sign is that the Supreme Court in *Hippocratic Medicine* noted that it "has been careful not to extend the *Havens* holding beyond its context." *602 U.S. at 396*. But our court has been anything but careful in its broad reading of *Havens Realty*, and we must comply with the Supreme Court's admonition that

*Havens Realty* is an "unusual case" that should not be expanded beyond its unique context. *Id.* We thus now apply the traditional Article III inquiry for organizational standing (as clarified by *Hippocratic Medicine*) and cannot rely on our two-part test of simply looking **[*21]** at diversion of resources and frustration of mission.

The dissent tries to put a favorable gloss on our *Havens Realty* case law, arguing that "[n]o Ninth Circuit precedent describes *Havens Realty* as a two-part test." Dissent at 47. But we have done just that. For example, in *Sabra*, we held that "we have 'read *Havens* to hold that an organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose.'" *44 F. 4th at 876* (quoting *E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 663 (9th Cir. 2020)* (in turn quoting *Fair Hous. of Marin v. Combs, 285 F.3d 899, 905 (9th Cir. 2002)*)). Indeed, we did not even bother mentioning the traditional three-part Article III standing inquiry (injury-in-fact, causation/traceability, redressability) in *Sabra* because we were relying solely on the two-part frustration of mission and diversion of resources framework that our circuit adopted for organizational standing. And even when we give lip service to Article III standing requirements, we often ultimately applied the more forgiving two-part test that we mistakenly derived from *Havens Realty. See, e.g., E. Bay Sanctuary, 993 F. 3d at 691* (Bumatay, J., dissenting from the denial of rehearing en banc) (noting that the panel opinion's "broad and malleable standard" of standing is **[*22]** "an end-run around Article III"). We no longer can do so.

## C. Our organizational standing precedent is clearly irreconcilable with *Hippocratic Medicine*.

Supreme Court authorities—rather than Ninth Circuit precedent—are binding on three-judge panels "where intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority." *Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003)* (en banc). In *Hippocratic Medicine*, the Supreme Court applied traditional standing principles to an organizational plaintiff, and in doing so, rejected both prongs of our organizational standing test. *602 U.S. at 395-96*. In particular, the Supreme Court clarified that organizational standing may not be premised on a broadly stated mission or goal. *Id. at 394*. Nor may it hinge on the claim that the organization has diverted resources in response to government action that does not directly affect that organization's existing core

activities. *Id.*

To start, *Hippocratic Medicine* clarified that a policy does not cause an injury in fact unless the policy "directly affect[s] and interfere[s]" with the organization's "core business activities"—much like a manufacturer's sale of a defective good harms the consumer who buys it. *Id. at 395*. So just as a consumer must suffer an actual and concrete harm, **[*23]** the organization must suffer an actual and concrete harm. *Id.* And that harm must directly and actually affect the organization's "core" activities, not merely its "abstract social interests." *Id.* (quoting *Havens Realty, 455 U.S. at 379*). No matter how much a defendant's conduct can be said to frustrate an organization's abstract mission, alleged injuries to an organization's "general legal, moral, ideological, and policy concerns do not suffice on their own to confer Article III standing to sue in federal court." *Hippocratic Medicine, 602 U.S. at 386*; *see also id. at 394* (holding that the plaintiffs organizations' argument that the FDA's challenged policy "has 'impaired' their 'ability to provide services and achieve their organizational missions'" "does not work to demonstrate standing").

In *Havens Realty*, it was "[c]ritical[]" that HOME was "not only [an] issue-advocacy organization, but also operated a housing counseling service." *Id. at 395*. In other words, HOME had standing because receiving false information about available housing directly harmed HOME's core activity—counseling its clients on housing availability. *Id.* HOME would not have had standing, however, if the racial steering practice only affected its "public advocacy" and "public education" functions—the injury depended **[*24]** on HOME's counseling services. *Id. at 394*; *cf. Sabra, 44 F.4th at 879* (permitting standing based on mere harm to abstract advocacy interests and on a government action's effects in shifting public opinion on matters of public interest).

Next, *Hippocratic Medicine* clarified that it is tougher for a plaintiff to establish causation than some of our precedents suggested. *602 U.S. at 382-83*. This is obvious: If the party before the court seeks to challenge a law that does not directly affect it, the chain of causation will be longer and inferences will be necessary. *Id.* So we must scrutinize the harm an organization asserts to ensure that the organization has not tried to "spend its way into standing simply by expending money to gather information and advocate against the defendant's actions." *Id. at 394*. If we do not, we risk permitting "all the organizations in America" to challenge everything they dislike, "provided they spend

even a single dollar opposing those policies." *Id. at 395*. To avoid that, we must not allow the diversion of resources *in response* to a policy to confer standing—instead, the organization must show that the new policy directly harms its *already-existing* core activities. *Id.*

Even the narrowest reading of our organizational standing **[*25]** precedents allowed plaintiffs to satisfy Article III using the sort of frustration-of-mission and diversion-of-resource theories the Supreme Court rejected in *Hippocratic Medicine*. *See Nielsen, 101 F.4th at 1180-81* (Collins, J., dissenting); *see also Sabra, 44 F.4th at 879*; *Roommate.com, 666 F.3d at 1219*; *Nat'l Council of La Raza, 800 F.3d at 1040-41*. These precedents are thus irreconcilable with *Hippocratic Medicine*—and thus overruled. In sum, rather than applying our two-pronged inquiry of whether a challenged policy frustrates an organization's mission and requires it to spend money resources, we now must apply, following the strictures of *Hippocratic Medicine*, the traditional three-part Article III standing analysis: (1) injury-in-fact, (2) causation, and (3) redressability.

**D. The plaintiffs here lack standing to challenge the Cancellation Provision because they have alleged only a frustrated mission and diverted resources**.

The plaintiffs have not shown they have standing to challenge the Cancellation Provision. The plaintiffs speculate that they might in the future need to divert resources because the Cancellation Provision could cause voters' current registrations—rather than old, outdated registrations—to be cancelled. And the plaintiffs allege that this interferes with their mission to encourage minority voter registration. **[*26]** This conjecture-laden theory is insufficient under Article III.

First, the plaintiffs cannot show injury-in-fact because the Cancellation Provision does not directly affect their pre-existing core activities. With or without the Cancellation Provision, the plaintiffs can still register and educate voters—in other words, continue their core activities that they have always engaged in. *See Hippocratic Medicine, 602 U.S. at 396*. Rather, the plaintiffs are complaining that they must now take it upon themselves to develop training materials or ask constituents additional questions in response to the Cancellation Provision. The plaintiffs thus attempt to spend their way into Article III standing by taking new actions in response to what they view as a disfavored policy. But as *Hippocratic Medicine* explains, spending money voluntarily in response to a governmental policy

cannot be an injury in fact. *See* 602 U.S. at 394.

Second, the plaintiffs' speculative harm is too attenuated to satisfy Article III's causation requirement. According to the plaintiffs, if they fail to confirm whether voters have existing registrations, the Cancellation Provision may cause a county recorder to cancel the voter's new registration instead of the old one. It is unclear whether the plaintiffs view **[\*27]** this as a direct organizational harm based on the resources they will divert to avoid cancelled voter registrations, or if they instead intend to assert claims on behalf of the members whose registrations may be cancelled. *See Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)* (discussing organization's associational standing based on representing its members). But regardless of whether they are alleging a *Havens Realty* direct organizational standing or a *Hunt* associational standing based on their members' alleged injuries, their theory rests on either an implausible reading of the Cancellation Provision or pure speculation—neither of which creates enough of a causal chain to satisfy Article III.

Take the plaintiffs' misreading of the Cancellation Provision. The plaintiffs insist that the Cancellation Provision could be read to allow county recorders to cancel a new voter registration when that registration is submitted. Arizona law, as well as basic common sense, makes clear that the Cancellation Provision does no such thing. The statute says that the "county recorder shall cancel a registration . . . [w]hen the county recorder receives confirmation from another county recorder that the person registered has registered to vote in that other county." **[\*28]** *See* A.R.S. § 16-165(A)(11). As the statutory text explains, the county recorder will cancel the old registration in its county if it confirms that the voter "has registered" in a new county. [3] As the Arizona Secretary of State Katie Hobbs has explained, the state maintains a statewide voter registration system, Arizona Voter Information Database (AVID), that all the counties rely on for maintaining and

verifying voter registration. That AVID database reveals which registration is more recent for a particular voter. And in case there was any doubt remaining about what the law requires, the Arizona Attorney General confirmed in its supplemental brief that only the old registration would be cancelled under the statute. [4]

At its core, the plaintiffs' argument is that the county recorder—whose main job is to maintain accurate voting registration—will negligently remove the *new* voting registration and decide to keep the old one. But as the Arizona Secretary of State and the Arizona Attorney General have explained, that is not what the law requires or what any county recorder would reasonably be expected to do. The plaintiffs' causal chain of harm is as fanciful as a complaint alleging that the U.S. Department **[\*29]** of State will process a passport renewal by destroying the new passport and sending the expired one back. This theory of causation is "simply too speculative" to satisfy Article III. *Hippocratic Medicine, 602 U.S. at 393*. And for similar reasons, the plaintiffs are also wrong in contending that they have associational standing based, not on their own injuries, but on the alleged harms that the Cancellation Provision will inflict on their members. *See Hunt, 432 U.S. at 343*. These associational-standing arguments rest on the same unduly speculative theory of causation—namely, that county recorders will supposedly cancel new voter registrations rather than old ones. [5]

---

[3] Other statutory provisions in Arizona law echo this same point. *See* A.R.S. § 16-164(A) ("On receipt of a *new* registration form that effects a change of . . . address . . . the county recorder shall indicate electronically in the county voter registration that the registration has been canceled . . . .") (emphasis added); A.R.S. § 16-166(B) ("If the elector provides the county recorder with a *new* registration form or otherwise revises the elector's information, the county recorder shall change the register to reflect the changes indicated on the new registration.") (emphasis added).

