AUSTIN KNUDSEN
  *Montana Attorney General*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
christian.corrigan@mt.gov

*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**MISSOULA DIVISION**

| | |
|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; CHARYN PFEUFFER; JFF PUBLICATIONS, LLC; ANNA LOUISE PETERSON; LYNSEY GRISWOLD ; PHE, INC.; AND CONVERGENCE HOLDINGS, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> AUSTIN KNUDSEN, in his official capacity as Attorney General of the State of Montana <br><br> *Defendant.* | Case No. 9:24-cv-00067-DWM <br><br> **REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT** <br><br> **\* SOVEREIGN IMMUNITY \* ASSERTED** |

# **TABLE OF CONTENTS**

ARGUMENT ................................................................................................. 1

I. Plaintiffs' claims are barred by sovereign immunity. ........................... 1

    A. As amended, SB 544 "may *only* be enforced by individuals claiming damages," not by the Attorney General. .................................. 1

    B. The Attorney General's role in issuing drivers licenses does not provide the connection to enforcement required by *Ex Parte Young*.. 4

II. Plaintiffs fails to establish their Article III standing. ........................ 10

CONCLUSION ............................................................................................. 14

CERTIFICATE OF COMPLIANCE ................................................................. 16

CERTIFICATE OF SERVICE .......................................................................... 16

# ARGUMENT

## I. Plaintiffs' claims are barred by sovereign immunity.

### A. As amended, SB 544 "may *only* be enforced by individuals claiming damages," not by the Attorney General.

Attempting to circumvent the Eleventh Amendment via *Ex Parte Young*, Plaintiffs point to the general "enforcement measures authorized by the Consumer Protection Act, see Mont. Code Ann. § 30–14–101, et seq., of which [SB 544, codified as amended at Mont. Code Ann. § 30–14–159] is but one part." Opp. 4. Plaintiffs then point to the AG's description of his authority before the Consumer Protection Act was amended:

> SB544 doesn't expressly delegate enforcement authority to Montana's Attorney General, but as head of the Department of Justice, see Mont. Code Ann. § 2-15-2001, the Attorney General is tasked with employing various enforcement measures authorized by Montana's Consumer Protection Act, id. § 30 14-101, et seq., including SB544, id. § 30-14-159. In certain in stances, id. § 30-14-103, the department of justice may initiate enforcement actions "to restrain by temporary or permanent injunction or temporary restraining order" the unlawful con duct after giving appropriate notice, id. § 30-14-111.

*Id.* (quoting ECF 18 at 4). In doing so, Plaintiffs highlight why the AG can't enforce SB 544 now.

As always, start with the basics. When a legislature amends a statute, courts "presume [the legislature] intends its amendment to have real

1

and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995); *accord Formicove, Inc. v. Burlington N., Inc.*, 207 Mont. 189, 194 (1983) ("We must assume that the legislature does not perform idle acts."). Here, SB 488 amended the Consumer Protection Act to provide that the section requiring age verification "may ***only*** be enforced by individuals claiming damages pursuant to subsection (3)." Mont. Code Ann. § 30-14-159(6) (emphasis added). Plaintiffs' construction would render that amendment a meaningless and idle act. The court cannot adopt such a construction.

Other canons reinforce that the AG now lacks power to enforce SB 544. Plaintiffs offer no response to the rule that a general provision cannot overcome the section-specific limitation in SB 544 to enforcement by individuals. *See* ECF 39 at 14 (citing *Gallatin Saddle & Harness Club v. White*, 246 Mont. 273, 276 (1990)). The legislature's use of the word "only" in Mont. Code Ann. § 30-14-159(6) similarly indicates the enforcement mechanism in Mont. Code Ann. § 30-14-159(3) is exclusive. *See Mont. Trout Unlimited v. Mont. Dep't of Natural Res. & Conservation*, 331 Mont. 483, 490 (2006) (courts "must endeavor to avoid a statutory construction that … fails to give effect to all of the words used"). And the general enforcement provisions Plaintiffs point to give power to the

"Department," but the enforcement mechanism in Mont. Code Ann. § 30-14-159 is exclusive to "individuals." That, too, must be given effect. *See Mont. Indep. Living Project v. City of Helena*, 403 Mont. 81 (2021). Each of these canons indicates that SB 488 stripped the AG of any authority he had vis-à-vis SB 544.