[4] The dissent states that the Arizona Attorney General "agree[s] with plaintiffs' statutory interpretation." Dissent at 53. But the Attorney General was only referring to what constitutes "credible information" under the statute, not whether the statute requires a new voting registration to be cancelled in favor of the old one. Further, the dissent's suggestion that third parties may try to maliciously purge voting registrations (Dissent at 52, n.2) is off-base. Under the statute, a county recorder has to confirm voting registration records with the other county recorder before removing the old registration.

[5] The dissent argues that we are addressing the merits of the claim in our standing analysis. Dissent at 51. We are not. The plaintiffs' claim is based on the premise that the National Voter Registration Act preempts Arizona law. We do not address the merits of that preemption argument. Rather, we merely point out that the plaintiffs' chimerical and speculative theory of harm—that the law will compel the state to bizarrely cancel a *new* voting registration form and keep the *old* one—is belied by the statutory language, common sense, and statements from bipartisan state elected officials in charge of administering and enforcing Arizona's election laws. We are not bound to accept an incorrect premise in determining whether a party has standing. Indeed, in determining whether

The plaintiffs attempt to cure these problems by claiming that they have alleged more than "mere issue advocacy"—and thus satisfied *Hippocratic Medicine*—because the Cancellation Provision creates a direct organizational harm by "impact[ing] their ability to engage in their core voter registration activities." But this is a diversion-of-resources theory by another name. The only way in which the Cancellation Provision arguably affects the plaintiffs' "core voter registration activities" is by causing the plaintiffs, in response to the provision, to decide to shift some resources from one **[*30]** set of pre-existing activities in support of their overall mission to another, new set of such activities. Indeed, the plaintiffs' purported harm—*e.g.*, they will have to "expend . . . resources," "create[e] a training program," "divert additional time and resources" (Dissent at 58-59)—represent the same diversion-of-resources and frustration-of-mission injury that *Hippocratic Medicine* rejected.

Unlike *Havens Realty*, as clarified by *Hippocratic Medicine*, here there is no sense in which the Cancellation Provision can be said to directly injure the organizations' pre-existing core activities, apart from the plaintiffs' response to that provision. The dissent suggests that the plaintiff HOME in *Havens Realty* would not have standing under our reading of *Hippocratic Medicine*. We disagree. Havens Realty had "perceptibly impaired" HOME's "core" and ongoing ability to provide counseling and referral services because it lied and "provided HOME's black employees false information about apartment availability." [Hippocratic Medicine, 602 U.S. at 395](). Put another way,

---

a chain-of-causation is too speculative under our Article III standing principles, we must look at whether a plaintiff is relying on a far-fetched speculation in assessing how a statute may be applied.

The dissent relies on our decision in [Peace Ranch, LLC v. Bonta, 93 F.4th 482 (9th Cir. 2024)](), to argue that we are impermissibly determining the merits of the case in our standing analysis. But that case is plainly distinguishable. There, the state argued in its brief that its law regulating mobile home parks did not apply to the plaintiff's park and thus the plaintiff did not have standing. But at oral argument the state refused to say that it would not enforce that law against the plaintiff. The state's refusal to disclaim enforcement was especially notable because the record showed that the state legislature had specifically targeted that park (and that park only) in passing the law. [Id. at 486](). Given that record, we refused to credit the state's argument in its brief that the law did not apply to the plaintiff. Here, in contrast, the law is clear that the state will not cancel the new registration.

Havens Realty had "directly affected and interfered" with HOME's pre-existing goal of helping its Black clients obtain housing because Havens Realty had wrongfully lied **[*31]** that nothing was available in predominantly white apartments. *Id.* As the Supreme Court explained, a plaintiff group has organizational standing if it can show harm to its "core business activities" much like a "retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* So *Havens Realty* was not a case in which HOME claimed standing based on its voluntary decision to spend more resources to educate its clients in response to Havens Realty's actions; rather, its core and ongoing business activity was "perceptibly impaired" by Havens Realty's wrongful lies. *Id.*

The plaintiffs here, in contrast, can continue its core and ongoing business of registering voters. The Cancellation Provision does not "directly affect[] and interfere[]" with that pre-existing activity. The only harm here is the potential diversion of resource to remind people of the far-fetched possibility that the registrar of voters may somehow mistakenly or maliciously cancel their new voting registration form if they had earlier registered elsewhere. In other words, the plaintiffs are claiming that they are harmed because they will spend resources on education in response to the new law. This alleged **[*32]** harm simply is not akin to a "retailer who sues a manufacturer for selling defective goods to the retailer" or a group's core business activity being "perceptibly impaired." *Id.* If we accepted the plaintiffs' extravagant theory of standing, a law school professor who teaches election law would have standing to challenge the Cancellation Provision because she would have to expend resources to change her curriculum and further educate her students about the state of the law. Article III standing cannot be based on such fanciful or speculative harm.

## II. The plaintiffs have standing to challenge the Felony Provision but their argument likely fails on the merits.

To establish standing at the preliminary injunction stage, plaintiffs must make a clear showing that they have suffered an actual or imminent injury that a preliminary injunction would remedy. *See* [Lujan, 504 U.S. at 564](); [Spokeo, 578 U.S. at 339]() ("a plaintiff must show that he or she suffered" an "actual or imminent" injury (citation omitted)); *Lopez, 630 F.3d at 785*. Only if plaintiffs make that clear showing can we decide the merits of the claim.

**A. The plaintiffs have standing because they have shown that they face a realistic possibility of prosecution**.

To make a clear showing of standing, the plaintiffs [*33] must show that they face a reasonable risk of prosecution under the Felony Provision such that they are chilled from engaging in their constitutionally protected voter outreach and registration activities. [6]

This court has repeatedly held that when a "threatened enforcement effort implicates *First Amendment* rights, the inquiry tilts dramatically toward a finding of standing" to guard against chilling protected speech. *LSO, Ltd. v. Stroh, 205 F.3d 1146, 1155 (9th Cir. 2000)*. Of course, even under this "lowered threshold," the threat of injury to plaintiffs still must be "credible, not imaginary or speculative." *Lopez, 630 F.3d at 781, 786* (cleaned up). Put another way, plaintiffs satisfy the injury-in-fact requirement in a pre-enforcement challenge if they allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159, 134 S. Ct. 2334, 189 L. Ed. 2d 246 (2014)*.

Thus, a plaintiff bringing a pre-enforcement *First Amendment* challenge typically must show that her expressive activity is chilled because she faces a "realistic danger" of prosecution under the statute she challenges. *Libertarian Party of L.A. Cnty. v. Bowen, 709 F.3d 867, 870 (9th Cir. 2013)* (citation omitted). "In evaluating the genuineness of a claimed threat of prosecution, courts examine three [*34] factors: (1) whether plaintiffs have articulated a 'concrete plan' to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." *Id.* (citation omitted). In assessing these three factors, we believe that the plaintiffs face a "realistic

danger" of prosecution.

First, the plaintiffs have concrete plans to engage in constitutionally protected voter outreach activities, including voter registration, that they believe may violate the Felony Provision. We have generally held that a plaintiff satisfies this first factor if the "plaintiff's intended speech *arguably* falls within the statute's reach." *Cal. Pro-Life Council, Inc. v. Getman, 328 F.3d 1088, 1095 (9th Cir. 2003)* (emphasis added). The plaintiffs clear that low hurdle because the undefined phrase "mechanism for voting" arguably could be read to encompass *First Amendment* activities such as voter registration.

Second, while no Arizona official has threatened to prosecute the plaintiffs, that does not defeat their standing. In *First Amendment* challenges, "the plaintiff need only demonstrate that a threat of potential enforcement will cause him to self-censor, and not follow [*35] through with his concrete plan to engage in protected conduct." *Protectmarriage.com-Yes on 8 v. Bowen, 752 F.3d 827, 839 (9th Cir. 2014)*; *see also Tingley v. Ferguson, 47 F.4th 1055, 1068 (9th Cir. 2022)* (suggesting that a plaintiff need not show a specific threat of prosecution to establish standing if the general specter of liability will cause her to self-censor).

In this litigation, the state's Attorney General has rejected any interpretation of SB 1260 that would criminalize ordinary voter outreach. But this court has held that officials cannot inoculate laws from review if the disavowal is a "mere litigation position." *Lopez, 630 F.3d at 788*. Outside of this case, the state has offered no official guidance limiting the Felony Provision's reach, even though the state has been on notice that the provision is vague and potentially chilling speech. The Attorney General's office also acknowledges that its interpretation will not bind its successor. Thus, the plaintiffs have established that they will self-censor because of SB 1260's nascent threat, satisfying the second factor too.