Plaintiffs even concede the purpose of SB 488 was "to divest the AG of enforcement authority." Opp. 1. Assuming Plaintiffs are correct, the Court must construe the amendment in furtherance of that purpose. *See Clark Fork Coal. v. Mont. Dep't of Nat. Res. & Conserv.*, 403 Mont. 225, 257 (2021). And if divestiture of any AG enforcement authority was the purpose of SB 488, the canons of construction make clear the legislature succeeded.

Tellingly, Plaintiffs provide no textual analysis of their own. Plaintiffs also don't identify a single authority supporting their claim that "the amendment did nothing to strip the AG of powers and duties conferred in these other sections of the Consumer Protection Act." Opp. 5. The canons adopted by the Montana Supreme Court yield a contrary answer, and those canons are binding on federal courts construing a Montana statute. *See Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1070-71 (9th Cir. 2020). SB

3

488 did strip the AG of whatever enforcement authority he had. The Consumer Protection Act's general enforcement provisions thus fail to provide the connection to enforcement required by *Ex Parte Young*.

> **B. The Attorney General's role in issuing drivers licenses does not provide the connection to enforcement required by *Ex Parte Young*.**

Flailing for some way to tie SB 544 to the AG, Plaintiffs continue pointing to the Montana Department of Justice's role in issuing drivers licenses. Specifically, Plaintiffs identify "the Department of Justice's charge to (1) promulgate rules governing the issuance and maintenance of state ID cards, and (2) establish a program "that allows every qualifying applicant for a driver's license the option to acquire a digital version[.]" Opp. 7.[1]

**1.** As explained in the AG's motion to dismiss, FSC et al. made this argument in the case they brought against Utah's nearly-identical age verification law. They lost. ECF 39 at 7, 15 (citing *FSC v. Anderson*, 119

---

[1] Plaintiffs don't dispute that the AG's statutory duties "to prosecute or defend appropriate cases in which the state or any officer of the state in the officer's official capacity is a party or in which the state has an interest" whenever "required by the public service," and "to give an opinion in writing" when requested, FAC ¶32 (quoting Mont. Code Ann. § 2-15-501), have no connection to SB 544. *See* ECF 39 at 13.

F. 4th 732, 736-737 (10th Cir. 2024)). Plaintiffs try to distinguish *Andersen* because the official responsible for issuing digital identification in that case was not the Utah attorney general, despite the Utah statute being otherwise essentially identical to Montana's. Opp. 7-10, 12. Of course, the official's title isn't relevant to whether he has a sufficient connection to enforcement for purposes of *Ex Parte Young*.

Just like the age verification law in *Andersen*, "nothing in [SB 544] expressly refers to [Montana's digital drivers license] or promises a state-sponsored means of age verification," and nothing mandates the AG "require the online functionality that would allow [the Montana digital drivers license] to operate as a means of complying with the Act." 119 F.4th at 737. Tracking the Tenth Circuit's analysis:

> The [AG's] authority over the [digital drivers license] does not give … effect to the Act. To begin with, the [digital drivers license] is not required to and does not currently provide for online age verification. Moreover, the Act and the [digital drivers license] exist in parallel: neither depends on the other. So even if the [digital drivers license] did provide for online age verification, the [AG] supervises that program independently from the Act and not as a means of enforcing or giving effect to the Act. And on the other hand, if the [digital drivers license] did not exist, compliance with the Act would still be possible via the other verification methods, and private parties could still assert violations of the Act.