Finally, the plaintiffs' inability to show a history of prosecution under the Felony Provision does not undermine their standing. *See LSO, Ltd., 205 F.3d at 1155*; *see also Libertarian Party, 709 F.3d at 872*. In pre-enforcement cases, "an actual arrest, prosecution, or other enforcement action is not a prerequisite [*36] to challenging the law." *Driehaus, 573 U.S. at 158*. SB 1260 was enjoined the day after it took effect, so Arizona never had a genuine opportunity to enforce it. *See id.*

---

[6] Unlike the Cancellation Provision, *Hippocratic Medicine* does not undermine the plaintiffs' standing to challenge the Felony Provision because the plaintiff organizations allege that they will *themselves* be prosecuted for violating the Felony Provision, *i.e.*, that they are parties as to whom the Felony Provision "forbid[s] some action." *Hippocratic Medicine, 602 U.S. at 382*. Thus, in asserting standing to challenge the Felony Provision, the plaintiffs do not rely on the frustration of their mission or diversion of resources.

Considering these three factors together, we hold that the plaintiffs have met their burden to make a clear showing of a concrete injury and thus they have Article III standing.

**B. The plaintiffs are unlikely to prevail on the merits because the phrase "mechanism for voting" is not unconstitutionally vague**.

In a vagueness challenge, our first task is to determine whether the challenged law curtails *First Amendment* freedoms. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982)*. Laws that restrict *First Amendment* rights are less likely to survive a vagueness challenge. *Compare Humanitarian L. Project v. U.S. Treasury Dep't, 578 F.3d 1133, 1146 (9th Cir. 2009) with Hotel & Motel Ass'n of Oakland v. City of Oakland, 344 F.3d 959, 972 (9th Cir. 2003)*. That is because *First Amendment* rights are "delicate and vulnerable, as well as supremely precious in our society . . . [and] the threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." *NAACP v. Button, 371 U.S. 415, 433, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963)*.

A law is void for vagueness when it "fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits" or when it "authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chicago v. Morales, 527 U.S. 41, 56, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999)*. This court applies this test more strictly when the challenged law touches on forms of political [*37] speech. *Butcher v. Knudsen, 38 F.4th 1163, 1169 (9th Cir. 2022)*. At the same time, we know that "[f]acial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort." *Cal. Tchrs. Ass'n v. State Bd. of Educ., 271 F.3d 1141, 1155 (9th Cir. 2001)* (citation omitted).

When evaluating the vagueness of a statute, we "interpret statutory language in view of the entire text, considering the context." *Nicaise v. Sundaram, 245 Ariz. 566, 432 P.3d 925, 927 (Ariz. 2019)*. We give words "their ordinary meaning unless it appears from the context or otherwise that a different meaning is intended." *Arizona ex rel. Brnovich v. Maricopa Cnty. Cmty. Coll. Dist. Bd., 243 Ariz. 539, 416 P.3d 803, 805 (Ariz. 2018)* (citation omitted).

The Felony Provision prohibits "[k]nowingly provid[ing] a mechanism for voting to another person who is registered in another state, including by forwarding an early ballot addressed to the other person." *A.R.S. § 16-1016(12)*. Because the statute does not define "mechanism for voting," we must begin by "apply[ing] the ordinary meaning of the term." *Arizona v. Dann, 220 Ariz. 351, 207 P.3d 604, 621 (Ariz. 2009)*. As relevant here, a "mechanism" is "a process or technique for achieving a particular result," *Mechanism*, Webster's Third New International Dictionary (1981 ed.), or an "instrument or process . . . by which something is done," *Mechanism*, American Heritage Dictionary (5th ed. 2018). The object of "mechanism" in the statute's prepositional phrase is "voting," which refers to the "act or process of [*38] casting a vote," *Voting*, Webster's Third New International Dictionary (1981 ed.). So construed under its ordinary meaning, the phrase "mechanism for voting" likely refers to a process, technique, or instrument for *casting a vote*. That plain-meaning construction of the phrase does not include activities such as voter registration because providing a mechanism for *registering* to vote is different from providing a "mechanism for *voting*."

We also do not read words or phrases divorced from the statutory scheme. "[I]t is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.'" *Adams v. Comm'n on App. Ct. Appointments, 227 Ariz. 129, 254 P.3d 367, 374 (Ariz. 2011)* (quoting *Deal v. United States, 508 U.S. 129, 132, 113 S. Ct. 1993, 124 L. Ed. 2d 44 (1993)*). When we look at the entire statute, including the surrounding provisions, that reinforces our conclusion that "mechanism for voting" does not include voting outreach or registration. *See Nicaise, 432 P.3d at 927*.

To begin, the title of the statutory section where the Felony Provision is housed suggests that it only criminalizes misconduct involving the actual act of casting a vote. *See Miller v. City of Tucson, 153 Ariz. 380, 736 P.2d 1192, 1193 (Ariz. Ct. App. 1987)* ("This court has also ruled that it is proper to consider the title of a statute in attempting to [*39] interpret the enacting body's intent." (citing *State v. Shepler, 141 Ariz. 43, 684 P.2d 924, 925 (Ariz. Ct. App.1984)*)). The title lists "Illegal voting," "pollution of ballot box," and "removal or destruction of ballot box, poll lists or ballots." *A.R.S. § 16-1016*. All these activities in the title involve the act of voting, confirming that "mechanism for voting" is confined to that as well.

And all the other specific criminal violations listed in this section are indeed related to acts of voting. *See id.* That underscores that this section regulates the act of voting itself, not voter registration. *See id.* The section criminalizes twelve specified acts related to voting:

    1. Not being entitled to vote, knowingly votes.

    2. Knowingly votes more than once at any election.

    3. Knowingly votes in two or more jurisdictions in this state for which residency is required for lawful voting and the person is not a resident of all jurisdictions in which the person voted. For the purposes of this paragraph, a person has only one residence for the purpose of voting.

    4. Knowingly votes in this state in an election in which a federal office appears on the ballot and votes in another state in an election in which a federal office appears on the ballot and the election day for both states **[*40]** is the same date.

    5. Knowingly gives to an election official two or more ballots folded together.

    6. Knowingly changes or destroys a ballot after it has been deposited in the ballot box.

    7. Knowingly adds a ballot to those legally cast at any election, by fraudulently introducing the ballot into the ballot box either before or after the ballots in the ballot box have been counted.

    8. Knowingly adds to or mixes with ballots lawfully cast, other ballots, while they are being canvassed or counted, with intent to affect the result of the election, or to exhibit the ballots as evidence on the trial of an election contest.

    9. Knowingly and unlawfully carries away, conceals or removes a poll list, ballot or ballot box from the polling place, or from possession of the person authorized by law to have custody thereof.

    10. Knowingly destroys a polling list, ballot or ballot box with the intent to interrupt or invalidate the election.

    11. Knowingly detains, alters, mutilates or destroys ballots or election returns.

    12. Knowingly provides a mechanism for voting to another person who is registered in another state, including by forwarding an early ballot addressed to the other person.

*Id.* The first eleven **[*41]** provisions all directly relate to misconduct in the act of voting; none of them relates to pre-voting activity, such as voting registration or outreach. The provision about "mechanism for voting" appears as the last and twelfth item on that list of misconduct. As a general matter, "words grouped in a list should be given related meanings." *See* Scalia and

Garner, *Reading Law* at 195. Consistent with the other eleven neighboring provisions, the twelfth provision about "mechanism for voting" likely encompasses only misconduct related to the act of voting.

Another statutory clue that "mechanism for voting" does not include voting outreach and registration is that a different section penalizes voter registration-related misconduct. *See A.R.S. § 16-181-84. Section 16-182(A)* provides criminal penalties for any individual who "allows himself to be registered . . . knowing that he is not entitled to such registration, or a person who knowingly causes or procures another person to be registered . . . knowing that such other person is not entitled to such registration." This express provision for voting registration fraud implies that the "mechanism for voting" provision in the section devoted to illegal voting refers only to voting, **[*42]** not voting registration. Otherwise, the separate registration section would be superfluous. And a "cardinal principle of statutory interpretation is to give meaning, if possible, to every word and provision so that no word or provision is rendered superfluous." *Nicaise, 432 P.3d at 927.*

In sum, when we review "mechanism for voting" within the broader context of the statutory framework, its meaning is clear such that it "defin[es] a 'core' of proscribed conduct that allows people to understand whether their actions will result in adverse consequences." *Forbes v. Napolitano, 236 F.3d 1009, 1011 (9th Cir. 2001)* (citation omitted). A "mechanism for voting" thus concerns the process involved in casting a vote, not registering to vote. *See, e.g., Stambaugh v. Killian, 242 Ariz. 508, 398 P.3d 574, 575 (Ariz. 2017)* ("Words in statutes should be read in context in determining their meaning."); Scalia and Garner, *Reading Law* at 167-68 ("Context is a primary determinant of meaning.").