5

*Id.* at 738. Accordingly, the AG "neither enforces nor gives effect to the allegedly unconstitutional Act for purposes of the *Ex Parte Young* exception." *Id.* at 737.

The Tenth Circuit applied a very broad interpretation of "enforcement" for purposes of *Ex Parte Young*, just like the Ninth Circuit did in the cases Plaintiffs cite. *See, e.g.*, Opp. 10 (citing *Los Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)). Indeed, the "give effect" standard Plaintiffs advocate for is the same standard the Tenth Circuit found unmet in *Andersen.* 119 F.4th at 737-738. So not only do Plaintiffs advocate an outcome that isn't supportable under Ninth Circuit law, they seek to rehash the application of that standard to an almost identical law on almost identical facts, with the upshot of inviting a naked circuit split.

**2.** The lack of connection between the AG and SB 544 becomes apparent when one contemplates what Plaintiffs would have the Court do. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) ("*WWH*"). Plaintiffs identify "a judicial decree declaring [SB 544] unconstitutional, and an injunction precluding the AG from participating in its enforcement" as the remedies they seek. Opp. 15-16. But federal courts do not act against "laws themselves." 595 U.S. at 44 (quoting *Whole Woman's*

6

*Health v. Jackson*, 141 S. Ct. 2194, 2495 (2021)). They also do not act against "participating." Rather, a federal court may do no more than "enjoin named defendants from taking specified *unlawful* actions." *Id.* (emphasis added).[2]

Plaintiffs don't identify any *unlawful* action by the AG. There is nothing unlawful about "promulgating rules governing the issuance and maintenance of state ID cards" or "establish[ing] a program 'that allows every qualifying applicant for a driver's license the option to acquire a digital version.'" Opp. 7 (quoting Mont. Code Ann. § 61-14-201(23)). Those laws simply exist in parallel to SB 544.

**3.** Plaintiffs next gripe that Montana's digital drivers license "still is not in effect, leaving consumers without a state-guaranteed option for verifying their ages online," which Plaintiffs assert provides SB 544 with

---

[2] That point is nothing new. In *Edgard v. MITE Corp.*, 457 U.S. 624 (1982), for example, the Court found a live controversy where the State of Illinois threatened to enforce a criminal statute if a lower court injunction were reversed. The Court thus implicitly rejected a dissenting argument that an injunction "would have barred the [State] from seeking either civil or criminal penalties for violations" that occurred while the injunction was in effect. *Id.* at 655-664 (Marshall, J., dissenting); *see also id.* at 647-655 (Stevens, J., concurring in part). It was the same analysis that *WWH* made express: an injunction bars specific, named defendants from undertaking specified unlawful acts; it doesn't operate against the law itself.

a "veneer of constitutionality." Opp. 7, 16. But the absence of a digital drivers license and the statute creating those licenses are not what Plaintiffs attack in their complaint. And their complaint "cannot be amended by the briefs filed … in opposition to the motion to dismiss." *Wilson v. Dep't of Transp.*, 2018 Bankr. LEXIS 540, at *16 (9th Cir. B.A.P. Feb. 26, 2018) (quoting *Gomez v. Ill. State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987)).

Perhaps the absence of a digital drivers license would provide an as-applied defense in a suit by an individual under SB 544. That does not, however, render any action by the AG unlawful, thus leaving the Court with nothing it can enjoin. Moreover, to the extent Plaintiffs are complaining about some hypothetical non-compliance with Montana law, the Eleventh Amendment bars a federal court from "instruct[ing] state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

**4.** None of the cases Plaintiffs cite suggest a different result. Both *Matsumoto v. Labrador,* 122 F.4th 787, 802-803 (9th Cir. 2024), and *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 920 (9th Cir. 2004), relied on the Idaho attorney general's discretion to directly enforce

8

the challenged law. Plaintiffs concede it was this authority for the Idaho Attorney General to "deputize himself" that provided the requisite connection to enforcement. Opp. 5-7. The same was true in *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943–44 (9th Cir. 2013), where Plaintiffs concede the requisite connection was provided by the California Attorney General's "duty to prosecute any violations of law whenever she believes that the law is not being enforced adequately." Opp. 7 n.5.