Finally, we have another reason for rejecting the plaintiffs' expansive reading of the Felony Provision. We try to avoid constitutional problems if there is a reasonable way to read a statute to avoid them. *Cal. Tchrs. Ass'n, 271 F.3d at 1147* (explaining that "before invalidating a state statute on its face, a federal court must determine whether the statute is 'readily susceptible' to a narrowing **[*43]** construction" (quoting *Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 397, 108 S. Ct. 636, 98 L. Ed. 2d 782 (1988)*)); *see Arizona v. Gomez, 212 Ariz. 55, 127 P.3d 873, 878 (Ariz. 2006)* ("We also construe statutes, when possible, to avoid constitutional difficulties."). And in the realm of criminal law, the rule of lenity tilts the scale in favor of

the criminal defendant and we construe ambiguous criminal statutes narrowly. *See Arizona v. Brown, 217 Ariz. 617, 177 P.3d 878, 882 (Ariz. Ct. App. 2008)* ("[W]e construe criminal statutes that are unclear or reasonably susceptible to different interpretations in favor of lenity."). Here, as explained earlier, the Felony Provision is readily susceptible to a narrowing construction and we will not construe its use of "mechanism for voting" broadly to include voter registration.

In sum, the district court abused its discretion in concluding that the plaintiffs would likely prevail in their challenge of the Felony Provision and granting their motion for preliminary injunction. Because we hold that the Felony Provision is not unconstitutionally vague, the plaintiffs have not met their burden of showing a likelihood of success on the merits.

**CONCLUSION**

We hold that the plaintiffs lack standing to challenge the Cancellation Provision, and that the district court erred in concluding that the plaintiffs showed a likelihood of success in their challenge of the Felony Provision. **[*44]** We thus vacate the district court's grant of a preliminary injunction and remand for further proceedings consistent with this opinion.

**Concur by:** Kenneth K. Lee

# Concur

LEE, Circuit Judge, concurring.

As the majority opinion points out, the plaintiffs lack Article III standing to challenge Arizona's Cancellation Provision. But even if they had standing, they likely would not prevail on their claim that the National Voter Registration Act (NVRA) preempts the Cancellation Provision. The district court here relied on the reasoning in a pair of decisions from the Seventh Circuit, the only circuit to have addressed the reach of NVRA's *section 20507(d)(1)*. Because I strongly but respectfully disagree with the Seventh Circuit's textual analysis and expect that this question will arise in similar challenges, I write separately to offer a countervailing reading of the statute.

\* \* \* \*

An Arizona voter can, of course, lawfully vote only once. And that is where the Cancellation Provision comes in: It tries to reduce the risk of someone voting twice in two jurisdictions by allowing a county recorder to cancel a voter's prior registration if she learns that the voter has moved to a new jurisdiction. The county recorder can do so only if she either (1) "receives confirmation from another **[*45]** county recorder that the person registered has registered to vote in that other county," *A.R.S. § 16-165(A)(10)*, or (2) receives "credible information that a person has registered to vote in a different county," at which point she "shall confirm the person's voter registration with that other county and, on confirmation, shall cancel the person's registration," *A.R.S. § 16-165(B)*.

But in enacting the NVRA, Congress set baseline procedural requirements that all states must comply with in removing a registered voter from their voting rolls. Among other things, the NVRA allows a state to remove a voter if she has moved to a different jurisdiction. *52 U.S.C. § 20507(d)(1)*. There are two ways a county can confirm that the voter has moved under the NVRA: (1) the voter can "confirm[] in writing that [she] has changed residence to a place outside the registrar's jurisdiction," or (2) the county may remove a voter who has not recently voted and does not respond after receiving notice from the state. *Id. § 20507(d)(1)(A)*, *(B)*.

Relying heavily on two Seventh Circuit decisions relating to Indiana state law—*Common Cause Indiana v. Lawson, 937 F.3d 944 (7th Cir. 2019)* and *League of Women Voters of Indiana, Inc. v. Sullivan, 5 F.4th 714 (7th Cir. 2021)*—the district court held that Arizona's Cancellation Provision conflicts with the NVRA. It held that the NVRA's requirement that a voter must "confirm[] in writing that **[*46]** [she] has changed residence to a place outside the registrar's jurisdiction" creates a two-step process for confirming that someone has moved: first, when a state receives the initial information that a voter may have moved, it must reach out to the voter; then second, the voter must confirm that she has indeed moved. According to the district court, only then can the county recorder remove that voter from the voting roll of the prior county where she had lived.

The Seventh Circuit—and the district court here—hinged their argument on the word "confirm" in the NVRA: "A plain-meaning reading of the NVRA dictates that the *states* need to 'confirm' something—in this instance the *initial information* [about a change in residence] they received. It stretches the meaning of 'confirm' past its limits to ignore its key feature of

corroborating or verifying a prior piece [of] knowledge." *Common Cause, 937 F.3d at 962* (emphasis added). In other words, the Seventh Circuit believed that the word "confirm" creates a two-step process in which a *state* (or county) needs to confirm the "*initial information*" it receives about a change in residence.

The district court's (and the Seventh Circuit's) reading of the NVRA is highly questionable **[*47]** both textually and structurally. The NVRA says nothing about a "*state*" confirming any "*initial information*" it receives about a change in residence. Rather, it just says that "the *registrant* [*i.e.*, the voter] confirms in writing that *[she] has changed residence* to a place outside the registrar's jurisdiction." *52 U.S.C. § 20507(d)(1)(A)* (emphasis added). So it is the *voter*—not the state—that is confirming the fact that she has moved. *Compare id.* ("the *registrant* confirms in writing" (emphasis added)) with *Common Cause, 937 F.3d at 962* ("the NVRA then requires that the *state* . . . 'confirm' with the registrant before removing the person from the rolls" (emphasis added)).

And how does a voter "confirm[] in writing that [she] has changed residence to a place outside the registrar's jurisdiction"? One way is by registering to vote in a new county and affirming under the penalty of perjury that she now lives in that new jurisdiction. Put another way, the very act of filling out a form to register in another county is by itself a written confirmation of the fact that a voter has changed residence—just as Arizona's Cancellation Provision provides. The dissent argues that this reading is "unmoored from the statutory text." Dissent at 68. But filling **[*48]** out a new voting registration form in a new county obviously can be a "confirm[ation] in writing that [the voter] has changed residence." *52 U.S.C. § 20507(d)(1)(A)*. Indeed, the reason why a voter would fill out a new voting registration form is to alert the county that she has moved and now lives in a new residence—i.e., to "confirm in writing that [she] has changed residence." This type of confirmation by citizens is common. For example, someone who buys a car from a dealer must submit a new car registration form to the DMV. And by filing out the DMV registration form, the person has confirmed in writing that she is the owner of a new car.

Nothing in the text of the NVRA requires the county to send a separate notice to the voter—and then await a reply from that voter—to ensure that the voter really meant to say that she moved when she registered in a different county. The Seventh Circuit divined this two-step notice process solely from the word "confirm." That

single word cannot bear the load of an intricate two-step statutory scheme that the district court and the Seventh Circuit impose on it.[1]

The district court also reasoned that Arizona's Cancellation Provision conflicts with the NVRA **[*49]** because a "county recorder's confirmation with *another county recorder* [that a voter has moved] is similarly insufficient to constitute confirmation *from the registrant* under the NVRA." But the "confirmation from the registrant" about a new residence has already occurred when the voter signed a voting registration form in a new jurisdiction. The logistics of one county recorder— whose job is to keep track of voting registration— contacting another county recorder does not change the fact that the voter already confirmed in writing that she moved to a new county.

We also know that the NVRA does not establish a twostep confirmation process under *§ 20507(d)(1)(A)* because it says nothing about it—but the statute *does* lay out a two-step confirmation process for a different scenario under *§ 20507(d)(1)(B)*. As noted earlier, *§ 20507(d)(1)(B)* establishes an alternative way for a state to remove a voter from the voting rolls: if a voter has not recently voted and does not respond to a notice from the state, that person can be removed. The statute outlines how the notice-and-confirmation process works for removing a voter under this method—the state must send a "postage prepaid and pre-addressed return card" "by forwardable mail" under a set **[*50]** timeline. *§ 20507(d)(2)*.

The dissent relies on this different statutory provision (for removing voters who have not voted recently) to argue that the state must also comply with this two-step notice process for the provision at issue involving voters who have moved and registered to vote in a new county. Dissent at 65-66. But the statutory provision for

---

[1] The Seventh Circuit later doubled down on its reading of the NVRA in *League of Women Voters*, and went even further by saying that under *§ 20507(d)(1)(A)* a "state may not remove a voter from its voter rolls without . . . receiving a direct communication from the voter that she wishes to be removed." *5 F. 4th at 723*. But there is nothing in *§ 20507(d)(1)(A)* that requires a voter to say that she "wishes to be removed." It only says that a voter must "confirm[] in writing" that she has "changed residence" to a new jurisdiction. There is a separate provision in the NVRA in which a voter can request that she be removed from the voting rolls. *52 U.S.C. § 20507(d)(3)(A)*. In contrast, *§ 20507(d)(1)(A)* allows the removal of a person if she has moved and registered in a new jurisdiction.

removing voters who have registered to vote elsewhere says nothing about a two-step process. If Congress wanted a two-step confirmation process for removing voters under *§ 20507(d)(1)(A)* (for voters who have registered to vote in a new county), it could have laid out a process to do so, much like it did in *§ 20507(d)(1)(B)* (for voters who have not voted recently). That *§ 20507(d)(1)(A)* says nothing about a two-step process is telling, and we should not concoct a confirmation process when Congress has not uttered a word about it. See *Lamie v. United States Trustee, 540 U.S. 526, 537, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004)* (explaining that it is not the role of the courts to "rewrit[e] rules that Congress has affirmatively and specifically enacted") (citation omitted).[2]

Indeed, it makes sense why Congress would want additional protections—through a two-step notice process—for voters who have not voted recently. Merely **[*51]** not voting recently does not signify that the voter will not vote in that county in the future. Perhaps that voter was too busy to vote or did not support any of the candidates in the last election but she may want to vote in the next election. In contrast, if a voter moves and registers to vote in a new county, that is confirmation that the voter will not—and cannot—vote in the old county where she no longer lives.