Such authority to prosecute pursuant to an unconstitutional statute is the type of unlawful conduct that is classically enjoinable under *Ex Parte Young*. Here, of course, SB 488 makes clear the AG has *no* authority to enforce SB 544. The AG's parallel authority to issue digital drivers licenses—which are not required to and does not currently provide for online age verification—are in no way analogous.

Plaintiffs' *Ex Parte Young* analysis thus principally relies on *Mecinas v. Hobbs*, 30 F. 4th 890 (9th Cir. 2022). Opp. 9-10. In *Mecinas*, the plaintiffs challenged a ballot order statute, and they named the Arizona Secretary of State as a defendant pursuant to *Ex Parte Young*. 30 F.4th at 894. The Ninth Circuit held the Secretary of State a proper defendant

9

because the officials actually responsible for printing the ballots "have no discretion in ordering candidate names" and "are bound to follow the Statute and the Election Procedures Manual, which is promulgated by the Secretary as a matter of Arizona law." *Id.* at 900. It was that statutory power to compel lower officials that led to the Secretary having the requisite connection; an injunction against her would likely alter the conduct of the officials obligated to follow the manual she published on pain of criminal penalty. *See id.* at 904. The AG has no similar direct authority here.[3]

## II. Plaintiffs fail to establish their Article III standing.

Plaintiffs correctly recognize "the causation and redressability questions dovetail with the *Ex parte Young* "connection" inquiry…." Opp. 14-15. But the failure of those Article III prongs is even more clear.

**1.** Article III standing requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly

---

[3] The AG submits that he prevails under the "give effect" standard advocated by Plaintiffs. But the AG preserves for certiorari and en banc review that the Ninth Circuit's undemanding *Ex Parte Young* jurisprudence and the associated traceability and redressability jurisprudence are inconsistent with recent Supreme Court authority, including *Murthy v. Missouri*, 603 U.S. 43 (2024); *California v. Texas*, 593 U.S. 659 (2021); and *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021).

traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, **not to the provision of law that is challenged**." *Collins v. Yellin*, 594 U.S. 220, 243 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *see also Murthy v. Missouri*, 603 U.S. 43, 73 (2024) ("[T]he plaintiffs have not shown that they are likely to face a risk of future censorship traceable to the *defendants*." (emphasis in original)).

**2.** Plaintiffs first point to "the threat that the AG will enforce the provisions of the Consumer Protection Act based on violations of" SB 544. Opp. 16. Whether any unlawful conduct by the AG is even possible merges with the statutory analysis of the AG's enforcement power after the amendments in SB 488. *See supra.* Absent enforcement authority, any harm attributable to SB 544 isn't traceable to the AG.

**3.** Plaintiffs then point to "the delayed provision of a digitized identification card that provides [SB 544] its veneer of constitutionality." Opp. 16. Again, the AG isn't obligated to provide a digitized drivers license

11

with functionality to operate as a means of complying with the Act, and, even if he is, the Eleventh Amendment bars a federal court from instructing him on how to conform his conduct to state law. *Pennhurst*, 465 U.S. at 106. Regardless, Plaintiffs' claims recite that it is "the AV law," *i.e.*, SB 544, that purportedly violates their rights. Plaintiffs don't assert any claims based on the delay in providing a digitized drivers license. That should end the inquiry.