Another provision of the NVRA also weighs against reading into that statute a two-step confirmation process for removing a voter who has confirmed a change of residence through a new voting registration. That is because a separate provision of the NVRA mandates that, unless an explicit statute otherwise, "[a]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of a change of address for voter registration." *52 U.S.C. § 20504(d)*. The NVRA then directs state officials to treat a driver's license application as "updating any previous voter registration by the applicant." *§ 20504(a)(2)*. So if a change of address form submitted for purposes of a driver's license can serve as notification of a change of **[*52]** address for voting purposes, then a new voting registration also can.

To be clear, *§ 20507(d)(1)(A)* does not set up a toothless regime in which states or counties can remove willy-nilly any voter it suspects of having moved. A state cannot, for example, rely on a third-party database to remove a voter, like what Indiana did in *Common Cause* by using a "third-party database known as Crosscheck, which aggregates voter data from multiple states to identify potential duplicate voter registrations." *Common Cause, 937 F.3d at 948*. In such a case, there has been no written confirmation by the voter that she has moved. But Arizona's law meets the NVRA's written confirmation requirement because the county recorder—whose job is to maintain voting registration records—will have received the new voting registration form by the voter confirming in writing that she has moved to the new jurisdiction. *A.R.S. § 16-165(A)*, *(B)*. So, contrary to the reasoning of the Seventh Circuit's NVRA decisions and the district court's reliance on them, there is no conflict between the NVRA and Arizona's Cancellation Provision. And the plaintiffs' challenge to the Cancellation Provision would fail even on the merits.

**Dissent by:** Jacqueline H. Nguyen (In Part)

# Dissent

NGUYEN, Circuit Judge, dissenting in **[*53]** part: I strongly dissent from the majority's holding that plaintiffs lack standing to challenge the Cancellation Provision.[1] The majority's deeply flawed analysis improperly conflates standing with the merits; usurps the district court's role as factfinder by raising and resolving a standing issue for the first time on appeal; ignores plaintiffs' actual evidence; and confuses a third-party standing injury with the direct organizational injury here. Worse still, the majority erroneously overrules several cases as irreconcilable with *FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 395-96, 144 S. Ct. 1540, 219 L. Ed. 2d 121 (2024)*, which breaks no new ground on the standing doctrine.

The district court correctly determined, in line with the Seventh Circuit's analysis of a similar law, that the Cancellation Provision likely violates the National Voter Registration Act ("NVRA"). I would therefore affirm the district court's injunction as to the Cancellation Provision.

---

[2] YCRC points out that the Federal Election Commission's guidance states that registration in another state can serve as confirmation of a change of address. See *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* at 5-7 to 5-8 (Jan. 1, 1994). But there is no need to look at FEC guidance because the statutory text forecloses the plaintiffs' position.

---

[1] As for the Felony Provision, I concur in the result.

I.

A.

According to the majority, the standing analysis turns on *Hippocratic Medicine* overruling several of our cases applying *Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)*. But *Hippocratic Medicine*, which devoted little more than a page to discussing *Havens Realty*, merely "applied traditional standing principles to an organizational plaintiff," Maj. Op. at 21, as did *Havens Realty* itself, *see 455 U.S. at 378* (conducting **[*54]** "the same [standing] inquiry as in the case of an individual"). And it was *Havens Realty*—not *Hippocratic Medicine*—which established that a mere "setback to the organization's abstract social interests" is insufficient to confer standing. *Id. at 379*. *Hippocratic Medicine* is hardly a sea change in the law of organizational standing.

The majority mischaracterizes our precedent interpreting *Havens Realty* as creating "a two-part test" that "merely" requires a showing that "a challenged policy (1) frustrated the organization's mission or goal, and (2) required the organization to spend money or divert resources in response." Maj. Op. at 16. No Ninth Circuit precedent describes *Havens Realty* as a two-part test. While we have acknowledged that standing can be *based on* an organization's expenditure of resources to address conduct that frustrates its purpose—as did *Havens Realty* itself, *see 455 U.S. at 379* (finding plaintiff sufficiently established standing by alleging that it "devote[d] significant resources to identify and counteract . . . racially discriminatory steering practices" that "frustrated . . . its efforts to assist equal access to housing through counseling and other referral services")—we have been careful **[*55]** to explain that these circumstances alone are not sufficient and that caveats apply.

As the majority acknowledges, "[w]e have often said that *Havens Realty* does not allow organizations to vindicate abstract interests or spend their way into Article III standing." Maj. Op. at 17. So then how is our case law incorrect? The majority doesn't say. Although an organization's "mission" may be nothing more than "broad aspirational goals," *id.* at 17 (quoting *Nielsen v. Thornell, 101 F.4th 1164, 1170 (9th Cir. 2024)* (opinion of Lee, J.)), there is usually substantial overlap between an organization's goals and its "core business activities," *Hippocratic Med., 602 U.S. at 395*. *See, e.g., Fair Hous.*

*of Marin v. Combs, 285 F.3d 899, 902-05 (9th Cir. 2002)* (finding "frustration of mission" from injury to the plaintiff organization's ability to provide "activities" combatting housing discrimination).

Even if the majority is right that some of our decisions were "less clear" and provided "no detailed analysis" about the factual basis for standing, Maj. Op. at 17 (quoting *Nielsen, 101 F.4th at 1181* (Collins, J., dissenting)), that does not make those decisions "clearly irreconcilable with *Hippocratic Medicine,*" *id. at 7*.

B.

By misreading our case law, the majority erects new barriers to the courthouse for organizations that are directly injured by legislation. These restrictions find no support **[*56]** in *Hippocratic Medicine* or any other case. Instead, the majority grafts third-party standing principles onto a case of first-party standing.

According to the majority, the causation element of standing "may be harder to meet" for organizational plaintiffs. *Id.* at 14. That is true only when organizations seek to vindicate the rights of *others*. "Claims premised on the government's treatment of a third-party must satisfy . . . stringent constitutional standing requirements." *Kyung Park v. Holder, 572 F.3d 619, 625 (9th Cir. 2009)* (quoting *Shanks v. Dressel, 540 F.3d 1082, 1090 n.9 (9th Cir. 2008)*). In such cases, "much more is needed" to show causation and redressability because these elements' existence "depends on the unfettered choices made by independent actors not before the courts." *Lujan v. Defs. of Wildlife, 504 U.S. 555, 562, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)* (quoting *ASARCO Inc. v. Kadish, 490 U.S. 605, 615, 109 S. Ct. 2037, 104 L. Ed. 2d 696 (1989)* (opinion of Kennedy, J.)).

But this case involves *first*-party standing. *See Hippocratic Med., 602 U.S. at 393* ("Under this Court's precedents, organizations may have standing 'to sue on their own behalf for injuries they have sustained.'" (quoting *Havens Realty, 455 U.S. at 379 n.19*)). The majority is correct that causation normally is "easy" to show when an individual plaintiff is directly injured by the challenged law, because the plaintiff need not speculate about what actions it will take absent relief. Maj. Op. at 14. The analysis is the same for an organizational **[*57]** plaintiff. *See, e.g., Havens Realty, 455 U.S. at 379* (finding "no question that the organization has suffered injury in fact" because the

2024 U.S. App. LEXIS 23963, *57

defendant's policy brought "concrete and demonstrable injury to the organization's activities"); *see also* 13A Charles Alan Wright et al., *Federal Practice and Procedure* § 3531.9.5, Westlaw (database updated June 2024) ("Injury to an organization itself may involve matters no different than injury to any person, real or abstract. Standing to protect against such injury is easily recognized.").

Similarly, the majority wrongly asserts that an organization's standing requires more scrutiny than that of individual plaintiffs. *See* Maj. Op. at 22 (holding that "we must scrutinize the harm an organization asserts" because "*Hippocratic Medicine* clarified that it is tougher for a plaintiff to establish causation than some of our precedents suggested"). Tellingly, the majority relies on the portion of *Hippocratic Medicine* discussing third-party standing principles rather than the portion discussing *Havens Realty. See id.* (citing *602 U.S. at 382-83*). The Supreme Court has repeatedly explained, however, that the first-party standing analysis is the same for organizations as it is for individuals. *See Havens Realty, 455 U.S. at 378; Hippocratic Med., 602 U.S. at 394* ("Like **[*58]** an individual, an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct . . . ." (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 486, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982)*)).