*California v. Texas*, 593 U.S. 659 (2021), is instructive. There, Texas and several other states claimed Obamacare's minimum essential coverage requirement is unconstitutional. The plaintiffs tried to establish standing by pointing to harms arising from other, unchallenged Obamacare provisions that interacted with the challenged provision. But "[n]othing in the text of these … provisions suggest[ed] that they would not operate without" the challenged provision. *Id.* at 677. "To show that the minimum essential coverage requirement is unconstitutional would not show that enforcement of any of these other provisions violates the Constitution." *Id.* at 679. Traceability was therefore lacking. *Id.* Much the same is true here.

**4.** Seeking to dodge the traceability problem, Plaintiffs shift to redressability. Plaintiffs assert that an injunction or declaration against the AG is enough, and that "a judicial decision likely to induce or inhibit third party action in a manner favorable to the plaintiff is sufficient for redressability." Opp. 17. But that puts the cart before the horse: Plaintiffs must establish standing vis-à-vis the AG before *any* order or declaration can be made. And if the AG can't be enjoined, a declaratory judgment cannot issue. *See California*, 593 U.S. at 673 (finding no standing: a declaratory judgment "is the very kind of relief that cannot alone supply jurisdiction otherwise absent").

Contra Plaintiffs, the general rule is "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 (2013). Thus, in *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019), the Court pointed to specific evidence establishing "the predictable effect of Government action on the decisions of third parties" in finding standing. Similarly, in *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 76-78 (1978), the Court pointed to both trial testimony and legislative history establishing that an injunction against providing

13

insurance under the Price-Anderson Act would cause suppliers and shareholders to halt the construction of two nuclear facilities. Here, in contrast, Plaintiffs specifically allege their harms are tied to the risk of "ruinous liability" from a private suit. FAC ¶8, but they don't point to any allegations supporting their speculation about how potential plaintiffs would react to an order solely applicable to the AG.[4]

## CONCLUSION

Nothing in Plaintiffs' opposition changes the conclusion. Plaintiffs have had multiple bites at the sovereign immunity and jurisdictional apple. Courts have repeatedly told them their claims are barred by Eleventh Amendment sovereign immunity, they lack Article III standing, and the Supreme Court's analysis in *Whole Woman's Health* is controlling.

---

[4] In *Utah v. Evans*, 536 U.S. 452 (2002), the Court held that an injunction requiring the Secretary of Commerce to issue a new census report regarding apportionment would constitute a change in legal status between the parties, and it was "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision." In short, *Utah* reached the same result as *Department of Commerce* and *Duke Power* via the presumption of regularity. That presumption doesn't apply to the private individuals who might bring suits for damages under SB 544.

This Court should do the same, and dismiss Plaintiffs claims for those same reasons.[5]

DATED: June 18, 2025.           Respectfully submitted,

AUSTIN KNUDSEN
  *Montana Attorney General*
*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
christian.corrigan@mt.gov

---

[5] Plaintiffs fault the AG for branding FSC and its compatriots a "posse of pornographers." Opp. 1 n.1. Of course, FSC advertises itself as "the trade association of the adult entertainment industry." ECF 39 at 9. JFF alleges it "allows … producers/performers of erotic audiovisual works to publish" on its website. FAC ¶17. PHE "sells adult videos" and "streams erotic movies." FAC ¶26. O.school alleges it is confused about how much of the material on its website is "material harmful to minors." FAC ¶14. Perhaps Plaintiffs prevail. But it's not unprofessional to decline euphemisms. *See, e.g.*, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 242 (2002) ("Rather than creating original images, *pornographers* can alter innocent pictures….") (emphasis added).

15

### CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Century Schoolbook text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 3,207 words, excluding tables of content and authority, certificate of service, certificate of compliance, and exhibit index.

/s/ *Christian B. Corrigan*
CHRISTIAN B. CORRIGAN

### CERTIFICATE OF SERVICE

I hereby certify that on this date, an accurate copy of the foregoing document was served via ECF on registered counsel for Plaintiffs.

Dated: June 18, 2025     /s/ *Christian B. Corrigan*
CHRISTIAN B. CORRIGAN