Ultimately, the majority's focus on overruling our standing precedent is a distraction. There is no reason to consider the issue because plaintiffs' standing is consistent with *Hippocratic Medicine.* Plaintiffs do not seek to vindicate abstract social interests; the Cancellation Provision "directly affect[s] and interfere[s] with" their "core business activities." *Hippocratic Med., 602 U.S. at 395.*

## II.

## A.

The majority's standing conclusion rests on its disagreement with plaintiffs' statutory interpretation. *See* Maj. Op. at 24-25 (rejecting plaintiffs' "implausible reading of the Cancellation Provision"). Even if plaintiffs misread the Cancellation Provision—and they do not—that is a merits question. "[T]he Supreme Court has cautioned that standing 'in no way depends on the merits.'" *Arizona v. Yellen, 34 F.4th 841, 849 (9th Cir. 2022)* (quoting *Warth v. Seldin, 422 U.S. 490, 500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*); *see FEC v. Ted Cruz for Senate, 596 U.S. 289, 298, 142 S. Ct. 1638, 212 L. Ed. 2d 654 (2022)* ("For standing purposes, we accept as valid the merits of [the plaintiffs'] legal claims . . . ."); *E. Bay Sanctuary Covenant v. Biden ("E. Bay Sanctuary Covenant II"), 993 F.3d 640, 665 (9th Cir. 2021)* ("[A] plaintiff can have standing despite losing on the merits.").

"It is firmly established" that plaintiffs' statutory **[*59]** interpretation need only be "arguable" to serve as a basis for their standing. *Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998).* Federal courts "[have] jurisdiction if 'the right of the [plaintiffs] to recover under their complaint will be sustained if the Constitution and laws . . . are given one construction and will be defeated if they are given another.'" *Id.* (quoting *Bell v. Hood, 327 U.S. 678, 685, 66 S. Ct. 773, 90 L. Ed. 939 (1946)*). Only where a claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous" may we dismiss the suit on standing grounds. *Id.* (quoting *Bell, 327 U.S. at 682-83*).

In *Peace Ranch, LLC v. Bonta*, for example, we discussed the "'Alice in Wonderland air' about the parties' arguments" where, as here, the plaintiffs and government defendant disputed a statute's applicability in the context of a standing challenge—the plaintiffs arguing it did apply and the government arguing it did not—despite these positions being antithetical to the parties' interests if the court upheld the statute. *93 F.4th 482, 489 (9th Cir. 2024)* (quoting *Cruz, 596 U.S. at 299*). There was "no need to go 'further down [the] rabbit hole'" of whether the statute applied, we explained, because the inquiry would "unavoidably tangle standing with the merits." *Id.* (quoting *Cruz, 596 U.S. at 301*); *see also E. Bay Sanctuary Covenant II, 993 F.3d at 665* (distinguishing the actual **[*60]** or imminent "legally protected interest" from "an interest protected by statute," thereby "prevent[ing] Article III standing requirements from collapsing into the merits of a plaintiff's claim").

Here, plaintiffs' statutory interpretation is neither insubstantial nor frivolous. Under the Cancellation Provision, "[i]f the county recorder receives credible information that a person has registered to vote in a different county, the county recorder shall confirm the person's voter registration with that other county and, on

confirmation, shall cancel the person's registration." *Ariz. Rev. Stat. Ann. § 16-165(B)*. Plaintiffs' NVRA claim turns on the permissible sources of "credible information." Plaintiffs' concern is that, contrary to the NVRA, the Cancellation Provision enables nongovernmental actors to improperly disenfranchise voters by notifying the county recorder in a voter's new residence that the voter has moved to a former residence.[2] On its face, the Cancellation Provision requires only that the county recorder confirm that the voter is registered in another county before canceling the voter's registration; there is no requirement to determine which registration was first in time or to contact the voter in question. Thus, **[*61]** if a voter forgets to affirmatively cancel registration at a former residence, the county recorder will confirm the outdated registration and duly cancel the voter's most recent and legitimate registration—not by mistake, as the majority suggests, *see* Maj. Op. at 25-26—but through the normal operation of state law.[3]

Arizona's attorney general—the only defendant opposing the district court's injunction—and intervenor Yuma County Republican Committee ("YCRC") both *agree* with plaintiffs' statutory interpretation.[4] They assert that "[i]f the county recorders were to ignore credible information . . . from any source other than another county recorder (or other election official), they would be knowingly and willfully disregarding th[eir] duty to certify that the voter lists are accurate." Even Arizona's secretary of state, despite disagreeing with

plaintiffs' statutory interpretation,[5] acknowledges that the Cancellation Provision "could be interpreted differently."

The majority purports to interpret a statute, but then fails to engage with the statutory text. The majority insists that the statute requires cancellation of "the old registration" if "the voter 'has registered' in a **[*62]** new county," Maj. Op. at 25 (quoting *Ariz. Rev. Stat. Ann. § 16-165(B)*), but the majority does not divine this temporal relationship from the text, which says nothing about an "old" and "new" registration. Rather, the majority relies on other statutes that address different situations and contain materially different language. *See id.* at 25 n.3 (discussing Arizona statutes that expressly apply to "new" registrations).

Ultimately, it doesn't matter that the majority's conclusory dismissal of the merits is wrong. It is enough, for standing purposes, that plaintiffs' statutory interpretation is at least arguable. The majority errs by requiring more.

**B**.

The majority also wrongly dismisses plaintiffs' imminent injury as "speculative," Maj. Op. at 24, and "fanciful," *id.* at 26. In doing so, the majority improperly assumes the role of factfinder and focuses on the wrong injury.

**1**.

In the district court, no party challenged plaintiffs' standing to claim that the Cancellation Provision violates the NVRA for the reasons relied upon by the majority.[6]

---

[2] While third parties may attempt to purge registrations maliciously with the intent of disenfranchising certain types of voters, that need not be the case. Indeed, the nongovernmental actors may not even be human. *See Common Cause Ind. v. Lawson, 937 F.3d 944, 948 (7th Cir. 2019)* (describing Indiana's use of "a third-party database" that "aggregates voter data from multiple states to identify potential duplicate voter registrations").

[3] Even if the Cancellation Provision did not permit registrars to cancel the newer of two registrations, as the majority finds, plaintiffs maintain that it "would still violate the NVRA" because it permits cancellation without notice to the voter.

[4] Plaintiffs sued Arizona's attorney general, secretary of state, and county recorders. The parties stipulated that the county recorders were nominal parties who would "take no position on the merits" or "oppose [the] motion for preliminary injunction." The secretary of state also requested status as a nominal party, and the district court treated her as such, leaving the attorney general as the only defendant opposing injunctive relief. In addition, YCRC intervened to defend the state laws.

[5] The Secretary of State interprets the Cancellation Provision to "codify[] existing voter registration procedures" such that county recorders "*would not* initiate voter registration cancellations based solely on information from nongovernmental third parties, because such third-party information . . . does not constitute 'credible information.'"

[6] The Attorney General argued that plaintiffs lacked standing because the Cancellation Provision merely codified existing practices that plaintiffs did not challenge. The district court rejected the Attorney General's premise, finding that the statute "is not at all identical to the [Elections Procedure Manual]."

YCRC argued that plaintiffs lacked standing to assert their *due process* challenge to the Cancellation Provision, an argument

Although we must raise doubts about our subject matter jurisdiction even when the parties do not, see *LA All. for Human Rts. v. County of Los Angeles, 14 F.4th 947, 956 (9th Cir. 2021)*, we should not resolve such jurisdictional concerns ourselves when they turn on **[*63]** factual findings appropriately made by the district court. See *Lewis v. Cont'l Bank Corp., 494 U.S. 472, 481, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)* ("[T]he evaluation of . . . factual contentions bearing upon Article III jurisdiction should not be made by this Court in the first instance."); *see also California v. Texas, 593 U.S. 659, 683, 141 S. Ct. 2104, 210 L. Ed. 2d 230 (2021)* (Thomas, J., concurring) (explaining that "a court of review, not of first view," should refrain from addressing a novel standing argument that "the lower courts did not address . . . in any detail" (quoting *Brownback v. King, 592 U.S. 209, 215 n.4, 141 S. Ct. 740, 209 L. Ed. 2d 33 (2021)*)); *Cottonwood Env't L. Ctr. v. Edwards, 86 F.4th 1255, 1265 (9th Cir. 2023)* (citing our "standard practice" of "remand[ing] for a decision in the first instance without requiring any special justification for so doing" (quoting *Detrich v. Ryan, 740 F.3d 1237, 1248 (9th Cir. 2013)* (en banc) (lead opinion))).

We routinely remand for development of jurisdictional facts when jurisdiction is unclear. *See, e.g., Hajro v. USCIS, 811 F.3d 1086, 1102 (9th Cir. 2016)* (holding that where "the factual record [was] not sufficiently developed" for the district court "to determine whether [a litigant] has standing to bring a . . . claim," the remedy is to "remand for further fact finding"; *Rivas v. Napolitano, 714 F.3d 1108, 1112-13 (9th Cir. 2013)* (remanding "for the district court to determine in the first instance whether the court has jurisdiction" because "[t]he record on appeal [was] insufficient for us to determine whether jurisdiction exists"); *Aloe Vera of Am., Inc. v. United States, 580 F.3d 867, 873 (9th Cir. 2009)* (ordering

---

the district court did not address because it granted relief on plaintiffs' NVRA claim. Standing is assessed on a claim-by-claim basis, see *TransUnion LLC v. Ramirez, 594 U.S. 413, 431, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021)*, and the two claims involve different injuries. The alleged due process injury is to voters; YCRC argued that it was speculative "that the Cancellation Provision *might* result in a person's current voter registration being cancelled." The alleged NVRA violation injures plaintiffs directly by forcing them to change their existing voter outreach programs to address the Cancellation Provision, as I detail below. In the district court, YCRC did not dispute plaintiffs' assertion that they would expend resources for that purpose, so it is unsurprising that YCRC didn't challenge plaintiffs' standing to assert an NVRA claim until we invited them to do so.

"remand . . **[*64]** . to the district court so that it can determine in the first instance whether there is sufficient evidence to establish subject matter jurisdiction" where "[t]he pleadings alone [were] inadequate to make this determination").

In *Washington Local Lodge No. 104*, two district courts granted preliminary injunctions, and on appeal we had the parties brief a jurisdictional issue that we raised sua sponte. *See International Brotherhood of Boilermakers v. International Brotherhood of Boilermakers, etc., 621 F.2d 1032, 1033-34 (9th Cir. 1980)*. Because the district courts had not considered "[t]he crucial jurisdictional question," the plaintiffs' justiciability argument lacked "factual substantiation." *Id. at 1034*. The defendant argued that the plaintiffs' jurisdictional allegations were "speculative," but we had "no way to evaluate the substance of [the plaintiffs' jurisdictional] assertion." *Id.* Therefore, we held that "we must remand to the district courts" to "make findings of fact" and "determin[e] whether federal jurisdiction exists." *Id. at 1033-34*; *see also LA All. for Human Rts., 14 F.4th at 952* (vacating injunction and remanding for further proceedings where the plaintiffs "failed to put forth evidence to establish standing" and we first raised the jurisdictional issue on appeal).

The majority takes the opposite course. Rather than deferring to any factual findings that the **[*65]** district court might make, *see, e.g., Partington v. Gedan, 961 F.2d 852, 864 (9th Cir. 1992)* ("We accept the district court's factual findings supporting the exercise of jurisdiction unless the findings are clearly erroneous."), the majority makes its own factual findings. To state the obvious, that is not an appellate court's role.

The unfairness of this approach is particularly acute here, where plaintiffs had neither reason nor opportunity to present evidence on the standing issue raised by the majority. Plaintiffs had no opportunity to make a record regarding, for example, their core activities, whether the Arizona Voter Information Database ("AVID") adequately prevents older Arizona registrations from cancelling newer ones, and whether there is any mechanism to prevent older, out-of-state registrations from cancelling newer, in-state ones. The majority makes improper factual findings on the first two issues and ignores the third altogether.[7]

---

[7] AVID does not track out-of-state registrations. It focuses on voters "moving to a different county" within Arizona and attempts to ensure that they "only have one active voter registration record in Arizona at any given time."

**2**.

The majority finds that plaintiffs "can . . . continue their core activities" unimpeded with the Cancellation Provision in effect. Maj. Op. at 24. That is directly contrary to plaintiffs' sworn declarations.

Arizona Alliance for Retired Americans ("AARA") will need to spend more time advising Arizonans **[*66]** about the process of casting their ballots because it "will not only need to ask citizens if they are registered to vote, but also whether they have any previous addresses, and whether they might still be registered to vote there." AARA "does not currently expend any resources toward identifying voters who have multiple registrations or helping voters cancel their other voter registrations." The Cancellation Provision will require it to divert scarce resources to these activities, such as by "creating a training program on how to cancel an out-of-state or out-of-county voter registration." These expenditures "would otherwise be directed toward traditional voter mobilization efforts" like helping voters register and vote.

"Voto Latino will need to divert additional time and resources to monitor for attempted voter purges in Arizona" because of the Cancellation Provision, which will "make [it] easier for third parties to engage in coordinated efforts to target Voto Latino's core constituency . . . for specious reasons." "[T]his tactic has taken place in other states," and Voto Latino "is currently engaged in efforts to prevent it." Voto Latino also "will be required to launch an educational **[*67]** campaign informing its constituents about [the Cancellation Provision] and emphasizing the need for them to check whether they have multiple voter registrations or active early voting list memberships." And like AARA, Voto Latino "will . . . need to divert its resources, including staff and volunteer time, to check whether its constituents have voter registrations in multiple states or Arizona counties and help them to cancel their non-active registrations."

The Cancellation Provision "will require Priorities [USA] to provide more grant funds to in-state partner organizations so that [it] can provide education and training" about the potential for voters to be purged from voter registration rolls without notice. In addition, Priorities USA "will spend time and funds on making voters aware that they need to determine whether they have multiple voter registrations and that they should cancel any prior registrations." Priorities USA would

spend these resources "on true voter mobilization activities" but for the Cancellation Provision.

The majority finds that plaintiffs' core activities are "register[ing] and educat[ing] voters," Maj. Op. at 24, and then dismisses these activities as "mere **[*68]** issue advocacy," *id.* at 27. How is registering voters and educating them about the voting process "issue advocacy"? For what issue are plaintiffs advocating? Would the majority describe a high school civics class as "political indoctrination"? The majority blatantly mischaracterizes the nature of plaintiffs' activities.

Even more disturbing, however, is the majority's extraordinarily narrow view of what it means for a law to "directly affect[] and interfere[] with" plaintiffs' core activities. *Hippocratic Med., 602 U.S. at 395*. The majority holds that plaintiffs lack standing because the Cancellation Provision does not prevent them from doing the exact same things in the exact same ways that they have always done. Virtually no organization could meet that test.

While plaintiffs *could* continue to register and educate voters without changing their practices in response to the Cancellation Provision, the registrations would be inadequate, and the education incomplete, under plaintiffs' view of the law. Registering to vote in Arizona does a person little good if the registration is subject to cancellation without notice because the person never knew to cancel a prior registration. When legislation renders an organization's **[*69]** core business activities inadequate or incomplete, and the organization must expend resources modifying the activities to remedy the deficiency, then the legislation plainly affects and interferes with the activities.

Under the majority's reasoning, *Havens Realty* would have come out the other way. HOME, a housing counseling organization, sued Havens Realty, which owned and operated apartment complexes, over Havens' racial steering practices. *See id.* The Supreme Court held that HOME had standing to sue Havens under the *Fair Housing Act* because "Havens had provided HOME's black employees false information about apartment availability," which "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id.* (quoting *Havens Realty, 455 U.S. at 379*).

The majority here, however, would have barred HOME from the courthouse. After all, Havens' Fair Housing Act

violations did not prevent HOMES from continuing its core activities of counseling and referring homeseekers to available housing. To be sure, the housing information was incomplete because Havens lied about vacancies at its properties, but HOME could simply have made do with Havens' racism and provided its clients with **[*70]** whatever listings it had. By trying to provide its clients complete and accurate information, HOME was merely engaging in what the majority would characterize as "issue advocacy." Fortunately, that was not the law in 1982. Unfortunately, it is now the law of the Ninth Circuit.

**3**.

We found organizational standing under materially identical circumstances in *East Bay Sanctuary Covenant v. Trump ("East Bay Sanctuary Covenant I"), 932 F.3d 742 (9th Cir. 2018)*, a case cited by plaintiffs that the majority ignores. There, four legal services organizations representing asylum-seekers sued to prevent enforcement of a rule that categorically barred asylum for migrants who crossed the southern border between ports of entry. *See id. at 761-62*. The plaintiffs argued, among other things, that the rule conflicted with the *Immigration and Naturalization Act*. *See id.* The district court enjoined the government from enforcing the rule. *See id.*

We held that the plaintiffs had organizational standing because the challenged rule would require "a diversion of resources, independent of expenses for [the] litigation, from their other initiatives." *Id. at 766*. Through declarations, the plaintiffs established that if the rule took effect, they "would be forced at the client intake stage to 'conduct detailed screenings for alternative forms of relief to facilitate referrals **[*71]** or other forms of assistance'" and, because alternative forms of relief "do not allow a principal applicant to file a derivative application for family members," the plaintiffs would "have to submit a greater number of applications for family-unit clients." *Id.* The plaintiffs also planned "to undertake[] education and outreach initiatives regarding the new rule." *Id.* We found that the diversion of plaintiffs' resources to conduct these activities, made necessary by the rule, was sufficient to establish organizational standing. *See id.*

Thus, we held that organizational plaintiffs can show a diversion of resources—and thereby establish standing—when, in response to a challenged rule or law, they will spend more time assessing the needs of

each person they serve and expend additional resources educating the population they serve. Just as the *East Bay* plaintiffs needed to spend more time screening clients for potential alternatives to asylum relief and filing a greater number of applications for such relief, plaintiffs here will need to spend more time verifying whether voters have cancelled registrations at their prior residences. And just as the *East Bay* plaintiffs needed to spend additional **[*72]** resources educating noncitizens about the new asylum rule, plaintiffs here must do the same to educate voters about the need to cancel prior registrations. By ignoring *East Bay Sanctuary Covenant I*, the majority creates an intra-circuit split. And it creates an inter-circuit split as well. *See Common Cause Ind., 937 F.3d at 954-55* (holding, under similar circumstances, that organizations had standing to challenge Indiana voting law as inconsistent with the NVRA based on a diversion-of-resources theory).

**4**.

The majority minimizes the likelihood of harm to plaintiffs by focusing on the wrong injury. Plaintiffs assert, definitively, that they will divert resources, and they explain how and why they will do so. The only assumption that plaintiffs make—an entirely reasonable one—is that voters do not always affirmatively cancel their former registrations.

Once again, the majority muddles the distinction between first- and third-party standing, identifying the injury as: "the Cancellation Provision may cause a county recorder to cancel the voter's new registration instead of the old one." Maj. Op. at 24. The majority fails to mention the lack of notice. But these are injuries to the *voter*. They are relevant only to plaintiffs' **[*73]** third-party standing. *See Common Cause Ind., 937 F.3d at 963* (Brennan, J., concurring) ("People vote, not organizations, so none of the [organizational] plaintiffs before us may cast a vote in any election."). The injury at issue—plaintiffs' diversion of resources to ensure that voters cancel prior registrations—is certain to occur if the Cancellation Provision takes effect.

Because the Cancellation Provision can be interpreted as plaintiffs fear, it makes no difference whether the current Arizona election officials adopt that interpretation. Unless a court prohibits it, nothing stops them from doing so. Voters may leave their registration status in place through multiple political administrations, so plaintiffs cannot blithely assume that no future

administration would cancel valid registrations without notice to the voter based on information from third parties that the administration deems "credible." *Ariz. Rev. Stat. Ann. § 16-165(B)*. Plaintiffs would be remiss not to divert resources now to minimize the substantial impact that a less favorable interpretation of the Cancellation Provision could have and elsewhere has had.

\* \* \*

Plaintiffs have established their organizational standing to challenge the Cancellation Provision, and the majority is clearly **[\*74]** wrong in holding otherwise.

**III**.

The district court did not abuse its discretion in preliminarily enjoining the Cancellation Provision. Because the majority does not reach this issue,[8] I will only briefly summarize why I would affirm that aspect of the injunction.

To establish their entitlement to injunctive relief, plaintiffs must show that they are likely to succeed on the merits and to suffer irreparable harm in the absence of preliminary relief, and that the balance of equities tips in their favor. *See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*; *Porretti v. Dzurenda, 11 F.4th 1037, 1050 (9th Cir. 2021)* ("The third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry when the government opposes a preliminary injunction.").

**A.**

Turning to the merits, the NVRA provides that, in general, "the name of a registrant [*i.e.*, registered voter] may not be removed from the official list of eligible voters except . . . at the request of the registrant." *52 U.S.C. § 20507(a)(3)(A)*. If the voter does not make such a request, election officials may remove her name only due to death, criminal conviction, mental incapacity,

or, as relevant here, "a change in [her] residence." *Id. § 20507(a)(4)(B)*; *see id. § 20507(a)(3)-(4)*. "A State shall not remove the name of a registrant . . . on the **[\*75]** ground that the registrant has changed residence unless the registrant" either "confirms in writing" that she has moved outside the registrar's jurisdiction or "has failed to respond" to a notice.[9] *Id. § 20507(d)(1)(A), (B)(i)*.

The Cancellation Provision plainly conflicts with the NVRA because it allows state election officials to cancel a voter's registration without input from or notice to the voter. The NVRA allows states to cancel a voter's registration due to a change in residence only pursuant to a state program that is uniform and nondiscriminatory. *Id. §52 20507(a)(4)(A), (b)(1)*. The Cancellation Provision allows an Arizona registrar to cancel a voter's registration pursuant to information provided by a third party, not pursuant to a state program, and there is no guarantee that the third party gathered the information in a uniform and nondiscriminatory way.

YCRC argues that a voter's conduct—in particular, a voter's registration in another Arizona county—amounts to a "request of the registrant" to be removed from the list of eligible voters in her original county. *Id. § 20507(a)(3)(A)*. Alternatively, YCRC contends that registering in another county amounts to "confirm[ing] in writing" that the registrant has moved outside her original **[\*76]** jurisdiction. *Id. § 20507(d)(1)(A)*.

But conduct is not a request or a confirmation; registering in another jurisdiction "is only an action that allows an inference that the voter is relinquishing her" right to vote in the original jurisdiction, and "the NVRA requires more than such an inference." *Common Cause Ind., 937 F.3d at 960*. A voter may register to vote in another jurisdiction where she temporarily resides without intending to cancel her registration in the original jurisdiction, particularly if that jurisdiction is her domicile, to which she intends to return. "While double voting is surely illegal, having two open voter registrations is a different issue entirely. In the overwhelming majority of states, it is not illegal to be registered to vote in two places." *Id.* (cleaned up).

---

[8] Judge Lee's concurrence explains why he would reverse the district court if, hypothetically, the majority had jurisdiction to consider the merits. *But see Steel Co., 523 U.S. at 101* (rejecting "a doctrine of 'hypothetical jurisdiction' that enables a court to resolve contested questions of law when its jurisdiction is in doubt").

---

[9] The notice must inform the registrant that her name will be removed from the list of eligible voters if she does not respond. *52 U.S.C. § 20507(d)(2)(A)*. In lieu of returning the notice card, she can vote in at least one of the next two federal elections to avoid having her name purged. *See id. § 20507(d)(1)(B)(ii)*.

YCRC insists that the Cancellation Provision applies only to persons with registrations in two Arizona counties and that Arizona's voting system ensures that a new Arizona registration automatically cancels the old. But the Cancellation Provision is not limited to the intrastate context. It applies whenever an Arizona county recorder learns of a voter's registration "in a different county," *Ariz. Rev. Stat. Ann. § 16-165(B)*, which could be a different county in another state. And even **[\*77]** if YCRC were correct about the Cancellation Provision's geographic scope, there would be no need for it if Arizona's system worked as perfectly as YCRC supposes. To the extent the law was designed to correct errors, it violates the NVRA by allowing for such error correction without the voter's participation.

Judge Lee argues that "[t]he NVRA says nothing about a 'state' confirming any 'initial information' it receives about a change in residence." Lee Concurrence at 41 (emphasis omitted). I agree. The "confirmation" at issue in the NVRA has nothing to do with states receiving information from third parties about a voter's registration in another jurisdiction; rather, it has to do with states *inferring* a voter's intent to be removed from the voter list due to the state's suspicion that the voter has moved and the voter's repeated failure to vote.

The NVRA provides that "the name of a registrant may not be removed from the official list of eligible voters" due to "a change in the residence of the registrant" unless the state "conduct[s] a general program" that is "in accordance with *subsections (b)*, *(c)*, and *(d)*" of *§ 20507*. *52 U.S.C. § 20507(a)(3)*, *(4)*, *(4)(B)*. Under *§ 20507(b)*, entitled "[c]onfirmation of voter registration," the NVRA provides that the **[\*78]** registrar may only remove the voter's name after "[two] or more consecutive general elections" have passed and, during that time, the voter has neither "notified the applicable registrar . . . [n]or responded . . . to the notice sent by the applicable registrar" nor "appeared to vote." *Id. § 20507(b)(2)(A)-(B)*.

*Subsection (c)* allows states to update a voter's registration records without confirmation if the voter moves within the registrar's jurisdiction and submits a change-of-address form to the Postal Service. If the voter moves out of the registrar's jurisdiction and submits a change-of-address form, the registrar must "use[] the notice procedure described in *subsection (d)(2)* to confirm the change of address." *52 U.S.C. § 20507(c)(1)(B)(ii)*.

Judge Lee's interpretation, that "the very act of filling out a form to register in another county is by itself a written confirmation of the fact that a voter has changed residence," Lee Concurrence at 42, is unmoored from the statutory text. The NVRA is extremely clear that a voter "confirms" a changed residence by contacting the registrar at the old residence or returning the notice. *See 52 U.S.C. § 20507(b)(2)(A)*. Contacting the registrar at the new residence accomplishes neither.

Judge Lee's interpretation also ignores the legislative history. **[\*79]** The purpose of requiring voter confirmation of a change of address is "to prohibit selective or discriminatory purge programs," including "lists provided by other parties." H.R. Rep. No. 103-9, at 15 (1993). Congress described *§ 20507(d)(1)(A)* specifically as providing that "[n]o State may remove the name of a voter from the rolls *due to possible change of address* unless the registrant confirms in writing to have moved out of voting jurisdiction." H.R. Rep. No. 103-66, at 21 (1993) (Conf. Rep.) (emphasis added). Thus, Congress recognized that a registrar may suspect a voter has moved, perhaps because the voter registered to vote in another jurisdiction, and Congress prohibited a purge based solely on that suspicion. The NVRA prohibits the registrar from acting until the voter confirms the move in writing or fails to respond to a notice.

In my view, the district court correctly found that plaintiffs are likely to succeed on the merits of their challenge to the Cancellation Provision.

**B**.

The district court did not abuse its discretion in finding that plaintiffs are likely to suffer irreparable harm absent an injunction against the Cancellation Provision. As the district court observed, plaintiffs "must **[\*80]** divert resources to combat the negative effects of the law," and plaintiffs cannot recover the lost use of limited resources.

Nor did the district court err in finding that the balance of equities favors plaintiffs. The district court properly "weigh[ed], in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Purcell v. Gonzalez, 549 U.S. 1, 4, 127 S. Ct. 5, 166 L. Ed. 2d 1 (2006)* (per curiam). "[T]he Supreme Court in *Purcell* did not set forth a per se prohibition against enjoining voting laws on the eve of an election." *Feldman v. Ariz. Sec'y of State's Off., 843 F.3d 366, 368 (9th Cir. 2016)* (en banc) (emphasis omitted). Here, most importantly, the district court's

2024 U.S. App. LEXIS 23963, *80

injunction does not "disrupt long standing state procedures" because it merely "preserves the status quo prior to the recent legislative action." *Id. at 368-69* (emphasis omitted).

* * *

Respectfully, I strongly dissent from the majority's conclusion that plaintiffs lack standing to challenge the Cancellation Provision, and I would affirm the district court's order enjoining it.

---

**End of Document**